# EXHIBIT A

**PEM LAW LLP**
Rajiv D. Parikh, Esq.
Kathleen Barnett Einhorn, Esq.
Jessica A. Merejo, Esq.
1 Boland Drive, Suite 101
West Orange, New Jersey 07052
Telephone: (973) 567-7832
Email: rparikh@pemlawfirm.com
        keinhorn@pemlawfirm.com
        jmerejo@pemlawfirm.com

**BOIES SCHILLER FLEXNER LLP**
Adam Shaw, Esq. (*pro hac vice*
application to be filed)
30 South Pearl Street, 12th Floor
Albany, New York 12207
Telephone: (518) 434-0600
Email: ashaw@bsfllp.com

*Attorneys for Plaintiffs*

| | |
|---|---|
| J.V., S.T., R.T., D.M., P.J., G.P., C.N., J.O., M.S.,<br><br>Plaintiff,<br><br>v.<br><br>LEXISNEXIS RISK SOLUTIONS, INC., RICHARD ROES 1-10, fictitious names of unknown individuals and ABC COMPANIES 1-10, fictitious names of unknown entities,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY ESSEX COUNTY: LAW DIVISION DOCKET NO.: ESX-L-7269-25<br><br>**<u>CIVIL ACTION</u>**<br><br><br><br>**SUMMONS** |

**FROM THE STATE OF NEW JERSEY TO:** LEXISNEXIS RISK SOLUTIONS, INC.

To the Defendants Named Above:

The plaintiffs named above (and identified in the enclosed Complaint) have filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

1

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages, or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal services Offices and Lawyer Referral services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.

/s/ Michelle M. Smith
MICHELLE M. SMITH
Clerk of the Superior Court

Dated: November 6, 2025

**Name and Address of Defendants to be Served:**

C T Corporation System
c/o LEXISNEXIS RISK SOLUTIONS, INC.
820 Bear Tavern Road
West Trenton, New Jersey 08628

2

**PEM LAW LLP**
Rajiv D. Parikh, Esq.
Kathleen Barnett Einhorn, Esq.
Jessica A. Merejo, Esq.
1 Boland Drive, Suite 101
West Orange, New Jersey 07052
Telephone: (973) 567-7832
Email: rparikh@pemlawfirm.com
       keinhorn@pemlawfirm.com
       jmerejo@pemlawfirm.com

*Attorneys for Plaintiffs*

**BOIES SCHILLER FLEXNER LLP**
Adam Shaw, Esq. (*pro hac vice* application to
be filed)
30 South Pearl Street, 12th Floor
Albany, New York 12207
Telephone: (518) 434-0600
Email: ashaw@bsfllp.com

---

| | |
|---|---|
| J.V., S.T., R.T., D.M., P.J., G.P., C.N., J.O., M.S.,<br><br>Plaintiffs,<br><br>v.<br><br>LEXISNEXIS RISK SOLUTIONS, INC., RICHARD ROES 1-10, *fictitious names of unknown individuals* and ABC COMPANIES 1-10, *fictitious names of unknown entities*,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, ESSEX COUNTY DOCKET NO.; ESX-L-_____-25<br><br>**CIVIL ACTION**<br><br>**COMPLAINT** |

## INTRODUCTION

This case is very simple. Irrespective of whether a proper security freeze has been imposed on a consumer's credit file, consumer reporting agencies have an unequivocal obligation under both Federal and State law to lift such a freeze promptly upon the consumer's request.

Here, Defendant LexisNexis Risk Solutions, Inc. and its affiliates (collectively "Defendants") failed to lift security freezes they unilaterally imposed on Plaintiffs despite each Plaintiff's repeated attempts and efforts to have Defendants remove them.

Defendants' failure to remove these security freezes, irrespective of whether they were properly placed or not, violates the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, et seq.; the New Jersey Identity Theft Prevention Act, N.J.S.A. 56:11-44, et seq.; and common law.

As set forth in more detail below, Plaintiffs, whose names have been anonymized due to their privacy and safety concerns, are all law enforcement officers who reside in New Jersey.

Defendants are consumer reporting agencies engaged in data-brokering and credit-reporting services. Defendants are each directly involved in the violations and unlawful conduct described in this Complaint.

Plaintiffs name additional fictitious defendants insofar as they are affiliates of LexisNexis's consumer reporting business. Plaintiffs expressly exclude any of LexisNexis's non-FCRA covered entities that also sell or disclose data from this Complaint.

## JURISDICTION AND VENUE

Jurisdiction and venue are proper in this Court by virtue that Plaintiffs reside in New Jersey, Defendants conduct business within New Jersey including in Essex County, and a substantial portion of the events giving rise to this action occurred within that county.

## FACTS COMMON TO ALL COUNTS

Plaintiffs are law enforcement officers and their spouses in New Jersey.

By virtue of their roles as law enforcement officers and spouses thereof, they qualify as covered persons under New Jersey state law entitled to the protections of N.J.S.A. 56:8-166.1, which is more commonly known as Daniel's Law.[1]

---

[1]    P.L. 2020, c. 125 *codified in* N.J.S.A. 47:1A-1.1, N.J.S.A. 47:1B-1, et seq., and N.J.S.A. 56:8-166.1, N.J.S.A. 2C:20-31.1.

As set forth in more detail below, Plaintiffs each personally transmitted a nondisclosure request via electronic mail to Defendants or entities related to Defendants, only seeking to prevent disclosure of their home address and/or unpublished home telephone number to **unauthorized** third parties (a "Nondisclosure Request").

Rather than complying with these lawful requests, Defendants chose to engage in an unlawful campaign of retaliation and intimidation against Plaintiffs. Instead of fulfilling their legal obligations, Defendants set into motion a campaign to, among other things, freeze Plaintiffs' credit reports, effectively blocking their access to financial, insurance, and other essential services. This deliberate retaliation punished Plaintiffs for invoking their privacy and safety rights under Daniel's Law.[2]

In written correspondence to Plaintiffs, Defendants themselves admitted that the freezes they imposed could result in denied credit, insurance underwriting failures, and barriers to accessing financial and healthcare services.

In response to this correspondence, Plaintiffs repeatedly contacted Defendants requesting removal of the freezes, only to be met with delays, denials, and misleading responses that exacerbated their hardship.

The consequences of Defendants' misconduct have been devastating. Many Plaintiffs have faced severe actual financial hardship, lost opportunities, and experienced significant emotional distress due to their inability to access their own credit. Some Plaintiffs were unable to purchase vehicles, refinance loans, or obtain necessary insurance coverage. Others were humiliated and

---

[2]    As Plaintiff Officer J.O. (amongst others) will explain herein, he called Defendants and asked why there was a freeze on his credit. The representative asked if he happened to be a cop and if he "did Daniel's Law." Officer J.O. answered yes to both questions. Defendants said that was why it was frozen.

3

frustrated when denied routine financial transactions due to the unauthorized freezes. Most spent a significant amount of time seeking to have the improper freezes lifted without success. Defendants' deliberate refusal to remove these freezes—even after Plaintiffs verified their identities multiple times—left them stranded without financial access, forcing them to make desperate pleas for resolution.

Plaintiffs now bring this action because they have exhausted all other avenues for relief. To be clear, this suit is not about whether Defendants acted in accordance with the law in placing unauthorized security freezes on Plaintiffs' consumer reports. Rather, this suit is singularly focused on the fact that despite numerous requests, Defendants have and continue to defy the law by failing to timely remove these unauthorized security freezes.

The law is clear: security freezes must be promptly lifted or removed upon request. Yet, Defendants have brazenly disregarded this requirement, inflicting harm upon these public servants and their families. The purposeful retribution, intimidation, and financial harm orchestrated by Defendants against the Plaintiff law enforcement officers—who already risk their lives in service to the public—cannot and should not be tolerated.

## THE PARTIES

I.    Plaintiff, Officer J.V.

Plaintiff J.V., whose name and address have been anonymized for security reasons, is a resident of Union, New Jersey.

Officer J.V. serves as a Detective in Essex County.

4

II.    Plaintiffs, Officer S.T. and R.T.

Plaintiffs S.T. and R.T., whose names and addresses have been anonymized for security reasons, are residents of Dumont, New Jersey.

Officer S.T. serves as the Captain in a Police Department. R.T. is his spouse.

III.    Plaintiff, Officer D.M.

Plaintiff D.M., whose name and address have been anonymized for security reasons, is a resident of Neshanic Station, New Jersey.

Officer D.M. serves as the Chief of Police with a Police Department. He has served as a police officer for approximately 40 years, and as chief for 20 years.

IV.    Plaintiff, Officer P.J.

Plaintiff P.J., whose name and address have been anonymized for security reasons, is a resident of Flemington, New Jersey.

Officer P.J. serves as a Detective in Somerset County.

V.    Plaintiff, Officer G.P.

Plaintiff G.P., whose name and address have been anonymized for security reasons, is a resident of Lacey Township, New Jersey.

Officer G.P. serves as a Detective in Monmouth County. He has served as a law enforcement officer for over 20 years and has received multiple commendations from his department in recognition of his dedication and service.

VI.     Plaintiff, Officer C.N.

Plaintiff C.N., whose name and address have been anonymized for security reasons, is a resident of Brick, New Jersey.

Officer C.N. serves as a law enforcement officer in Ocean County, where he works as a SWAT sniper.

VII.    Plaintiff, Officer J.O.

Plaintiff J.O., whose name and address have been anonymized for security reasons, is a resident of Union, New Jersey.

Officer J.O. has served as a law enforcement officer in Union County for the past nine years. He currently works in the Neighborhood Services Unit, focusing on street crimes, narcotics investigations, gang activity, and firearm-related offenses.

VIII.   Plaintiff, Officer M.S.

Plaintiff M.S., whose name and address have been anonymized for security reasons, is a resident of Woodbridge Township, New Jersey.

Officer M.S. serves as a Sergeant in Bergen County.

IX.     Defendants, ROES, and ABC Companies

Defendant LexisNexis Risk Solutions, Inc. ("LNRS") transacts business within the State of New Jersey and is registered to do business in the State of New Jersey. LNRS is registered with the New Jersey Department of the Treasury and the New Jersey Division of Revenue and Enterprise Services to do business in the State of New Jersey. LNRS has been incorporated in New Jersey since February 14, 1975. LNRS has an office in New Jersey at 300 Connell Drive, Berkeley Heights, New Jersey 07922.

6

LNRS is a corporation with its principal place of business located at 1000 Alderman Drive, Alpharetta, Georgia. LNRS engages in data-brokering and credit-reporting services and is directly involved in the violations and unlawful conduct described in this Complaint. LNRS is a credit reporting agency that issues consumer reports regulated by the FCRA. LNRS discloses or re-discloses on the Internet or otherwise makes available the home addresses and/or unpublished home telephone numbers of Covered Persons.

LNRS provides services that are specific to New Jersey. In 2017, the New Jersey Department of Gaming Enforcement accepted LNRS' application to service the New Jersey gaming sector.[3] Public information on LNRS' website shows it offers identity and age verification services to online gaming operators in New Jersey. LNRS also contracts with law enforcement agencies in New Jersey to buy access to automobile crash reports and then sells this crash report data to third parties through its product, BuyCrash.[4] LNRS has another contract with the New Jersey state government to provide "DATA ACCESS SERVICES: WEB-BASED INVESTIGATIVE AND LOCATOR DATA" from March 9, 2016 through September 8, 2025.[5] In addition, LNRS works extensively with the New Jersey Department of Labor and Workforce Development.

LNRS provides credit reporting services nationwide, including in New Jersey.

LNRS also acknowledges that it is subject to regulation in New Jersey in its privacy policies. The policies state they apply to LNRS and the "LexisNexis Risk Solutions companies."[6]

---

[3]     https://www.nj.gov/oag/ge/docs/Rulings/2017/may16_31/c4_lexis.pdf.
[4]     https://www.rlsmedia.com/article/settlement-reached-lexisnexis-over-its-failure-make-automobile-crash-report-payments; https://policereports.lexisnexis.com/ui/coverage.
[5]https://www.njstart.gov/bso/external/purchaseorder/poSummary.sdo?docId=40692&releaseNbr=0&external=true&parentUrl=close.
[6]     https://consumer.risk.lexisnexis.com/newjersey.

In one policy, LNRS details users' "Rights Under New Jersey Privacy Laws," including those under Daniel's Law, and explains what LNRS and the LexisNexis Risk Solutions companies must do to comply with New Jersey law.[7] In its U.S. Consumer Privacy Notice, LNRS asserts compliance with the New Jersey Data Privacy Act.[8]

Defendants Richard ROES 1–10 and ABC Companies 1–10 (collectively with the defendant identified above referred to as the "Defendants") are fictitious names used for currently unknown individuals and/or corporate entities involved in the violations set forth in this Complaint. These ROES and ABC Companies are organizations and entities acting as consumer reporting agencies under the FCRA. Plaintiffs have been unable to identify these entities in part due to Defendants' apparent efforts to obscure the specific corporate actors involved in and jointly responsible for Defendants' unlawful actions.

Plaintiffs are informed, and on that basis allege, that Defendants are mobilizing and coordinating their members to continue harming and exacting retribution on the judges, prosecutors, law enforcement officers, and child protective investigators in the Division of Child Protection and Permanency—as well as their immediate family members—seeking protections under Daniel's Law. Like LNRS, the ROES and ABC Companies may also know that Plaintiffs never requested a security freeze or reported an identity theft, but nevertheless are perpetuating a fraud and intimidation campaign to further industry financial interests, instead of the very important safety of the public servants of this State and their families.

---

[7]    Id.

[8]    https://risk.lexisnexis.com/state-privacy-act-notice.

# FACTS

X.     Plaintiff, Officer J.V.

In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer J.V. exercised his statutory privacy and security rights under Daniel's Law. Around early 2024, Officer J.V. sent a Nondisclosure Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available his home address and unpublished telephone number.

At no point did Officer J.V. request a security freeze on his consumer report, nor did he report an instance of identity theft pursuant to N.J.S.A. 56:11-44, et seq.[9] Nothing in the Nondisclosure Request sent by Officer J.V. to Defendants—or any other entity—contained a request for a security freeze or any report of identity theft.

Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer J.V., acting with intent, design, and malice.

A few weeks later, Defendants responded via email, acknowledging receipt of Officer J.V.'s Nondisclosure Request and confirming that it had been processed. In that same email, Defendants unilaterally imposed a security freeze on Officer J.V.'s consumer report without authorization.

Subsequently, Officer J.V. received a physical letter in the mail from Defendants at his home address, notifying him that a security freeze had been placed on his file, and that an identity theft had been reported under N.J.S.A. 56:11-44, et seq. (a "LexisNexis Security Freeze Notification Letter"):

---

[9] N.J.S.A. 56:11-44, et seq. is entitled the "Identity Theft Prevention Act."

9





LexisNexis® Consumer Center

Consumer Number: ██████

Case Number: ██████

Dear ██████████████

RE: Security Freeze Confirmation

Thank you for your request to place a security freeze on your file with LexisNexis Risk Solutions, ("LexisNexis") as provided by law in your state of residence. This letter is to confirm that a security freeze has been placed on your file.

Security freezes will be placed based on your state of residency and the customers use case. Based on this information, LexisNexis may not release your report(s) or score(s) derived for those use cases. You should be aware that applying a security freeze to your file may delay, interfere with, or prohibit the timely approval of applications you make for items such as credit, benefits, or insurance underwriting. WARNING TO PERSONS SEEKING A CREDIT FREEZE AS PERMITTED BY THE CREDIT REPORT PROTECTION ACT: YOU MAY BE DENIED CREDIT AS A RESULT OF A FREEZE PLACED ON YOUR CREDIT FILE. A security freeze does not apply to certain users of consumer reports, including those with whom you already have an existing account. These users request your file for the purpose of reviewing that account.

This security freeze is being placed on your file pursuant to the security freeze laws in your state of residence, NJ, specifically, N.J Stat. Ann. § 56 11-30, 56:11-46, 13:45F-2.1 through 13:45F-2.7, 13 45F-5 1 as of the date of this letter. If your state of residence changes, please notify LexisNexis at the number below and request an update to the applicability of your security freeze. This security freeze will remain in place indefinitely until you decide to temporarily or permanently remove the security freeze. Below you will find a unique Personal Identification Number(PIN) that you will need in the event that you choose to temporarily or permanently remove the security freeze

██████████

Should you wish to remove your security freeze, you must contact us and provide proper identification and your PIN number.

Please note that LexisNexis does not charge for security freezes.

If you have any further questions, you may contact the LexisNexis Consumer Center via email at consumer.documents@LexisNexisRisk.com or by phone at 800-456-1244. The LexisNexis Consumer Center's hours of operation are Monday – Friday from 8.00 A M. to 7:00 P.M. Eastern Time. In an effort to protect your privacy and deliver prompt service, please have your Consumer Number (located at the top of this letter) accessible when you call our support number,

LexisNexis Consumer Center
Attn: Security Freeze
P.O. Box 105108
Atlanta, GA 30348-5108

Total Pages 1 of 6                                      Page 1

On or about December 20, 2024, Officer J.V.'s vehicle began experiencing mechanical issues. At the time, Officer J.V. was recovering from surgery, and both his mother and grandmother

were battling cancer. Given the urgent need to transport himself and his family members to critical medical appointments, reliable access to a vehicle was imperative.

On December 21, 2024, Officer J.V. visited a Dodge dealership in Manhattan, New York, with intent to purchase a new vehicle. As part of the routine financing process, the dealership attempted to run a credit check on Officer J.V. However, the bank informed the dealership that a security freeze had been placed on Officer J.V.'s credit file by Defendants, preventing the completion of the transaction.

Immediately upon learning of the security freeze, Officer J.V. called Defendants and spoke with a customer service representative. The LexisNexis representative requested that Officer J.V. verify his personal information, including his full name, driver's license number, home address, social security number, and cell phone number. Despite providing all requested details, the representative informed Officer J.V. that no profile associated with his information existed in Defendants' system.

The representative then requested that Officer J.V. provide a PIN to authenticate his request. At the time, Officer J.V. did not realize he had ever received a PIN. He told the representative that he had never received or set a PIN, as he had never requested a security freeze. The representative advised that Defendants would send him a new letter containing a PIN.

Given the urgency of the situation, Officer J.V. requested to speak with a supervisor. Officer J.V. explained to the representative that he was unable to proceed with his vehicle purchase due to the unauthorized security freeze. The representative stated that no supervisor was available at that time but assured Officer J.V. that one would return his call shortly.

No supervisor called.

11

The next day, Officer J.V. called Defendants again and provided his personal information and case number. Despite this, the representative stated Defendants were still unable to authenticate his account. Frustrated and desperate for a resolution, Officer J.V. again requested to speak with a supervisor. However, he was met with the same response as before—that no supervisor was available and no immediate action could be taken. Officer J.V. reiterated the significant hardship this issue was causing, emphasizing that he was unable to purchase a vehicle, which was essential for his family's medical and daily needs.

Despite Defendants' repeated promises that a supervisor would call, no supervisor ever called Officer J.V.

Additionally, Defendants never sent Officer J.V. the promised PIN.

Instead, Officer J.V. eventually received two letters from Defendants, both dated December 22, 2024, stating that Defendants were unable to process his requests to remove the security freeze.

On December 23, 2024, Officer J.V. again called Defendants. He spoke with a different representative, provided both of his case numbers, and explained that the situation was causing extreme stress for him and his family. He emphasized that without access to a vehicle, he was unable to fulfill his daily responsibilities, including transporting his family members to critical medical appointments.

Later that day, Officer J.V. made another call to Defendants and spoke with yet another representative. He reiterated his ongoing struggle to remove the unauthorized security freeze and asked for clarification on why his credit report was frozen and why his profile could not be located or authenticated. The representative again requested that Officer J.V. verify his personal information, but despite his compliance, Defendants were still unable to authenticate his account.

The representative then instructed Officer J.V. to submit additional documentation, including a copy of his social security card and a utility bill, to prove his identity.

Officer J.V. complied with this request.

That same day, Officer J.V. was finally able to speak with a LexisNexis supervisor after multiple unsuccessful attempts. After again verifying Officer J.V.'s personal information, the supervisor was still unable to locate his profile. However, later that evening, the supervisor contacted Officer J.V. and informed him that the security freeze had been removed. When Officer J.V. asked why the freeze had been placed on his credit report without his authorization, the supervisor responded that the freeze had been imposed solely because he was enrolled in Daniel's Law.

Relieved that the issue had apparently been resolved, Officer J.V. returned to the Dodge dealership the same day to complete his vehicle purchase. However, upon attempting to proceed with the financing, the dealership informed him that the security freeze had, in fact, not been removed.

It was not until the following morning that the security freeze appeared to have been removed when the dealership was finally able to run Officer J.V.'s credit check and process his application.

Officer J.V. hopes to buy his first home soon, but he is worried that the lack of a profile for him in Defendants' systems could be an obstacle to this major purchase.

XI.    Plaintiffs, Officer S.T. and R.T.

In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer S.T. and his spouse exercised their statutory privacy and security rights under Daniel's Law. Around January 3, 2024, Officer S.T. and his spouse R.T. sent a Nondisclosure

13

Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available Officer S.T. and R.T.'s home address and unpublished telephone number.

At no point did Officer S.T. or R.T. request a security freeze on their consumer reports. Nothing in the Nondisclosure Request sent by Officer S.T. or R.T. to Defendants—or any other entity—contained a request for a security freeze or any report of identity theft.

Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer S.T. and R.T., acting with intent, design, and malice.

A few weeks later, Defendants responded via email, acknowledging receipt of Officer S.T. and R.T.'s Nondisclosure Request and confirming that it had been processed. In that same email, Defendants unilaterally imposed a security freeze on Officer S.T. and R.T.'s consumer reports without authorization.

Subsequently, Officer S.T. and R.T. received physical LexisNexis Security Freeze Notification Letters in the mail from Defendants, formally notifying them that a security freeze had been placed on each file. The letters further stated that identity thefts had been reported under N.J.S.A. 56:11-44, et seq.—a complete fabrication, as Officer S.T. and R.T. had never made such reports.

In March 2025, Officer S.T. and R.T.'s son was about to earn his driver's license. R.T. decided to give her vehicle to their son, so she needed to obtain a new vehicle for herself.

Officer S.T. and R.T. contacted their preferred broker, a close friend of 25 years, with the intent of purchasing a Stellantis Jeep priced at $3,273.75 in inception fees and $625 per monthly payment.

On March 31, 2025, the broker submitted their credit application to lease a Stellantis Jeep under R.T.'s name.

14

On April 1, 2025, the broker informed Officer S.T. and R.T. that their credit application was still pending review, but confirmed that the vehicle they intended to purchase would remain available at the same price despite the delay. On the same day, Stellantis requested an SSA-89 form to verify R.T.'s social security number.

On April 4, 2025, Officer S.T. and R.T.'s broker informed them that Stellantis was unable to verify R.T.'s identity, preventing completion of the purchase.

Officer S.T. and R.T. grew increasingly worried and upset as they had no idea why their identities could not be verified or what they could do to resolve the issue. Both Officer S.T. and R.T. maintain excellent credit scores, and neither previously had any issues accessing their credit, nor had either ever been subject to a security freeze.

After several days, the answer came from Officer S.T.'s co-worker, who suggested Stellantis' inability to verify R.T.'s identity may have been connected to the Nondisclosure Request they sent to Defendants.

R.T. promptly contacted Defendants and was told by a LexisNexis representative that a security freeze had been placed on R.T.'s credit file. After R.T. requested that Defendants remove the security freeze, Defendants promised to do so within the next 15 minutes.

Since then, Defendants have not provided R.T. with any updates on the status of the security freeze.

On April 8, 2025, Officer S.T. and R.T.'s broker informed them that the Stellantis Jeep they had sought to lease was sold and that he was unable to find a similar vehicle for sale. Officer S.T. and R.T. contacted a different broker who quoted their desired vehicle at a higher price than the original vehicle, at $3,412.90 in inception fees and $635 per monthly payment.

Frustrated with how long it was taking to lease the vehicle, Officer S.T. and R.T. reluctantly agreed to proceed with the higher quoted price. On April 11, 2025, Officer S.T. submitted the required financing application and a completed SSA-89 form to Stellantis, and awaited approval of the vehicle lease.

On April 12, 2025, Officer S.T. called Defendants to ensure his credit file was not also subject to a security freeze. To verify his identity, a LexisNexis representative asked Officer S.T. to provide his social security card. Before he had a chance to do so, on a later call, a different LexisNexis representative told Officer S.T. that his social security card was unnecessary and instead asked him to provide a copy of his driver's license. Officer S.T. complied with the latter instruction, and Defendants promised to verify his identity within 24 hours.

On April 14, 2025, two days after the initial call, Defendants confirmed Officer S.T.'s identity was verified and claimed his credit file was not subject to a security freeze.

On April 16, 2025, Officer S.T. and R.T.'s new broker informed them that Stellantis was still unable to verify Officer S.T.'s identity. The broker said he had never seen anything like this before. In hopes of helping the verification process proceed, R.T. sent the broker a utility bill that listed Officer S.T.'s and R.T.'s names and home address.

On April 17, 2025, Officer S.T. and R.T. received a physical letter in the mail from Defendants informing them that a security freeze had been placed on Officer S.T.'s file and containing a PIN that could be used to remove the security freeze. This contradicted Defendants' earlier representation to Officer S.T. that no such freeze existed.

Later that day, R.T. again contacted Defendants to remove the security freeze. Defendants requested additional identity-verifying documents. R.T. disputed the need for additional verification, expressed frustration with the hardships caused by Defendants' repeated delays in

16

removing the security freeze, and threatened to take legal action against Defendants. Defendants subsequently reversed course and claimed that the security freeze on Officer S.T.'s credit file was lifted.

The same day, Officer S.T. and R.T.'s broker informed them that their lease application was still awaiting approval due to pending fraud review. Officer S.T. and R.T. then contacted the Stellantis dealership. The dealership stated it possessed all the documents required for the lease, but expressed confusion about the delay caused by the pending fraud review.

Eventually, the fraud review was completed, and Officer S.T. and R.T. were able to lease the Stellantis Jeep. However, it took Officer S.T. and R.T. approximately 6–8 hours of dealing with phone calls and providing numerous verification documents to resolve the unauthorized security freezes, which eventually resulted in their having to purchase a more expensive vehicle. The whole process (which should have taken less than a day) took weeks, during which Officer S.T. and R.T. suffered anxiety and distress. Further, both Officer S.T. and R.T. are still worried about the status of their respective credit files and the risk of the freezes causing issues again in the future.

XII.    Plaintiff, Officer D.M.

In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer D.M. exercised his statutory privacy and security rights under Daniel's Law. Around January 2, 2024, Officer D.M. sent a Nondisclosure Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available Officer D.M.'s home address and unpublished telephone number.

At no point did Officer D.M. request a security freeze on his consumer report. Nothing in the Nondisclosure Request sent by Officer D.M. to Defendants—or any other entity—contained a request for a security freeze or any report of identity theft.

Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer D.M., acting with intent, design, and malice.

A few weeks later, Defendants responded via email, acknowledging receipt of Officer D.M.'s Nondisclosure Request and confirming that it had been processed. In that same email, Defendants unilaterally imposed a security freeze on Officer D.M.'s consumer report without authorization.

Subsequently, Officer D.M. received a physical LexisNexis Security Freeze Notification Letter in the mail from Defendants, formally notifying him that a security freeze had been placed on his file. The letter further stated that an identity theft had been reported under N.J.S.A. 56:11-44, et seq.—a complete fabrication, as Officer D.M. had never made such a report.

Officer D.M. and his spouse own a business to which a vehicle is titled. Because the vehicle was rarely used for business purposes, Officer D.M. and his spouse decided they wanted to make personal use of the vehicle for the benefit of their family.

In or around March 2025, Officer D.M. contacted his automobile insurance provider, who advised him that to do so, the vehicle should be retitled under Officer D.M.'s name. Officer D.M. retitled the vehicle and attempted to add it to his insurance. However, Officer D.M.'s insurance provider denied this request, stating that they were unable to verify Officer D.M.'s and his spouse's driver's licenses.

Now fearing that he may lose access to his vehicle insurance altogether, Officer D.M. sought to contact Defendants to ensure his insurance provider's inability to verify his driver's license was not due to a security freeze on his credit file. Officer D.M. contacted the phone number that Defendants provided online approximately 50 times but was never able to speak to a LexisNexis representative.

Officer D.M. then attempted to contact Defendants at a different phone number. Almost every time Officer D.M. called the phone number, the call would disconnect before he was able to reach a live representative. Officer D.M. was able to reach a LexisNexis representative a few times, but after identifying himself and stating that he was a law enforcement officer seeking to remove a security freeze, each representative would place Officer D.M. on hold, and the call would disconnect shortly thereafter. Despite significant time and effort, Officer D.M. was never able to discuss removing the freeze with a representative.

Growing increasingly frustrated with his inability to contact Defendants after hours of attempts, and distraught at the prospect of his family losing the insurance it its entirety, Officer D.M. tried a different strategy and obtained an abstract from the Department of Motor Vehicles at a cost of $15 per person. Fortunately, with the submission of the abstract, Officer D.M. was finally able to verify his identity with his insurance provider and add the vehicle to his personal policy.

Officer D.M. was especially surprised at his inability to easily remove the freeze since his son has a security freeze from other consumer reporting agencies (for reasons unrelated to Daniel's Law), and his son is always easily able to quickly lift and replace the freeze without complications.

As far as Officer D.M. is aware, the security freeze is still in place. Fearing for his family's financial well-being, Officer D.M. became concerned that the security freeze on his credit file resulted from his Nondisclosure Request to Defendants and even considered rescinding that request to ensure Defendants cease interfering with his credit file. Officer D.M. decided against this course of action, and he is still anxious about the future financial implications of Defendants' security freeze.

XIII.    Plaintiff, Officer P.J.

In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer P.J. exercised his statutory privacy and security rights under Daniel's Law. Around early 2024, Officer P.J. sent a Nondisclosure Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available his home address and unpublished telephone number.

At no point did Officer P.J. request a security freeze on his consumer report, nor did he report an instance of identity theft pursuant to N.J.S.A. 56:11-44, et seq. Nothing in the Nondisclosure Request sent by Officer P.J. to Defendants—or any other entity—contained a request for a security freeze or any report of identity theft.

Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer P.J., acting with intent, design, and malice.

A few weeks later, Defendants responded via email, acknowledging receipt of Officer P.J.'s Nondisclosure Request and confirming that it had been processed. In that same email, Defendants unilaterally imposed a security freeze on Officer P.J.'s consumer report without authorization.

Subsequently, Officer P.J. received a physical LexisNexis Security Freeze Notification Letter in the mail from Defendants, formally notifying him that a security freeze had been placed on his file. The letter further stated that an identity theft had been reported under N.J.S.A. 56:11-44, et seq.—a complete fabrication, as Officer P.J. had never made such a report.

In July of 2024, Officer P.J. called Defendants using the phone number provided in the LexisNexis Security Freeze Notification Letter to request the security freeze on his credit report be lifted. At that time, he needed financing to purchase a new mattress. In accordance with the process outlined by Defendants, Officer P.J. provided his PIN, verified his personal information,

and uploaded a copy of his social security card and New Jersey driver's license to the LexisNexis Dropbox. Defendants did not lift the freeze right away. After approximately two days, Defendants lifted the security freeze, allowing Officer P.J. to obtain financing and complete the purchase of the mattress. However, shortly thereafter, Defendants reinstated the security freeze.

In December 2024, Officer P.J. sought to purchase a Toyota Tacoma. Anticipating that a credit check would be required, he called Defendants on December 10, 2024, and again requested that the security freeze be lifted to facilitate the vehicle purchase. After verifying his identity, the LexisNexis representative instructed him to upload his identifying documents again. The representative advised that processing the request could take up to 24 hours. Officer P.J. also provided the representative his PIN.

Following these instructions, Officer P.J. again uploaded copies of his driver's license and Social Security card. Upon submission, Officer P.J. received an automated confirmation message via the LexisNexis web portal, indicating that the documents had been received.

That same day, Officer P.J. visited the Morristown Toyota dealership, intending to place a deposit on a specific 2022 Tacoma TRD Sport for $33,873.21 ("Desired Tacoma"). The Desired Tacoma was in pristine condition and met all of Officer P.J.'s specifications.

However, Officer P.J. was unable to proceed with the purchase due to the ongoing security freeze. Recognizing the risk that another buyer might purchase the vehicle, he inquired with a dealership sales representative about placing a deposit to hold the vehicle until the security freeze was lifted. Unfortunately, the dealership required a credit check before allowing a deposit, effectively preventing Officer P.J. from securing the Desired Tacoma.

On the morning of December 11, 2024, Officer P.J. again called Defendants, seeking an update on the removal of the security freeze. The LexisNexis representative informed him that this

21

identity verification process would take an additional 24 hours, followed by another 24-hour period before the security freeze could be lifted.

Due to the urgency of the situation, Officer P.J. requested expedited processing. The LexisNexis representative denied this request, stating that the documents he previously submitted could not be located. Eventually the representative located the documents but then claimed that Officer P.J.'s profile could not be found in the system.

Frustrated by Defendants' continued delays, Officer P.J. requested that the matter be escalated to a supervisor. He was transferred to a supervisor who verified his identity for the third time, but the LexisNexis supervisor likewise stated that his profile could not be located.

The following morning, at approximately 10 a.m., the dealership contacted Officer P.J. and informed him that the Desired Tacoma had been sold to another buyer.

Later that morning, the LexisNexis supervisor called Officer P.J. but had no update regarding the status of his request. Frustrated and realizing the financial loss caused by Defendants' deliberate conduct, Officer P.J. explained to the supervisor that due to their inability to lift the freeze in a timely manner, he had lost the opportunity to purchase his preferred vehicle. Later that afternoon, in a subsequent call with the same supervisor, the supervisor reiterated that she could not provide an estimate for when the security freeze could be lifted or escalate the issue to another department.

After approximately 5 p.m., another LexisNexis representative called Officer P.J. and informed him that the security freeze had been lifted. However, the representative noted that there were still unresolved issues with his profile.

Now left without his desired vehicle, Officer P.J. had no choice but to purchase a different vehicle. The alternative vehicle he was able to find was inferior in condition and cost more than

the Desired Tacoma. Additionally, it lacked several features that were included in the Desired Tacoma, forcing Officer P.J. to incur additional expenses to obtain those features separately.

Shortly after purchasing the replacement vehicle, Officer P.J. began experiencing electrical system issues with the vehicle. Moreover, because Defendants had only temporarily lifted the security freeze, Officer P.J. continues to face difficulties accessing his credit.

Then, on April 8, 2025, Officer P.J. called Defendants again to request another lift of his security freeze to co-sign on a business bank account with his wife. Once again, the LexisNexis representative could not find Officer P.J.'s profile in their system. The representative provided Officer P.J. with a case number and directed him to upload his driver's license and social security card to verify his identity yet again.

Officer P.J. uploaded the supporting documents to the LexisNexis portal the next morning. Defendants never confirmed receipt or followed up.

In attempt to speed up the process, on April 11, 2025 Officer P.J. returned to the portal and submitted his documentation again.   The portal immediately confirmed receipt and informed Officer P.J. that his submission was under review.

Since then, Officer P.J. has not received any communication from Defendants regarding the status of his request to lift the freeze.

As a result of this delay, Officer P.J. had to postpone the bank appointment with his wife indefinitely. While Defendants refuse to lift the freeze, Officer P.J. cannot co-sign on the business account, inhibiting his family's ability to generate income.

XIV.    Plaintiff, Officer G.P.

In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer G.P. exercised his statutory privacy and security rights under Daniel's Law. Around

23

late 2023, Officer G.P. sent a Nondisclosure Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available his home address and unpublished telephone numbers.

At no point did Officer G.P. request a security freeze on his consumer report, nor did he report an instance of identity theft pursuant to N.J.S.A. 56:11-44, et seq. Nothing in the Nondisclosure Request sent by Officer G.P. to Defendants—or any other entity—contained a request for a security freeze or any report of identity theft.

. Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer G.P., acting with intent, design, and malice.

A few weeks later, Defendants responded via email, acknowledging receipt of Officer G.P.'s Nondisclosure Request and confirming that it had been processed. In that same email, Defendants unilaterally imposed a security freeze on Officer G.P.'s consumer report without authorization.

On December 30, 2024, Officer G.P. received a letter from his homeowners' insurance provider, Narragansett Bay Insurance Company, informing him that his homeowners' insurance policy would not be renewed.

Concerned with this unexpected policy cancellation, Officer G.P. contacted Geico Insurance ("Geico") to secure a new homeowners' insurance policy. During the application process, Geico agent Jeffrey Sinicki ("Sinicki") informed Officer G.P. that he was unable to complete the application due to an issue with the insurance underwriting. Sinicki then forwarded Officer G.P. an email from Geico's underwriting department which stated: "[t]he loss report was not received due to a Hold placed on the loss report. Please have the customer contact LexisNexis at 1-800-456-1244 and include the C.L.U.E. reference number below to have the Hold lifted."

Upon receiving this information, Officer G.P. immediately called Defendants. He provided his full name, address, date of birth, Social Security number, and New Jersey driver's license number. He then explained that he was attempting to obtain homeowners' insurance but had been informed that a security freeze on his file was preventing the completion of the application.

The LexisNexis representative informed Officer G.P. that she was unable to locate his file. She then asked whether he was a covered person under Daniel's Law as a law enforcement officer or government employee. Officer G.P. confirmed that he was a law enforcement officer covered under Daniel's Law. In response, the LexisNexis representative stated that she needed to check the system again.

After reviewing the system, the representative informed Officer G.P. that she could not remove the security freeze and that his request would be forwarded to another department. When Officer G.P. asked for additional information regarding the status of the request, the LexisNexis representative refused to provide further details and stated she had no estimated timeframe for the removal of the security freeze.

The following day, on December 31, 2024, Officer G.P. sent an email to Defendants, demanding that the security freeze be removed within one hour of receipt. In the email, Officer G.P. provided the same information as in his initial Nondisclosure Request: his name, address, and phone number.

On January 2, 2025, Officer G.P. followed up with Geico agent Sinicki to determine whether Defendants had removed the freeze from his file. Sinicki replied that the security freeze was still in place and that he remained unable to process the application.

Following Sinicki's email, Officer G.P. located his physical LexisNexis Security Freeze Notification Letter which he had received in the mail from Defendants. The letter formally notified

25

him that a security freeze had been placed on his file. The letter further stated that an identity theft had been reported under N.J.S.A. 56:11-44, et seq.—a complete fabrication, as Officer G.P. had never made such a report.

That same day, Officer G.P. once again called Defendants seeking the removal of the unauthorized security freeze placed on his consumer report. As in prior calls, he was required to provide his personal information, including his full name, address, date of birth, Social Security number, and New Jersey driver's license number. Given the sensitive nature of this information, Officer G.P. felt increasingly uneasy about repeatedly disclosing it. Nevertheless, he complied and provided the case number and PIN, clearly identifying himself and authenticating his request.

After returning to the call, the representative said that under New Jersey state law, there was a freeze placed on the account. Officer G.P. stopped the representative and advised her that she and her company misinterpreted Daniel's Law.

Despite his full compliance with all authentication requirements, the LexisNexis representative informed him there was nothing she could do. She stated that the request would have to be forwarded to another department for further handling. When Officer G.P. inquired about the expected timeline for resolution, the representative admitted she could not provide an estimate.

Frustrated by the continued delays, Officer G.P. requested to speak to a LexisNexis supervisor. However, his conversation with the supervisor was nearly identical to the previous exchange with the representative. Once again, Defendants refused to take immediate action, despite Officer G.P.'s urgent need to secure homeowners' insurance. He explained that Defendants' refusal to remove the unauthorized security freeze placed him at risk of a lapse in coverage and the loss of a favorable insurance rate from Geico. Despite the serious financial consequences, the LexisNexis supervisor failed to provide any assistance or timeline for resolution.

26

After several additional days of uncertainty and financial risk, on the morning of January

9, 2025, Sinicki was finally able to run Officer G.P.'s application for homeowners' insurance.

XV.    Plaintiff, Officer C.N.

In an effort to protect himself and his family from threats arising from his law enforcement

duties, Officer C.N. exercised his statutory privacy and security rights under Daniel's Law. Around

late 2023, Officer C.N. sent a Nondisclosure Request to Defendants, requesting they cease

disclosing, re-disclosing, or otherwise making available his home address and unpublished

telephone number.

At no point did Officer C.N. request a security freeze on his consumer report, nor did he

report an instance of identity theft pursuant to N.J.S.A. 56:11-44, et seq. Nothing in the

Nondisclosure Request sent by Officer C.N. to Defendants—or any other entity—contained a

request for a security freeze or any report of identity theft.

Rather than complying with Daniel's Law, Defendants engaged in a deliberate and

retaliatory course of conduct against Officer C.N., acting with intent, design, and malice.

A few weeks later, Defendants responded via email, acknowledging receipt of Officer

C.N.'s Nondisclosure Request and confirming that it had been processed. In that same email,

Defendants unilaterally imposed a security freeze on Officer C.N.'s consumer report without

authorization.

Subsequently, Officer C.N. received a physical LexisNexis Security Freeze Notification

Letter in the mail from Defendants, formally notifying him that a security freeze had been placed

on his file. The letter further stated that an identity theft had been reported under N.J.S.A. 56:11-

44, et seq.—a complete fabrication, as Officer C.N. had never made such a report.

Over the past several months, Officer C.N. has encountered numerous financial obstacles due to Defendants' unauthorized security freeze on his consumer report.

In February 2024, Officer C.N. contacted USAA to inquire about interest rates for refinancing his truck. However, USAA was unable to retrieve the necessary financial data to provide refinancing options. When Officer C.N. inquired about the issue, USAA could not identify the reason for the problem. Unbeknownst to him at the time, Defendants' unauthorized security freeze had blocked access to his credit report, preventing him from obtaining refinancing.

Officer C.N. shares a JetBlue credit card account with his wife, which serves as the primary credit card for their household expenses. Recently, JetBlue began sending repeated requests for him to update his account information, indicating that their system could not verify his existence. Despite multiple attempts to update his account information, the issue remained unresolved. If Officer C.N. is ultimately removed as a cardholder due to his inability to authenticate his identity through a credit check, his family will suffer substantial financial hardship.

In May 2024, Officer C.N. attempted to use his BestBuy credit card to make a purchase. At the point of sale, the store representative informed him that there was an issue with his account and advised him to contact the bank. Upon calling the bank, the bank agent confirmed that there were no issues with his account and that he should have been approved to complete the purchase. Confused and embarrassed, Officer C.N. had no choice but to use a different card, forfeiting the deferred interest benefits and rewards points that he would have otherwise accumulated on the purchase.

Officer C.N. also attempted to use his Synchrony credit card to make a purchase. As before, the store representative informed him that there was a problem with his account and advised him to contact the bank. Although the bank was ultimately able to approve the transaction—since the

purchase was under $500.00—this incident was yet another consequence of the security freeze improperly placed by Defendants.

In addition to these challenges, Officer C.N. has experienced unexplained increases in his car insurance premiums with Farmers Insurance. After noticing multiple increases in his premium, he contacted Farmers Insurance to inquire about the cause. The Farmers Insurance agent was unable to provide an explanation, prompting Officer C.N. to request a credit check. The agent informed him that they were unable to access his credit file, preventing them from properly assessing his rates. Since then, his premiums have increased a third time, adding further financial strain on him and his family.

Officer C.N. also attempted to open a new credit card with Raymour & Flanigan to take advantage of a new cardholder deal to purchase a bed for his child at a discounted rate. After reviewing his personal information, the representative informed him that he was pre-approved for the store card. However, when he attempted to finalize the application, it was denied because his credit report could not be processed. As a result, he was forced to use a different card to complete the purchase, causing him to lose out on the deferred interest benefit he would have received as a new cardholder.

Due to the security freeze, Officer C.N. has also been denied multiple purchases through Affirm, a financial firm he regularly uses to make large purchases without interest. On January 2, 2025, he attempted to purchase a fireplace for $1,600 through Affirm. Despite multiple attempts, Affirm denied his purchase three times. The denial letters attributed the denial to issues verifying Officer C.N.'s identity, stating: "Our partner bank can't approve the loan you requested because we couldn't verify your identity based on the information we received."

Later that day, Officer C.N. called Defendants to demand the removal of the unauthorized security freeze. The LexisNexis representative requested that he verify his identity by providing his full name, address, date of birth, Social Security number, and PIN. Officer C.N. fully complied with these authentication procedures. Despite this, the LexisNexis representative informed him that his profile could not be created because his identifying information was frozen, rendering his account inaccessible.

Following this stressful call, Officer C.N. submitted his identification documents to Defendants, fully expecting the issue to be resolved.

However, instead of removing the security freeze, Defendants responded with yet another letter falsely informing Officer C.N. that he had once again requested a security freeze—a blatant misrepresentation of the facts:



LexisNexis® Consumer Center

Consumer Number: █████

Case Number: █████

January 06, 2025

████████████

Dear ████████████

RE: Security Freeze Confirmation

Thank you for your request to place a security freeze on your file with LexisNexis Risk Solutions, ("LexisNexis") as provided by law in your state of residence. This letter is to confirm that a security freeze has been placed on your file.

Security freezes will be placed based on your state of residency and the customers use case. Based on this information, LexisNexis may not release your report(s) or score(s) derived for those use cases. You should be aware that applying a security freeze to your file may delay, interfere with, or prohibit the timely approval of applications you make for items such as credit, benefits, or insurance underwriting. WARNING TO PERSONS SEEKING A CREDIT FREEZE AS PERMITTED BY THE CREDIT REPORT PROTECTION ACT: YOU MAY BE DENIED CREDIT AS A RESULT OF A FREEZE PLACED ON YOUR CREDIT FILE. A security freeze does not apply to certain users of consumer reports, including those with whom you already have an existing account. These users request your file for the purpose of reviewing that account.

This security freeze is being placed on your file pursuant to the security freeze laws in your state of residence, NJ, specifically, N.J. Stat. Ann. § 56:11-30, 56:11-46, 13:45F-2.1 through 13:45F-2.7, 13:45F-5.1 as of the date of this letter. If your state of residence changes, please notify LexisNexis at the number below and request an update to the applicability of your security freeze. This security freeze will remain in place indefinitely until you decide to temporarily or permanently remove the security freeze. Below you will find a unique Personal Identification Number(PIN) that you will need in the event that you choose to temporarily or permanently remove the security freeze.

████████

Should you wish to remove your security freeze, you must contact us and provide proper identification and your PIN number.

Please note that LexisNexis does not charge for security freezes.

If you have any further questions, you may contact the LexisNexis Consumer Center via email at consumer.documents@LexisNexisRisk.com or by phone at 800-456-1244. The LexisNexis Consumer Center's hours of operation are Monday – Friday from 8:00 A.M. to 7:00 P.M. Eastern Time. In an effort to protect your privacy and ensure prompt service, please have your Consumer Number (located at the top of this letter) ready when you call our support number.

LexisNexis Consumer Center
Attn: Security Freeze
P.O. Box 105108
Atlanta, GA 30348-5108

Total Pages 1 of 6                          Page 1

The ongoing security freeze poses an urgent and critical financial barrier for Officer C.N., as he is actively seeking to purchase land in another state to begin construction of his retirement home. The real estate market is highly competitive, and properties at his desired price point could become available at any moment. Due to Defendants' continued refusal to remove the unauthorized freeze, Officer C.N. faces the substantial risk of missing out on valuable opportunities simply because he cannot access his own credit report in a timely manner. Without immediate relief, he remains unable to proceed with his long-term financial and personal plans, further compounding the harm inflicted by Defendants' unlawful actions.

XVI.    Plaintiff, Officer J.O.

In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer J.O. exercised his statutory privacy and security rights under Daniel's Law. Around early 2024, Officer J.O. sent a Nondisclosure Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available his home address and unpublished telephone number.

At no point did Officer J.O. request a security freeze on his consumer report, nor did he report an instance of identity theft pursuant to N.J.S.A. 56:11-44, et seq. Nothing in the Nondisclosure Request sent by Officer J.O. to Defendants—or any other entity—contained a request for a security freeze or any report of identity theft.

Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer J.O., acting with intent, design, and malice.

A few weeks later, Defendants responded via email, acknowledging receipt of Officer J.O.'s Nondisclosure Request and confirming that it had been processed. In that same email,

Defendants unilaterally imposed a security freeze on Officer J.O.'s consumer report without authorization.

Subsequently, Officer J.O. received a physical LexisNexis Security Freeze Notification Letter in the mail from Defendants, formally notifying him that a security freeze had been placed on his file. The letter further stated that an identity theft had been reported under N.J.S.A. 56:11-44, et seq.—a complete fabrication, as Officer J.O. had never made such a report.

Officer J.O. needed to get car insurance on a new vehicle he bought. On January 13, 2025, Officer J.O. called USAA. During the process of obtaining an insurance quote, the insurance agent told Officer J.O. that she could not confirm his records through the DMV. The insurance agent told Officer J.O. to contact Defendants and ask if they had placed a freeze on his credit.

Later that day, Officer J.O. called Defendants and asked why there was a freeze on his credit. The representative asked if he happened to be a cop and if he "did Daniel's Law." Officer J.O. answered yes to both questions. The representative said that was why it was frozen.

To verify his identity, the representative asked for Officer J.O.'s PIN. Officer J.O. said he did not know his PIN. Next, the representative asked many questions to confirm Officer J.O.'s identity, all of which he answered. Regardless, the representative said they could not confirm his identity in their system. The representative then told Officer J.O. to submit a picture of his social security card and proof of address so they could generate a new PIN and unfreeze his record. Officer J.O. asked how long it would take to remove the freeze. The representative said it could take anywhere from 24–48 hours to process his paperwork, and then 15 minutes to remove the freeze.

Officer J.O. uploaded his documents on that same day, January 13, 2025. He called Defendants again the next day. Again, Officer J.O. was asked to provide personal information to

confirm his identity, which he did, and again, the representative said they could not confirm his identity and asked him to submit identifying documents, which he had already submitted.

Officer J.O. called Defendants again the day after that, trying to check on the status of the security freeze. After having essentially the same conversation as he had had the previous day, with no information about the status of removing his security freeze, Officer J.O. asked to speak to a supervisor. The supervisor told Officer J.O. that the system was not showing any profile under his name. When he asked how long it would take to fix that, they told him that there was no time frame as to when the issue would get resolved.

Officer J.O. called USAA later that day, hoping perhaps the freeze had been removed. The agent informed him that it had not, as they still could not access his information.

On January 16, 2025, Officer J.O. called Defendants yet again. There was still no profile under his name. Later that day, USAA confirmed the freeze was still in place.

Officer J.O. found a form on Defendants' website titled, "Temporarily Lift or Permanently Remove a Security Freeze on Your Credit Report."[10] He filled out and submitted this form as another attempt to get the freeze removed.

Because Defendants continued to refuse to remove the freeze, Officer J.O. spent nearly two weeks with a new car sitting in his driveway which he could not drive because he could not get insurance for it. During this time, Officer J.O. had to ask people to drive him places, pay for rideshare services, or borrow the car that his wife uses to get to work.

After nearly 2 weeks, Officer J.O. had to ask his sister to get the car insured in her name so that he could drive his own car.

---

[10]    https://forms.consumer.risk.lexisnexis.com/#/unfreeze-self.

XVII.    Plaintiff, Officer M.S.

In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer M.S. exercised his statutory privacy and security rights under Daniel's Law. Around January 3, 2024, Officer M.S. sent a Nondisclosure Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available Officer M.S.'s home address and unpublished telephone number.

At no point did Officer M.S. request a security freeze on his consumer report. Nothing in the Nondisclosure Request sent by Officer M.S. to Defendants—or any other entity—contained a request for a security freeze or any report of identity theft.

Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer M.S., acting with intent, design, and malice.

A few weeks later, Defendants responded via email, acknowledging receipt of Officer M.S.'s Nondisclosure Request and confirming that it had been processed. In that same email, Defendants unilaterally imposed a security freeze on Officer M.S.'s consumer report without authorization.

Subsequently, Officer M.S. received a physical LexisNexis Security Freeze Notification Letter in the mail from Defendants, formally notifying him that a security freeze had been placed on his file. The letter further stated that an identity theft had been reported under N.J.S.A. 56:11-44, et seq.—a complete fabrication, as Officer M.S. had never made such a report.

After his automobile insurance was cancelled in July 2024, Officer M.S. sought to purchase new insurance from AAA. The AAA agent informed Officer M.S. of a security freeze on his credit file that prevented AAA from providing him insurance. Officer M.S. needed this insurance for his personal car that he used to get to work, pick up his kids, and other everyday necessities. As he

35

was about to become entirely uninsured, it was imperative that Officer M.S. procure new insurance as soon as possible.

Officer M.S. promptly contacted Defendants. Officer M.S. informed Defendants that a security freeze on his credit file was preventing him from purchasing dearly needed car insurance from AAA and requested a temporary lift of the security freeze. Defendants temporarily lifted the security freeze, and Officer M.S. was able to procure the insurance before the freeze was reinstated.

In December 2024, Officer M.S. went to a Verizon store to open a new account and obtain new cell phones for his children through financing. Despite presenting his driver's license and law enforcement ID, Verizon was unable to verify Officer M.S.'s identity. After calling Verizon support, Officer M.S. was advised by a Verizon representative to try completing the transaction at a different store. Officer M.S. then travelled to two different Verizon stores and, again, neither store was able to verify Officer M.S.'s identity.

Verizon did not suggest the issues could have resulted from a security freeze. Officer M.S. was confused and distraught by Verizon's inability to verify his identity. At the time, he had no idea what was causing the issue.

Officer M.S. had promised to buy his two children cell phones for Christmas. Having already spent hours arguing with Verizon and driving to different stores, Officer M.S. felt he had no choice but to buy two new phones at full retail price rather than financing the purchase at a lower cost.

Later that month, Officer M.S. contacted Xfinity to add a wireless account to his pre-existing cable account. However, the Xfinity representative informed Officer M.S. that they could not open a wireless account for him because they were unable to access his credit file. The Xfinity

36

representative asked if it was possible that Officer M.S. had some sort of lock or freeze on his credit and advised that he contact Defendants.

Officer M.S. promptly contacted Defendants and informed them that a security freeze on his credit file was preventing him from making purchases with Xfinity. This began Officer M.S.'s protracted and time-consuming efforts to try to remove the unrequested security freeze. Over the course of multiple days, Officer M.S. spent many hours making approximately 50 phone calls, waiting on hold, reciting his personal identifying information over and over, uploading and reuploading identification documents, and talking to numerous LexisNexis representatives.

When Officer M.S. initially contacted Defendants, a LexisNexis representative told him that they were unable to verify his identity. The LexisNexis representative told Officer M.S. that they needed to consult with a special division to fix the issue but promised to contact Officer M.S. when it was resolved. Defendants never contacted Officer M.S. after making these assurances. Instead, Officer M.S. was forced to make multiple phone calls to Defendants to check the status of his request and continue trying to remove the security freeze.

Each time Officer M.S. tried to contact Defendants to check on the status of the security freeze, he was met with one of two responses. Sometimes, a LexisNexis representative would once again say they were referring the problem to a different division and ask Officer M.S. to call back later for an update—something he did numerous times without ever receiving the promised updates. Other times, a LexisNexis representative would promise to lift the security freeze on Officer M.S.'s account, promising timeframes ranging from 15 minutes to 30 days for the removal. However, the security freeze was never lifted.

On each of these many calls with Defendants, Officer M.S. was always asked to verify his identity. In addition to numerous verbal questions requiring him to disclose sensitive identifying

information, LexisNexis representatives also asked Officer M.S. to upload his driver's license and social security card before he was able to request a lift of the security freeze.

Eventually, a LexisNexis representative told Officer M.S. that he needed to request a PIN to remove the security freeze.

Officer M.S. was now exhausted by Defendants' persistent evasiveness and unwillingness to comply with his countless requests. Officer M.S. felt he would rather deal with the safety risks to himself and his family posed by foregoing his rights under Daniel's Law than continue losing time, money, and sanity endlessly fighting Defendants just to access his own credit.

Officer M.S. asked Defendants for a PIN so he could permanently remove the security freeze. Officer M.S. received a physical letter in the mail some time later containing the PIN. Officer M.S. followed Defendants' directions to enter the PIN via an online portal and requested a removal of the security freeze.

Unfortunately, the security freeze remained in effect. Officer M.S. was infuriated that Defendants still refused to comply with his requests.

Yet again, Officer M.S. contacted Defendants to attempt to remove the security freeze. And again, a LexisNexis representative promised to remove the security freeze within 15 minutes. Like Officer M.S.'s many other phone calls to Defendants, this promise was never fulfilled. Feeling angry, hopeless, and powerless, Officer M.S. ceased contacting Defendants.

Officer M.S. was never able to remove the security freeze. Because of Defendants' conduct, Officer M.S. feels immense anxiety about his financial well-being. As such, Officer M.S. felt the need to purchase a credit repair service from Credit Saint LLC.

Officer M.S. fears that he and his family will continue to face adverse financial implications as a result of Defendants' security freeze. Significantly, Officer M.S. is currently between housing

situations and fears that he will be prevented from procuring a lease or mortgage because of Defendants' security freeze.

After his many futile interactions with Defendants, Officer M.S. feels helpless to remedy these concerns. Officer M.S. is shocked that Defendants have enough power over his life to prevent him from buying basic necessities like insurance, wireless internet, and even Christmas presents for his children. Officer M.S. is especially disturbed that he finds himself at the whims of the Defendants merely because he asserted his rights under Daniel's Law for the sake of his own and his family's safety.

## CLAIMS AGAINST DEFENDANTS

## COUNT ONE

### VIOLATION OF 15 U.S.C. § 1681c-1 OF THE FAIR CREDIT REPORTING ACT

The allegations of the Complaint set forth above in paragraphs ¶¶ 1–188 are incorporated herein by reference as if set forth at length.

According to the direction provided in the ruling in the Memorandum and Order dated January 27, 2025, Plaintiffs bring this claim under the FCRA. *John Doe-1 v. LexisNexis Risk Solutions, Inc.*, No. 24-4566, ECF Nos. 66–67 (D.N.J. Jan. 27, 2025).

Defendants are consumer reporting agencies. As such, they are required to abide by the mandates of the FCRA and New Jersey Identity Theft Prevention Act. Defendants admit this in their communications to Plaintiffs. Defendants also say so on their websites and in their privacy policies.

Defendants have policies published online and in the LexisNexis Security Freeze Notification Letters they sent to Plaintiffs providing what a consumer needs to do and say to get a security freeze lifted or removed.

39

Upon receiving Plaintiffs' Nondisclosure Requests under Daniel's Law, Defendants (improperly) placed security freezes on each Plaintiff's consumer report. Some time later, Defendants notified Plaintiffs of these security freezes via email and mailed letters. Each letter (incorrectly) asserted that the security freeze was placed on that Plaintiff's credit file pursuant to New Jersey state law: N.J.S.A. 56:11-44, et seq.

Defendants have tacitly admitted that the only statutory basis for imposing a security freeze on a consumer's report is pursuant to the FCRA, Section 1681c-1. The same statute governs the removal of security freezes. No other provision of the FCRA could authorize Defendants' conduct, as no other sections apply here.

Plaintiffs contacted Defendants through multiple channels—phone calls, emails, and online request forms—seeking the removal of these unauthorized security freezes. Plaintiffs complied with the legal authentication requirements when submitting these requests. However, Defendants unlawfully delayed and denied these requests, refusing to remove the security freezes within the one-hour timeframe required under the FCRA.

Defendants willfully violated Section 1681c-1(i) of the FCRA in the following ways, among others:

    a. Failing to provide Plaintiffs with legally required notifications, including:

        i. Failing to inform Plaintiffs within 5 business days after placing the security freezes of the process by which they could actually authenticate their identities and remove the security freezes (section 1681c-1(i)(2)(B)(ii)(I));

    b. Unlawfully denying or delaying Plaintiffs' requests to remove the security freezes, including:

      i.    Failing to remove the security freezes within one hour of receiving direct requests for removal and proper identification by toll-free telephone or secure electronic means (section 1681c-1(i)(3)(C)(i), 1681c-1(i)(3)(E));

    c.   Unlawfully obstructing Plaintiffs' access to their consumer reports for uses that are exempt from security freezes, including:

      i.    Blocking the use of consumer reports for insurance underwriting, background screening, and identity verification purposes other than the granting of credit, or for investigating or preventing actual or potential fraud, despite the security freezes (section 1681c-1(i)(4)(H)–(J)).

Willful Violations

      Section 1681n of the FRCA states that any person who willfully fails to comply with any requirement imposed under the FCRA with respect to any consumer is liable to that consumer for: (1) any actual damages sustained by the consumer as a result of the failure or damages not less than $100 and not more than $1000; (2) such amount of punitive damages as the court may allow; and (3) the costs of any successful action to enforce liability under Section 1681n, as well as reasonable attorney's fees as determined by the court.

Negligent Violations

      In the alternative, by their above-described wrongful actions, inaction and omissions, want of ordinary care, and the resulting failure to comply with the requirements of the FCRA, Defendants negligently violated the FCRA and are liable to Plaintiffs for actual damages sustained by Plaintiffs, as well as the costs of this action and reasonable attorney's fees.

      As a result of Defendants' negligent conduct (in addition or as an alternative to what was willful), Plaintiffs have suffered actual damages.

Section 1681o of the FCRA provides that any person who negligently fails to comply with any requirement of the FCRA is liable to any consumer for any actual damages as well as the costs of an action under the FCRA and reasonable attorney's fees.

As a result of Defendants' willful and/or negligent violations, Plaintiffs have suffered economic harm, loss of financial opportunities, and other compensable damages.

Defendants' acts or omissions in causing these violations were the product of actual malice or accompanied by a wanton and willful disregard of Plaintiffs, who foreseeably could have been and were harmed by these acts or omissions. Accordingly, Plaintiffs also seek punitive damages.

## COUNT TWO

### VIOLATION OF N.J.S.A. 56:11-46 OF THE NEW JERSEY IDENTITY THEFT PREVENTION ACT

The allegations of the Complaint set forth above in paragraphs ¶¶ 1–202 are included herein as if set forth at length.

Upon receiving Plaintiffs' requests that Defendants comply with Daniel's Law, Defendants placed security freezes on Plaintiffs' consumer credit reports, in addition to misreporting identity thefts. In so doing, Defendants cited N.J.S.A. 56:11-44, et seq., otherwise known as the New Jersey Identity Theft Prevention Act.

At no point did Plaintiffs authorize Defendants to place security freezes on their consumer credit reports. And at no point did Plaintiffs report any instances of identity theft.

Plaintiffs complied with all required procedures in order to remove or lift their security freezes under N.J.S.A. 56:11-46.

Defendants have failed to comply with Plaintiffs' requests to remove or lift their security freezes within three business days, as required by N.J.S.A. 56:11-46(j).

In some cases, Defendants appear to have removed or lifted these security freezes without the consumer providing their PIN, as required by N.J.S.A. 56:11-46(j)(2).

For any violations of N.J.S.A. 56:11-46, Defendants are civilly liable to Plaintiffs pursuant to N.J.S.A. 56:11-50.

As a result of Defendants' willful failure to comply with the Identity Theft Prevention Act, Plaintiffs have suffered damages.

Defendants' deliberate and willful scheme to use unauthorized security freezes as a cudgel against covered persons who asserted their rights under Daniel's Law is precisely the sort of egregious conduct that warrants the award of punitive damages under N.J.S.A. 56:11-44, et seq.

Willful Violations

N.J.S.A. § 56:11-38 states that any person who willfully fails to comply with any requirement imposed under Section 56:11-46 with respect to any consumer is liable to that consumer for: (1) any actual damages sustained by the consumer as a result of the failure or damages not less than $100 and not more than $1000; (2) such amount of punitive damages as the court may allow; and (3) the costs of any successful action to enforce liability under this section, as well as reasonable attorney's fees as determined by the court.

Negligent Violations

In the alternative, by their above-described wrongful actions, inaction and omissions, want of ordinary care, and the resulting failure to comply with the requirements of N.J.S.A. § 56:11-46, Defendants negligently violated the statute and are liable to Plaintiffs for actual damages sustained by Plaintiffs, as well as the costs of this action and reasonable attorney's fees.

As a result of Defendants' negligent conduct (in addition or as an alternative to what was willful), Plaintiffs have suffered actual damages.

43

N.J.S.A. § 56:11-39 provides that any person who negligently fails to comply with any requirement of the act is liable to any consumer for any actual damages as well as the costs of an action under this section and reasonable attorney's fees.

As a result of Defendants' willful and/or negligent violations, Plaintiffs have suffered economic harm, loss of financial opportunities, and other compensable damages.

Defendants' acts or omissions in causing these violations were the product of actual malice or accompanied by a wanton and willful disregard of Plaintiffs, who foreseeably could have been and were harmed by these acts or omissions. Accordingly, Plaintiffs also seek punitive damages.

## COUNT THREE

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

The allegations of the Complaint set forth above in paragraphs ¶¶ 1–217 are included herein as if set forth at length.

Upon receiving Plaintiffs' requests that Defendants comply with Daniel's Law, Defendants placed security freezes on Plaintiffs' consumer reports and misreported identity thefts.

In the correspondence to Plaintiffs informing them of the security freezes and alleged identity thefts, Defendants readily acknowledged that, "[y]ou should be aware that. . . a security freeze to your file may delay, interfere with, or prohibit the timely approval of applications you make for items such as credit, benefits, or insurance underwriting. YOU MAY BE DENIED CREDIT AS A RESULT OF A FREEZE PLACED ON YOUR CREDIT FILE."

At no point did Plaintiffs authorize Defendants to place security freezes on their consumer reports.

When Defendants placed the security freezes on Plaintiffs' reports and reported identity thefts, Defendants had reason to know that Plaintiffs would have prospective economic advantages

44

in the future, such that a security freeze or misreported identity theft could seriously impair each of these relationships and cause each of the Plaintiffs significant detriment.

Defendants were made aware of these specific prospective economic advantages, as each time a Plaintiff, or an agent or representative acting on a Plaintiff's behalf, attempted to run a consumer report to obtain the product or service they needed, Defendants would be notified that the entity making the request was doing so. For instance, Defendants would receive a notification that Geico was trying to run a credit check on a Plaintiff such that Defendants notified Geico that the consumer report was frozen and thereby inaccessible. *See* 15 U.S.C. § 1681c-1(i)(2)(C).

Plaintiffs made Defendants further aware of their specific expectations of economic advantage by informing Defendants of these expectations during their efforts to remove the freezes. Plaintiffs called Defendants, desperately requesting the freezes be removed so they could acquire life insurance or homeowners' insurance or purchase a vehicle before it was sold to another consumer, and so on. Plaintiffs even identified the companies with which they planned to contract for these products or services, hoping this information could help the companies obtain access to their credit more quickly.

Plaintiffs' expectations of prospective economic advantage were reasonable. They consisted of everyday contracts for insurance underwriting, loan refinancing, purchases of vehicles, and other similar processes for which consumer reports are commonly utilized.

Having had all of this information, Defendants intentionally and with malice delayed or outright refused to remove the security freezes on Plaintiffs' accounts.

As a result of Defendants' willful interferences, Plaintiffs have suffered damages and loss of the prospective gains as described above.

Defendants' acts or omissions in causing these violations were the product of actual malice or accompanied by a wanton and willful disregard of Plaintiffs, who foreseeably could have been and were harmed by these acts or omissions. Accordingly, Plaintiffs also seek punitive damages.

Plaintiffs further seek injunctive relief compelling Defendants to immediately and permanently remove the security freezes imposed on their consumer reports and to implement corrective measures ensuring that future requests for security freeze removal are promptly and properly processed.

## COUNT FOUR

## PROMISSORY ESTOPPEL/QUASI-CONTRACT (NEW JERSEY)

The allegations of the Complaint set forth above in paragraphs ¶¶ 1–229 are included herein as if set forth at length.

Defendants, through their written policies, communications, and representations, made clear and unambiguous promises to Plaintiffs regarding the process for removing or lifting security freezes from their consumer reports.

Plaintiffs reasonably and foreseeably relied upon these promises by submitting the requested documentation, following the verification procedures set forth by Defendants, and expecting timely relief from the unauthorized security freezes placed on their consumer reports.

Defendants failed to fulfill their promises and obligations, instead delaying, obstructing, and outright refusing to remove the security freezes, despite Plaintiffs' full compliance with Defendants' stated procedures.

As a direct and proximate result of Plaintiffs' reasonable reliance on Defendants' promises, Plaintiffs suffered substantial financial harm, emotional distress, and the loss of significant

financial opportunities, including but not limited to the denial of loans, inability to complete financial transactions, and higher costs of credit and insurance.

Plaintiffs further seek injunctive relief compelling Defendants to immediately and permanently remove the security freezes imposed on their consumer reports and to implement corrective measures ensuring that future requests for security freeze removal are promptly and properly processed.

**PRAYER**

**WHEREFORE**, Plaintiffs request that Judgment be entered against Defendants as follows:

A. Awarding actual damages, which may consist of any combination of compensatory damages, consequential damages, restitution, and/or return of unjust enrichment;

B. Awarding statutory damages, at minimum, of $100 to $1000 per violation;

C. Awarding an additional amount in punitive damages, to be determined by the Court, for intentional and malicious conduct as allowed under New Jersey and federal law;

D. Awarding reasonable attorneys' fees, interest (pre and post judgment), and litigation costs incurred, as provided by 15 U.S.C. §§ 1681n, 1681o; N.J.S.A. §§ 56:11-46, 56:11-39; or any other statute or rule;

E. Declaratory relief;

F. Entering equitable or other permanent injunctive relief requiring Defendants to comply with New Jersey and federal laws; and

G. Awarding such other and further relief against Defendants as the Court deems equitable and just.

47

Respectfully Submitted,

**PEM LAW LLP**

Dated: September 24, 2025                     By: */s/ Rajiv D. Parikh*

Rajiv D. Parikh, Esq.
Kathleen Barnett Einhorn, Esq.
Jessica A. Merejo, Esq.
1 Boland Drive, Suite 101
West Orange, New Jersey 07052
Telephone: (973) 567-7832
Email: rparikh@pemlawfirm.com
          keinhorn@pemlawfirm.com
          jmerejo@pemlawfirm.com

**BOIES SCHILLER FLEXNER LLP**
Adam Shaw, Esq. (*pro hac vice* application
to be filed)
30 South Pearl Street, 12th Floor
Albany, New York 12207
Telephone: (518) 434-0600
Email: ashaw@bsfllp.com

*Attorneys for Plaintiffs*

## DESIGNATION OF TRIAL COUNSEL

The Court is advised that pursuant to New Jersey Court Rules 4:5-1(c) and 4:25-4, Rajiv

D. Parikh, Esq. is hereby designated as trial counsel for Plaintiffs in this matter.

**PEM LAW LLP**

Dated: September 24, 2025                     By: */s/ Rajiv D. Parikh*

## CERTIFICATION PURSUANT TO R. 4:5-1

I certify that, to the best of my knowledge, the matter in controversy is not the subject of

another action pending in the Superior Court of New Jersey. I certify that there are no other

48

actions or arbitration proceedings contemplated. At the present time, I do not know the names of any other parties who should be joined in this action.

**PEM LAW LLP**

Dated: September 24, 2025                    By: */s/ Rajiv D. Parikh* _____

## CERTIFICATION PURSUANT TO RULE 1:38-7(b)

Pursuant to Rule 1:38-7(b), it is hereby stated that all confidential personal identifiers have been redacted from documents now submitted to the Court and will be redacted from all documents submitted in the future.

**PEM LAW LLP**

Dated: September 24, 2025                    By: */s/ Rajiv D. Parikh* _____

# Civil Case Information Statement

**Case Details: ESSEX | Civil Part Docket# L-007269-25**

**Case Caption:** V. J.  VS LEXISNEXIS RISK SOLU TIONS, IN

**Case Initiation Date:** 09/24/2025

**Attorney Name:** JESSICA A MEREJO

**Firm Name:** PEM LAW LLP

**Address:** 1 BOLAND DR SUITE 101

WEST ORANGE NJ 07052

**Phone:** 9735775500

**Name of Party:** PLAINTIFF : V., J.

**Name of Defendant's Primary Insurance Company**

(if known): Unknown

**Case Type:** COMPLEX COMMERCIAL

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 12 JURORS

**Is this a professional malpractice case?**  NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19? NO**

**Are sexual abuse claims alleged by: J. V.? NO**

**Are sexual abuse claims alleged by: S. T.? NO**

**Are sexual abuse claims alleged by: R. T.? NO**

**Are sexual abuse claims alleged by: D. M.? NO**

**Are sexual abuse claims alleged by: P. J.? NO**

**Are sexual abuse claims alleged by: G. P.? NO**

**Are sexual abuse claims alleged by: C. N.? NO**

**Are sexual abuse claims alleged by: J. O.? NO**

**Are sexual abuse claims alleged by: M. S.? NO**

---

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
    **If yes, please identify the requested accommodation:**


**Will an interpreter be needed?** NO
    **If yes, for what language:**


**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO
**Medical Debt Claim?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

09/24/2025
Dated

/s/ JESSICA A MEREJO
Signed

**PEM LAW LLP**
Rajiv D. Parikh, Esq.
Kathleen Barnett Einhorn, Esq.
Jessica A. Merejo, Esq.
1 Boland Drive, Suite 101
West Orange, New Jersey 07052
Telephone: (973) 567-7832
Email: rparikh@pemlawfirm.com
        keinhorn@pemlawfirm.com
        jmerejo@pemlawfirm.com

**BOIES SCHILLER FLEXNER LLP**
Adam Shaw, Esq. (*pro hac vice* application to
be filed)
30 South Pearl Street, 12th Floor
Albany, New York 12207
Telephone: (518) 434-0600
Email: ashaw@bsfllp.com

*Attorneys for Plaintiffs*

| | |
|---|---|
| J.V., S.T., R.T., D.M., P.J., G.P., C.N., J.O., M.S.,<br><br>Plaintiffs,<br><br>v.<br><br>LEXISNEXIS RISK SOLUTIONS, INC., RICHARD ROES 1-10, *fictitious names of unknown individuals* and ABC COMPANIES 1-10, *fictitious names of unknown entities*,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION—ESSEX COUNTY<br>DOCKET NO. ESX-L-7269-25<br><br><br>**CBLP**<br><br><br>**AMENDED COMPLAINT** |

## INTRODUCTION

1.    This case is very simple. Irrespective of whether a proper security freeze has been imposed on a consumer's credit file, consumer reporting agencies have an unequivocal obligation under both Federal and State law to lift such a freeze promptly upon the consumer's request.

2.    Here, Defendant LexisNexis Risk Solutions, Inc. and its affiliates (collectively "Defendants") failed to lift security freezes they unilaterally imposed on Plaintiffs despite each Plaintiff's repeated attempts and efforts to have Defendants remove them.

3.      Defendants' failure to remove these security freezes, irrespective of whether they were properly placed or not, violates the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, et seq.; the New Jersey Identity Theft Prevention Act, N.J.S.A. 56:11-44, et seq.; and common law.

4.      As set forth in more detail below, Plaintiffs, whose names have been anonymized due to their privacy and safety concerns, are all law enforcement officers who reside in New Jersey.

5.      Defendants are consumer reporting agencies engaged in data-brokering and credit-reporting services. Defendants are each directly involved in the violations and unlawful conduct described in this Complaint.

6.      Plaintiffs name additional fictitious defendants insofar as they are affiliates of LexisNexis's consumer reporting business. Plaintiffs expressly exclude any of LexisNexis's non-FCRA covered entities that also sell or disclose data from this Complaint.

## JURISDICTION AND VENUE

7.      Jurisdiction and venue are proper in this Court by virtue that Plaintiffs reside in New Jersey, Defendants conduct business within New Jersey including in Essex County, and a substantial portion of the events giving rise to this action occurred within that county.

## FACTS COMMON TO ALL COUNTS

8.      Plaintiffs are law enforcement officers and their spouses in New Jersey.

9.      By virtue of their roles as law enforcement officers and spouses thereof, they qualify as covered persons under New Jersey state law entitled to the protections of N.J.S.A. 56:8-166.1, which is more commonly known as Daniel's Law.[1]

---

[1]      P.L. 2020, c. 125 codified in N.J.S.A. 47:1A-1.1, N.J.S.A. 47:1B-1, et seq., and N.J.S.A. 56:8-166.1, N.J.S.A. 2C:20-31.1.

10.     As set forth in more detail below, Plaintiffs each personally transmitted a nondisclosure request via electronic mail to Defendants or entities related to Defendants, only seeking to prevent disclosure of their home address and/or unpublished home telephone number to **unauthorized** third parties (a "Nondisclosure Request").

11.     Rather than complying with these lawful requests, Defendants chose to engage in an unlawful campaign of retaliation and intimidation against Plaintiffs. Instead of fulfilling their legal obligations, Defendants set into motion a campaign to, among other things, freeze Plaintiffs' credit reports, effectively blocking their access to financial, insurance, and other essential services. This deliberate retaliation punished Plaintiffs for invoking their privacy and safety rights under Daniel's Law.[2]

12.     In written correspondence to Plaintiffs, Defendants themselves admitted that the freezes they imposed could result in denied credit, insurance underwriting failures, and barriers to accessing financial and healthcare services.

13.     In response to this correspondence, Plaintiffs repeatedly contacted Defendants requesting removal of the freezes, only to be met with delays, denials, and misleading responses that exacerbated their hardship.

14.     The consequences of Defendants' misconduct have been devastating. Many Plaintiffs have faced severe actual financial hardship, lost opportunities, and experienced significant emotional distress due to their inability to access their own credit. Some Plaintiffs were unable to purchase vehicles, refinance loans, or obtain necessary insurance coverage. Others were

---

[2]     As Plaintiff Officer J.O. (amongst others) will explain herein, he called Defendants and asked why there was a freeze on his credit. The representative asked if he happened to be a cop and if he "did Daniel's Law." Officer J.O. answered yes to both questions. Defendants said that was why it was frozen.

3

humiliated and frustrated when denied routine financial transactions due to the unauthorized freezes. Most spent a significant amount of time seeking to have the improper freezes lifted without success. Defendants' deliberate refusal to remove these freezes—even after Plaintiffs verified their identities multiple times—left them stranded without financial access, forcing them to make desperate pleas for resolution.

15.     Plaintiffs now bring this action because they have exhausted all other avenues for relief. To be clear, this suit is not about whether Defendants acted in accordance with the law in placing unauthorized security freezes on Plaintiffs' consumer reports. Rather, this suit is singularly focused on the fact that despite numerous requests, Defendants have and continue to defy the law by failing to timely remove these unauthorized security freezes.

16.     The law is clear: security freezes must be promptly lifted or removed upon request. Yet, Defendants have brazenly disregarded this requirement, inflicting harm upon these public servants and their families. The purposeful retribution, intimidation, and financial harm orchestrated by Defendants against the Plaintiff law enforcement officers—who already risk their lives in service to the public—cannot and should not be tolerated.

## THE PARTIES

### I.     Plaintiff, Officer J.V.

17.     Plaintiff J.V., whose name and address have been anonymized for security reasons, is a resident of Union, New Jersey.

18.     Officer J.V. serves as a Detective in Essex County.

### II.     Plaintiffs, Officer S.T. and R.T.

19.     Plaintiffs S.T. and R.T., whose names and addresses have been anonymized for security reasons, are residents of Dumont, New Jersey.

4

20.     Officer S.T. serves as the Captain in a Police Department. R.T. is his spouse.

**III.    Plaintiff, Officer D.M.**

21.     Plaintiff D.M., whose name and address have been anonymized for security reasons, is a resident of Neshanic Station, New Jersey.

22.     Officer D.M. serves as the Chief of Police with a Police Department. He has served as a police officer for approximately 40 years, and as chief for 20 years.

**IV.    Plaintiff, Officer P.J.**

23.     Plaintiff P.J., whose name and address have been anonymized for security reasons, is a resident of Flemington, New Jersey.

24.     Officer P.J. serves as a Detective in Somerset County.

**V.    Plaintiff, Officer G.P.**

25.     Plaintiff G.P., whose name and address have been anonymized for security reasons, is a resident of Lacey Township, New Jersey.

26.     Officer G.P. serves as a Detective in Monmouth County. He has served as a law enforcement officer for over 20 years and has received multiple commendations from his department in recognition of his dedication and service.

**VI.    Plaintiff, Officer C.N.**

27.     Plaintiff C.N., whose name and address have been anonymized for security reasons, is a resident of Brick, New Jersey.

28.     Officer C.N. serves as a law enforcement officer in Ocean County, where he works as a SWAT sniper.

## VII.    Plaintiff, Officer J.O.

29.    Plaintiff J.O., whose name and address have been anonymized for security reasons, is a resident of Union, New Jersey.

30.    Officer J.O. has served as a law enforcement officer in Union County for the past nine years. He currently works in the Neighborhood Services Unit, focusing on street crimes, narcotics investigations, gang activity, and firearm-related offenses.

## VIII.    Plaintiff, Officer M.S.

31.    Plaintiff M.S., whose name and address have been anonymized for security reasons, is a resident of Woodbridge Township, New Jersey.

32.    Officer M.S. serves as a Sergeant in Bergen County.

## IX.    Defendants, ROES, and ABC Companies

33.    Defendant LexisNexis Risk Solutions, Inc. ("LNRS") transacts business within the State of New Jersey and is registered to do business in the State of New Jersey. LNRS is registered with the New Jersey Department of the Treasury and the New Jersey Division of Revenue and Enterprise Services to do business in the State of New Jersey. LNRS has been incorporated in New Jersey since February 14, 1975. LNRS has an office in New Jersey at 300 Connell Drive, Berkeley Heights, New Jersey 07922.

34.    LNRS is a corporation with its principal place of business located at 1000 Alderman Drive, Alpharetta, Georgia. LNRS engages in data-brokering and credit-reporting services and is directly involved in the violations and unlawful conduct described in this Complaint. LNRS is a credit reporting agency that issues consumer reports regulated by the FCRA. LNRS discloses or re-discloses on the Internet or otherwise makes available the home addresses and/or unpublished home telephone numbers of Covered Persons.

6

35.     LNRS provides services that are specific to New Jersey. In 2017, the New Jersey Department of Gaming Enforcement accepted LNRS' application to service the New Jersey gaming sector.[3] Public information on LNRS' website shows it offers identity and age verification services to online gaming operators in New Jersey. LNRS also contracts with law enforcement agencies in New Jersey to buy access to automobile crash reports and then sells this crash report data to third parties through its product, BuyCrash.[4] LNRS has another contract with the New Jersey state government to provide "DATA ACCESS SERVICES: WEB-BASED INVESTIGATIVE AND LOCATOR DATA" from March 9, 2016 through September 8, 2025.[5] In addition, LNRS works extensively with the New Jersey Department of Labor and Workforce Development.

36.     LNRS provides credit reporting services nationwide, including in New Jersey.

37.     LNRS also acknowledges that it is subject to regulation in New Jersey in its privacy policies. The policies state they apply to LNRS and the "LexisNexis Risk Solutions companies."[6] In one policy, LNRS details users' "Rights Under New Jersey Privacy Laws," including those under Daniel's Law, and explains what LNRS and the LexisNexis Risk Solutions companies must do to comply with New Jersey law.[7] In its U.S. Consumer Privacy Notice, LNRS asserts compliance with the New Jersey Data Privacy Act.[8]

---

[3]      https://www.nj.gov/oag/ge/docs/Rulings/2017/may16_31/c4_lexis.pdf.
[4]      https://www.rlsmedia.com/article/settlement-reached-lexisnexis-over-its-failure-make-automobile-crash-report-payments; https://policereports.lexisnexis.com/ui/coverage.
[5]https://www.njstart.gov/bso/external/purchaseorder/poSummary.sdo?docId=40692&releaseNbr=0&external=true&parentUrl=close.
[6]      https://consumer.risk.lexisnexis.com/newjersey.
[7]      Id.
[8]      https://risk.lexisnexis.com/state-privacy-act-notice.

38.    Defendants Richard ROES 1–10 and ABC Companies 1–10 (collectively with the defendant identified above referred to as the "Defendants") are fictitious names used for currently unknown individuals and/or corporate entities involved in the violations set forth in this Complaint. These ROES and ABC Companies are organizations and entities acting as consumer reporting agencies under the FCRA. Plaintiffs have been unable to identify these entities in part due to Defendants' apparent efforts to obscure the specific corporate actors involved in and jointly responsible for Defendants' unlawful actions.

39.    Plaintiffs are informed, and on that basis allege, that Defendants are mobilizing and coordinating their members to continue harming and exacting retribution on the judges, prosecutors, law enforcement officers, and child protective investigators in the Division of Child Protection and Permanency—as well as their immediate family members—seeking protections under Daniel's Law. Like LNRS, the ROES and ABC Companies may also know that Plaintiffs never requested a security freeze or reported an identity theft, but nevertheless are perpetuating a fraud and intimidation campaign to further industry financial interests, instead of the very important safety of the public servants of this State and their families.

## FACTS

### I.    Plaintiff, Officer J.V.

40.    In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer J.V. exercised his statutory privacy and security rights under Daniel's Law. Around early 2024, Officer J.V. sent a Nondisclosure Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available his home address and unpublished telephone number.

8

41.    At no point did Officer J.V. request a security freeze on his consumer report, nor did he report an instance of identity theft pursuant to N.J.S.A. 56:11-44, et seq.[9] Nothing in the Nondisclosure Request sent by Officer J.V. to Defendants—or any other entity—contained a request for a security freeze or any report of identity theft.

42.    Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer J.V., acting with intent, design, and malice.

43.    A few weeks later, Defendants responded via email, acknowledging receipt of Officer J.V.'s Nondisclosure Request and confirming that it had been processed. In that same email, Defendants unilaterally imposed a security freeze on Officer J.V.'s consumer report without authorization.

44.    Subsequently, Officer J.V. received a physical letter in the mail from Defendants at his home address, notifying him that a security freeze had been placed on his file, and that an identity theft had been reported under N.J.S.A. 56:11-44, et seq. (a "LexisNexis Security Freeze Notification Letter"):

---

[9] N.J.S.A. 56:11-44, et seq. is entitled the "Identity Theft Prevention Act."

9



**LexisNexis**

LexisNexis® Consumer Center

Consumer Number: █████████

Case Number: █████████

Dear █████████

RE  Security Freeze Confirmation

Thank you for your request to place a security freeze on your file with LexisNexis Risk Solutions, ("LexisNexis") as provided by law in your state of residence. This letter is to confirm that a security freeze has been placed on your file.

Security freezes will be placed based on your state of residency and the customers use case. Based on this information, LexisNexis may not release your report(s) or score(s) derived for those use cases. You should be aware that applying a security freeze to your file may delay, interfere with, or prohibit the timely approval of applications you make for items such as credit, benefits, or insurance underwriting. WARNING TO PERSONS SEEKING A CREDIT FREEZE AS PERMITTED BY THE CREDIT REPORT PROTECTION ACT: YOU MAY BE DENIED CREDIT AS A RESULT OF A FREEZE PLACED ON YOUR CREDIT FILE. A security freeze does not apply to certain users of consumer reports, including those with whom you already have an existing account. These users request your file for the purpose of reviewing that account.

This security freeze is being placed on your file pursuant to the security freeze laws in your state of residence. NJ, specifically, N.J. Stat. Ann. § 56.11-30, 56·11-46, 13:45F-2,1 through 13:45F-2 7, 13·45F-5.1 as of the date of this letter.If your state of residence changes, please notify LexisNexis at the number below and request an update to the applicability of your security freeze.This security freeze will remain in place indefinitely until you decide to temporarily or permanently remove the security freeze.Below you will find a unique Personal Identification Number(PIN) that you will need in the event that you choose to temporarily or permanently remove the security freeze

Should you wish to remove your security freeze, you must contact us and provide proper identification and your PIN number

Please note that LexisNexis does not charge for security freezes.

If you have any further questions, you may contact the LexisNexis Consumer Center via email at consumer.documents@LexisNexisRisk.com or by phone at 800-456-1244. The LexisNexis Consumer Center's hours of operation are Monday – Friday from 8:00 A.M. to 7:00 P.M. Eastern Time. In an effort to protect your privacy and deliver prompt service, please have your Consumer Number (located at the top of this letter) accessible when you call our support number.

LexisNexis Consumer Center
Attn: Security Freeze
P.O. Box 105108
Atlanta, GA 30348-5108

Total Pages  1  of 6                           Page 1

45.     On or about December 20, 2024, Officer J.V.'s vehicle began experiencing mechanical issues. At the time, Officer J.V. was recovering from surgery, and both his mother and

10

grandmother were battling cancer. Given the urgent need to transport himself and his family members to critical medical appointments, reliable access to a vehicle was imperative.

46.     On December 21, 2024, Officer J.V. visited a Dodge dealership in Manhattan, New York, with intent to purchase a new vehicle. As part of the routine financing process, the dealership attempted to run a credit check on Officer J.V. However, the bank informed the dealership that a security freeze had been placed on Officer J.V.'s credit file by Defendants, preventing the completion of the transaction.

47.     Immediately upon learning of the security freeze, Officer J.V. called Defendants and spoke with a customer service representative. The LexisNexis representative requested that Officer J.V. verify his personal information, including his full name, driver's license number, home address, social security number, and cell phone number. Despite providing all requested details, the representative informed Officer J.V. that no profile associated with his information existed in Defendants' system.

48.     The representative then requested that Officer J.V. provide a PIN to authenticate his request. At the time, Officer J.V. did not realize he had ever received a PIN. He told the representative that he had never received or set a PIN, as he had never requested a security freeze. The representative advised that Defendants would send him a new letter containing a PIN.

49.     Given the urgency of the situation, Officer J.V. requested to speak with a supervisor. Officer J.V. explained to the representative that he was unable to proceed with his vehicle purchase due to the unauthorized security freeze. The representative stated that no supervisor was available at that time but assured Officer J.V. that one would return his call shortly.

50.     No supervisor called.

51.     The next day, Officer J.V. called Defendants again and provided his personal information and case number. Despite this, the representative stated Defendants were still unable to authenticate his account. Frustrated and desperate for a resolution, Officer J.V. again requested to speak with a supervisor. However, he was met with t e same response as before—that no supervisor was available and no immediate action could be taken. Officer J.V. reiterated the significant hardship this issue was causing, emphasizing that he was unable to purchase a vehicle, which was essential for his family's medical and daily needs.

52.     Despite Defendants' repeated promises that a supervisor would call, no supervisor ever called Officer J.V.

53.     Additionally, Defendants never sent Officer J.V. the promised PIN.

54.     Instead, Officer J.V. eventually received two letters from Defendants, both dated December 22, 2024, stating that Defendants were unable to process his requests to remove the security freeze.

55.     On December 23, 2024, Officer J.V. again called Defendants. He spoke with a different representative, provided both of his case numbers, and explained that the situation was causing extreme stress for him and his family. He emphasized that without access to a vehicle, he was unable to fulfill his daily responsibilities, including transporting his family members to critical medical appointments.

56.     Later that day, Officer J.V. made another call to Defendants and spoke with yet another representative. He reiterated his ongoing struggle to remove the unauthorized security freeze and asked for clarification on why his credit report was frozen and why his profile could not be located or authenticated. The representative again requested that Officer J.V. verify his personal information, but despite his compliance, Defendants were still unable to authenticate his

account. The representative then instructed Officer J.V. to submit additional documentation, including a copy of his social security card and a utility bill, to prove his identity.

57.     Officer J.V. complied with this request.

58.     That same day, Officer J.V. was finally able to speak with a LexisNexis supervisor after multiple unsuccessful attempts. After again verifying Officer J.V.'s personal information, the supervisor was still unable to locate his profile. However, later that evening, the supervisor contacted Officer J.V. and informed him that the security freeze had been removed. When Officer J.V. asked why the freeze had been placed on his credit report without his authorization, the supervisor responded that the freeze had been imposed solely because he was enrolled in Daniel's Law.

59.     Relieved that the issue had apparently been resolved, Officer J.V. returned to the Dodge dealership the same day to complete his vehicle purchase. However, upon attempting to proceed with the financing, the dealership informed him that the security freeze had, in fact, not been removed.

60.     It was not until the following morning that the security freeze appeared to have been removed when the dealership was finally able to run Officer J.V.'s credit check and process his application.

61.     Officer J.V. hopes to buy his first home soon, but he is worried that the lack of a profile for him in Defendants' systems could be an obstacle to this major purchase.

**II.     Plaintiffs, Officer S.T. and R.T.**

62.     In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer S.T. and his spouse exercised their statutory privacy and security rights under Daniel's Law. Around January 3, 2024, Officer S.T. and his spouse R.T. sent a Nondisclosure

13

Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available Officer S.T. and R.T.'s home address and unpublished telephone number.

63.     At no point did Officer S.T. or R.T. request a security freeze on their consumer reports. Nothing in the Nondisclosure Request sent by Officer S.T. or R.T. to Defendants—or any other entity—contained a request for a security freeze or any report of identity theft.

64.     Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer S.T. and R.T., acting with intent, design, and malice.

65.     A few weeks later, Defendants responded via email, acknowledging receipt of Officer S.T. and R.T.'s Nondisclosure Request and confirming that it had been processed. In that same email, Defendants unilaterally imposed a security freeze on Officer S.T. and R.T.'s consumer reports without authorization.

66.     Subsequently, Officer S.T. and R.T. received physical LexisNexis Security Freeze Notification Letters in the mail from Defendants, formally notifying them that a security freeze had been placed on each file. The letters further stated that identity thefts had been reported under N.J.S.A. 56:11-44, et seq.—a complete fabrication, as Officer S.T. and R.T. had never made such reports.

67.     In March 2025, Officer S.T. and R.T.'s son was about to earn his driver's license. R.T. decided to give her vehicle to their son, so she needed to obtain a new vehicle for herself.

68.     Officer S.T. and R.T. contacted their preferred broker, a close friend of 25 years, with the intent of purchasing a Stellantis Jeep priced at $3,273.75 in inception fees and $625 per monthly payment.

69.     On March 31, 2025, the broker submitted their credit application to lease a Stellantis Jeep under R.T.'s name.

70.    On April 1, 2025, the broker informed Officer S.T. and R.T. that their credit application was still pending review, but confirmed that the vehicle they intended to purchase would remain available at the same price despite the delay. On the same day, Stellantis requested an SSA-89 form to verify R.T.'s social security number.

71.    On April 4, 2025, Officer S.T. and R.T.'s broker informed them that Stellantis was unable to verify R.T.'s identity, preventing completion of the purchase.

72.    Officer S.T. and R.T. grew increasingly worried and upset as they had no idea why their identities could not be verified or what they could do to resolve the issue. Both Officer S.T. and R.T. maintain excellent credit scores, and neither previously had any issues accessing their credit, nor had either ever been subject to a security freeze.

73.    After several days, the answer came from Officer S.T.'s co-worker, who suggested Stellantis' inability to verify R.T.'s identity may have been connected to the Nondisclosure Request they sent to Defendants.

74.    R.T. promptly contacted Defendants and was told by a LexisNexis representative that a security freeze had been placed on R.T.'s credit file. After R.T. requested that Defendants remove the security freeze, Defendants promised to do so within the next 15 minutes.

75.    Since then, Defendants have not provided R.T. with any updates on the status of the security freeze.

76.    On April 8, 2025, Officer S.T. and R.T.'s broker informed them that the Stellantis Jeep they had sought to lease was sold and that he was unable to find a similar vehicle for sale. Officer S.T. and R.T. contacted a different broker who quoted their desired vehicle at a higher price than the original vehicle, at $3,412.90 in inception fees and $635 per monthly payment.

77.     Frustrated with how long it was taking to lease the vehicle, Officer S.T. and R.T. reluctantly agreed to proceed with the higher quoted price. On April 11, 2025, Officer S.T. submitted the required financing application and a completed SSA-89 form to Stellantis, and awaited approval of the vehicle lease.

78.     On April 12, 2025, Officer S.T. called Defendants to ensure his credit file was not also subject to a security freeze. To verify his identity, a LexisNexis representative asked Officer S.T. to provide his social security card. Before he had a chance to do so, on a later call, a different LexisNexis representative told Officer S.T. that his social security card was unnecessary and instead asked him to provide a copy of his driver's license. Officer S.T. complied with the latter instruction, and Defendants promised to verify his identity within 24 hours.

79.     On April 14, 2025, two days after the initial call, Defendants confirmed Officer S.T.'s identity was verified and claimed his credit file was not subject to a security freeze.

80.     On April 16, 2025, Officer S.T. and R.T.'s new broker informed them that Stellantis was still unable to verify Officer S.T.'s identity. The broker said he had never seen anything like this before. In hopes of helping the verification process proceed, R.T. sent the broker a utility bill that listed Officer S.T.'s and R.T.'s names and home address.

81.     On April 17, 2025, Officer S.T. and R.T. received a physical letter in the mail from Defendants informing them that a security freeze had been placed on Officer S.T.'s file and containing a PIN that could be used to remove the security freeze. This contradicted Defendants' earlier representation to Officer S.T. that no such freeze existed.

82.     Later that day, R.T. again contacted Defendants to remove the security freeze. Defendants requested additional identity-verifying documents. R.T. disputed the need for additional verification, expressed frustration with the hardships caused by Defendants' repeated

16

delays in removing the security freeze, and threatened to take legal action against Defendants. Defendants subsequently reversed course and claimed that the security freeze on Officer S.T.'s credit file was lifted.

83.    The same day, Officer S.T. and R.T.'s broker informed them that their lease application was still awaiting approval due to pending fraud review. Officer S.T. and R.T. then contacted the Stellantis dealership. The dealership stated it possessed all the documents required for the lease, but expressed confusion about the delay caused by the pending fraud review.

84.    Eventually, the fraud review was completed, and Officer S.T. and R.T. were able to lease the Stellantis Jeep. However, it took Officer S.T. and R.T. approximately 6–8 hours of dealing with phone calls and providing numerous verification documents to resolve the unauthorized security freezes, which eventually resulted in their having to purchase a more expensive vehicle. The whole process (which should have taken less than a day) took weeks, during which Officer S.T. and R.T. suffered anxiety and distress. Further, both Officer S.T. and R.T. are still worried about the status of their respective credit files and the risk of the freezes causing issues again in the future.

**III.    Plaintiff, Officer D.M.**

85.    In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer D.M. exercised his statutory privacy and security rights under Daniel's Law. Around January 2, 2024, Officer D.M. sent a Nondisclosure Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available Officer D.M.'s home address and unpublished telephone number.

86.     At no point did Officer D.M. request a security freeze on his consumer report. Nothing in the Nondisclosure Request sent by Officer D.M. to Defendants—or any other entity— contained a request for a security freeze or any report of identity theft.

87.     Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer D.M., acting with intent, design, and malice.

88.     A few weeks later, Defendants responded via email, acknowledging receipt of Officer D.M.'s Nondisclosure Request and confirming that it had been processed. In that same email, Defendants unilaterally imposed a security freeze on Officer D.M.'s consumer report without authorization.

89.     Subsequently, Officer D.M. received a physical LexisNexis Security Freeze Notification Letter in the mail from Defendants, formally notifying him that a security freeze had been placed on his file. The letter further stated that an identity theft had been reported under N.J.S.A. 56:11-44, et seq.—a complete fabrication, as Officer D.M. had never made such a report.

90.     Officer D.M. and his spouse own a business to which a vehicle is titled. Because the vehicle was rarely used for business purposes, Officer D.M. and his spouse decided they wanted to make personal use of the vehicle for the benefit of their family.

91.     In or around March 2025, Officer D.M. contacted his automobile insurance provider, who advised him that to do so, the vehicle should be retitled under Officer D.M.'s name. Officer D.M. retitled the vehicle and attempted to add it to his insurance. However, Officer D.M.'s insurance provider denied this request, stating that they were unable to verify Officer D.M.'s and his spouse's driver's licenses.

92.     Now fearing that he may lose access to his vehicle insurance altogether, Officer D.M. sought to contact Defendants to ensure his insurance provider's inability to verify his driver's

18

license was not due to a security freeze on his credit file. Officer D.M. contacted the phone number that Defendants provided online approximately 50 times but was never able to speak to a LexisNexis representative.

93. Officer D.M. then attempted to contact Defendants at a different phone number. Almost every time Officer D.M. called the phone number, the call would disconnect before he was able to reach a live representative. Officer D.M. was able to reach a LexisNexis representative a few times, but after identifying himself and stating that he was a law enforcement officer seeking to remove a security freeze, each representative would place Officer D.M. on hold, and the call would disconnect shortly thereafter. Despite significant time and effort, Officer D.M. was never able to discuss removing the freeze with a representative.

94. Growing increasingly frustrated with his inability to contact Defendants after hours of attempts, and distraught at the prospect of his family losing the insurance it its entirety, Officer D.M. tried a different strategy and obtained an abstract from the Department of Motor Vehicles at a cost of $15 per person. Fortunately, with the submission of the abstract, Officer D.M. was finally able to verify his identity with his insurance provider and add the vehicle to his personal policy.

95. Officer D.M. was especially surprised at his inability to easily remove the freeze since his son has a security freeze from other consumer reporting agencies (for reasons unrelated to Daniel's Law), and his son is always easily able to quickly lift and replace the freeze without complications.

96. As far as Officer D.M. is aware, the security freeze is still in place. Fearing for his family's financial well-being, Officer D.M. became concerned that the security freeze on his credit file resulted from his Nondisclosure Request to Defendants and even considered rescinding that request to ensure Defendants cease interfering with his credit file. Officer D.M. decided against

this course of action, and he is still anxious about the future financial implications of Defendants' security freeze.

**IV.    Plaintiff, Officer P.J.**

97.    In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer P.J. exercised his statutory privacy and security rights under Daniel's Law. Around early 2024, Officer P.J. sent a Nondisclosure Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available his home address and unpublished telephone number.

98.    At no point did Officer P.J. request a security freeze on his consumer report, nor did he report an instance of identity theft pursuant to N.J.S.A. 56:11-44, et seq. Nothing in the Nondisclosure Request sent by Officer P.J. to Defendants—or any other entity—contained a request for a security freeze or any report of identity theft.

99.    Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer P.J., acting with intent, design, and malice.

100.    A few weeks later, Defendants responded via email, acknowledging receipt of Officer P.J.'s Nondisclosure Request and confirming that it had been processed. In that same email, Defendants unilaterally imposed a security freeze on Officer P.J.'s consumer report without authorization.

101.    Subsequently, Officer P.J. received a physical LexisNexis Security Freeze Notification Letter in the mail from Defendants, formally notifying him that a security freeze had been placed on his file. The letter further stated that an identity theft had been reported under N.J.S.A. 56:11-44, et seq.—a complete fabrication, as Officer P.J. had never made such a report.

20

102.    In July of 2024, Officer P.J. called Defendants using the phone number provided in the LexisNexis Security Freeze Notification Letter to request the security freeze on his credit report be lifted. At that time, he needed financing to purchase a new mattress. In accordance with the process outlined by Defendants, Officer P.J. provided his PIN, verified his personal information, and uploaded a copy of his social security card and New Jersey driver's license to the LexisNexis Dropbox. Defendants did not lift the freeze right away. After approximately two days, Defendants lifted the security freeze, allowing Officer P.J. to obtain financing and complete the purchase of the mattress. However, shortly thereafter, Defendants reinstated the security freeze.

103.    In December 2024, Officer P.J. sought to purchase a Toyota Tacoma. Anticipating that a credit check would be required, he called Defendants on December 10, 2024, and again requested that the security freeze be lifted to facilitate the vehicle purchase. After verifying his identity, the LexisNexis representative instructed him to upload his identifying documents again. The representative advised that processing the request could take up to 24 hours. Officer P.J. also provided the representative his PIN.

104.    Following these instructions, Officer P.J. again uploaded copies of his driver's license and Social Security card. Upon submission, Officer P.J. received an automated confirmation message via the LexisNexis web portal, indicating that the documents had been received.

105.    That same day, Officer P.J. visited the Morristown Toyota dealership, intending to place a deposit on a specific 2022 Tacoma TRD Sport for $33,873.21 ("Desired Tacoma"). The Desired Tacoma was in pristine condition and met all of Officer P.J.'s specifications.

106.    However, Officer P.J. was unable to proceed with the purchase due to the ongoing security freeze. Recognizing the risk that another buyer might purchase the vehicle, he inquired

with a dealership sales representative about placing a deposit to hold the vehicle until the security freeze was lifted. Unfortunately, the dealership required a credit check before allowing a deposit, effectively preventing Officer P.J. from securing the Desired Tacoma.

107.    On the morning of December 11, 2024, Officer P.J. again called Defendants, seeking an update on the removal of the security freeze. The LexisNexis representative informed him that this identity verification process would take an additional 24 hours, followed by another 24-hour period before the security freeze could be lifted.

108.    Due to the urgency of the situation, Officer P.J. requested expedited processing. The LexisNexis representative denied this request, stating that the documents he previously submitted could not be located. Eventually the representative located the documents but then claimed that Officer P.J.'s profile could not be found in the system.

109.    Frustrated by Defendants' continued delays, Officer P.J. requested that the matter be escalated to a supervisor. He was transferred to a supervisor who verified his identity for the third time, but the LexisNexis supervisor likewise stated that his profile could not be located.

110.    The following morning, at approximately 10 a.m., the dealership contacted Officer P.J. and informed him that the Desired Tacoma had been sold to another buyer.

111.    Later that morning, the LexisNexis supervisor called Officer P.J. but had no update regarding the status of his request. Frustrated and realizing the financial loss caused by Defendants' deliberate conduct, Officer P.J. explained to the supervisor that due to their inability to lift the freeze in a timely manner, he had lost the opportunity to purchase his preferred vehicle. Later that afternoon, in a subsequent call with the same supervisor, the supervisor reiterated that she could not provide an estimate for when the security freeze could be lifted or escalate the issue to another department.

22

112.    After approximately 5 p.m., another LexisNexis representative called Officer P.J. and informed him that the security freeze had been lifted. However, the representative noted that there were still unresolved issues with his profile.

113.    Now left without his desired vehicle, Officer P.J. had no choice but to purchase a different vehicle. The alternative vehicle he was able to find was inferior in condition and cost more than the Desired Tacoma. Additionally, it lacked several features that were included in the Desired Tacoma, forcing Officer P.J. to incur additional expenses to obtain those features separately.

114.    Shortly after purchasing the replacement vehicle, Officer P.J. began experiencing electrical system issues with the vehicle. Moreover, because Defendants had only temporarily lifted the security freeze, Officer P.J. continues to face difficulties accessing his credit.

115.    Then, on April 8, 2025, Officer P.J. called Defendants again to request another lift of his security freeze to co-sign on a business bank account with his wife. Once again, the LexisNexis representative could not find Officer P.J.'s profile in their system. The representative provided Officer P.J. with a case number and directed him to upload his driver's license and social security card to verify his identity yet again.

116.    Officer P.J. uploaded the supporting documents to the LexisNexis portal the next morning.  Defendants never confirmed receipt or followed up.

117.    In attempt to speed up the process, on April 11, 2025 Officer P.J. returned to the portal and submitted his documentation again.  The portal immediately confirmed receipt and informed Officer P.J. that his submission was under review.

118.    Since then, Officer P.J. has not received any communication from Defendants regarding the status of his request to lift the freeze.

23

119.    As a result of this delay, Officer P.J. had to postpone the bank appointment with his wife indefinitely. While Defendants refuse to lift the freeze, Officer P.J. cannot co-sign on the business account, inhibiting his family's ability to generate income.

**V.      Plaintiff, Officer G.P.**

120.    In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer G.P. exercised his statutory privacy and security rights under Daniel's Law. Around late 2023, Officer G.P. sent a Nondisclosure Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available his home address and unpublished telephone numbers.

121.    At no point did Officer G.P. request a security freeze on his consumer report, nor did he report an instance of identity theft pursuant to N.J.S.A. 56:11-44, et seq. Nothing in the Nondisclosure Request sent by Officer G.P. to Defendants—or any other entity—contained a request for a security freeze or any report of identity theft.

122.    Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer G.P., acting with intent, design, and malice.

123.    A few weeks later, Defendants responded via email, acknowledging receipt of Officer G.P.'s Nondisclosure Request and confirming that it had been processed. In that same email, Defendants unilaterally imposed a security freeze on Officer G.P.'s consumer report without authorization.

124.    On December 30, 2024, Officer G.P. received a letter from his homeowners' insurance provider, Narragansett Bay Insurance Company, informing him that his homeowners' insurance policy would not be renewed.

24

125.    Concerned with this unexpected policy cancellation, Officer G.P. contacted Geico Insurance ("Geico") to secure a new homeowners' insurance policy. During the application process, Geico agent Jeffrey Sinicki ("Sinicki") informed Officer G.P. that he was unable to complete the application due to an issue with the insurance underwriting. Sinicki then forwarded Officer G.P. an email from Geico's underwriting department which stated: "[t]he loss report was not received due to a Hold placed on the loss report. Please have the customer contact LexisNexis at 1-800-456-1244 and include the C.L.U.E. reference number below to have the Hold lifted."

126.    Upon receiving this information, Officer G.P. immediately called Defendants. He provided his full name, address, date of birth, Social Security number, and New Jersey driver's license number. He then explained that he was attempting to obtain homeowners' insurance but had been informed that a security freeze on his file was preventing the completion of the application.

127.    The LexisNexis representative informed Officer G.P. that she was unable to locate his file. She then asked whether he was a covered person under Daniel's Law as a law enforcement officer or government employee. Officer G.P. confirmed that he was a law enforcement officer covered under Daniel's Law. In response, the LexisNexis representative stated that she needed to check the system again.

128.    After reviewing the system, the representative informed Officer G.P. that she could not remove the security freeze and that his request would be forwarded to another department. When Officer G.P. asked for additional information regarding the status of the request, the LexisNexis representative refused to provide further details and stated she had no estimated timeframe for the removal of the security freeze.

25

129.     The following day, on December 31, 2024, Officer G.P. sent an email to Defendants, demanding that the security freeze be removed within one hour of receipt. In the email, Officer G.P. provided the same information as in his initial Nondisclosure Request: his name, address, and phone number.

130.     On January 2, 2025, Officer G.P. followed up with Geico agent Sinicki to determine whether Defendants had removed the freeze from his file. Sinicki replied that the security freeze was still in place and that he remained unable to process the application.

131.     Following Sinicki's email, Officer G.P. located his physical LexisNexis Security Freeze Notification Letter which he had received in the mail from Defendants. The letter formally notified him that a security freeze had been placed on his file. The letter further stated that an identity theft had been reported under N.J.S.A. 56:11-44, et seq.—a complete fabrication, as Officer G.P. had never made such a report.

132.     That same day, Officer G.P. once again called Defendants seeking the removal of the unauthorized security freeze placed on his consumer report. As in prior calls, he was required to provide his personal information, including his full name, address, date of birth, Social Security number, and New Jersey driver's license number. Given the sensitive nature of this information, Officer G.P. felt increasingly uneasy about repeatedly disclosing it. Nevertheless, he complied and provided the case number and PIN, clearly identifying himself and authenticating his request.

133.     After returning to the call, the representative said that under New Jersey state law, there was a freeze placed on the account. Officer G.P. stopped the representative and advised her that she and her company misinterpreted Daniel's Law.

134.     Despite his full compliance with all authentication requirements, the LexisNexis representative informed him there was nothing she could do. She stated that the request would

26

have to be forwarded to another department for further handling. When Officer G.P. inquired about the expected timeline for resolution, the representative admitted she could not provide an estimate.

135.    Frustrated by the continued delays, Officer G.P. requested to speak to a LexisNexis supervisor. However, his conversation with the supervisor was nearly identical to the previous exchange with the representative. Once again, Defendants refused to take immediate action, despite Officer G.P.'s urgent need to secure homeowners' insurance. He explained that Defendants' refusal to remove the unauthorized security freeze placed him at risk of a lapse in coverage and the loss of a favorable insurance rate from Geico. Despite the serious financial consequences, the LexisNexis supervisor failed to provide any assistance or timeline for resolution.

136.    After several additional days of uncertainty and financial risk, on the morning of January 9, 2025, Sinicki was finally able to run Officer G.P.'s application for homeowners' insurance.

**VI.    Plaintiff, Officer C.N.**

137.    In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer C.N. exercised his statutory privacy and security rights under Daniel's Law. Around late 2023, Officer C.N. sent a Nondisclosure Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available his home address and unpublished telephone number.

138.    At no point did Officer C.N. request a security freeze on his consumer report, nor did he report an instance of identity theft pursuant to N.J.S.A. 56:11-44, et seq. Nothing in the Nondisclosure Request sent by Officer C.N. to Defendants—or any other entity—contained a request for a security freeze or any report of identity theft.

139.    Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer C.N., acting with intent, design, and malice.

140.    A few weeks later, Defendants responded via email, acknowledging receipt of Officer C.N.'s Nondisclosure Request and confirming that it had been processed. In that same email, Defendants unilaterally imposed a security freeze on Officer C.N.'s consumer report without authorization.

141.    Subsequently, Officer C.N. received a physical LexisNexis Security Freeze Notification Letter in the mail from Defendants, formally notifying him that a security freeze had been placed on his file. The letter further stated that an identity theft had been reported under N.J.S.A. 56:11-44, et seq.—a complete fabrication, as Officer C.N. had never made such a report.

142.    Over the past several months, Officer C.N. has encountered numerous financial obstacles due to Defendants' unauthorized security freeze on his consumer report.

143.    In February 2024, Officer C.N. contacted USAA to inquire about interest rates for refinancing his truck. However, USAA was unable to retrieve the necessary financial data to provide refinancing options. When Officer C.N. inquired about the issue, USAA could not identify the reason for the problem. Unbeknownst to him at the time, Defendants' unauthorized security freeze had blocked access to his credit report, preventing him from obtaining refinancing.

144.    Officer C.N. shares a JetBlue credit card account with his wife, which serves as the primary credit card for their household expenses. Recently, JetBlue began sending repeated requests for him to update his account information, indicating that their system could not verify his existence. Despite multiple attempts to update his account information, the issue remained unresolved. If Officer C.N. is ultimately removed as a cardholder due to his inability to authenticate his identity through a credit check, his family will suffer substantial financial hardship.

28

145. In May 2024, Officer C.N. attempted to use his BestBuy credit card to make a purchase. At the point of sale, the store representative informed him that there was an issue with his account and advised him to contact the bank. Upon calling the bank, the bank agent confirmed that there were no issues with his account and that he should have been approved to complete the purchase. Confused and embarrassed, Officer C.N. had no choice but to use a different card, forfeiting the deferred interest benefits and rewards points that he would have otherwise accumulated on the purchase.

146. Officer C.N. also attempted to use his Synchrony credit card to make a purchase. As before, the store representative informed him that there was a problem with his account and advised him to contact the bank. Although the bank was ultimately able to approve the transaction—since the purchase was under $500.00—this incident was yet another consequence of the security freeze improperly placed by Defendants.

147. In addition to these challenges, Officer C.N. has experienced unexplained increases in his car insurance premiums with Farmers Insurance. After noticing multiple increases in his premium, he contacted Farmers Insurance to inquire about the cause. The Farmers Insurance agent was unable to provide an explanation, prompting Officer C.N. to request a credit check. The agent informed him that they were unable to access his credit file, preventing them from properly assessing his rates. Since then, his premiums have increased a third time, adding further financial strain on him and his family.

148. Officer C.N. also attempted to open a new credit card with Raymour & Flanigan to take advantage of a new cardholder deal to purchase a bed for his child at a discounted rate. After reviewing his personal information, the representative informed him that he was pre-approved for the store card. However, when he attempted to finalize the application, it was denied because his

29

credit report could not be processed. As a result, he was forced to use a different card to complete the purchase, causing him to lose out on the deferred interest benefit he would have received as a new cardholder.

149.    Due to the security freeze, Officer C.N. has also been denied multiple purchases through Affirm, a financial firm he regularly uses to make large purchases without interest. On January 2, 2025, he attempted to purchase a fireplace for $1,600 through Affirm. Despite multiple attempts, Affirm denied his purchase three times. The denial letters attributed the denial to issues verifying Officer C.N.'s identity, stating: "Our partner bank can't approve the loan you requested because we couldn't verify your identity based on the information we received."

150.    Later that day, Officer C.N. called Defendants to demand the removal of the unauthorized security freeze. The LexisNexis representative requested that he verify his identity by providing his full name, address, date of birth, Social Security number, and PIN. Officer C.N. fully complied with these authentication procedures. Despite this, the LexisNexis representative informed him that his profile could not be created because his identifying information was frozen, rendering his account inaccessible.

151.    Following this stressful call, Officer C.N. submitted his identification documents to Defendants, fully expecting the issue to be resolved.

152.    However, instead of removing the security freeze, Defendants responded with yet another letter falsely informing Officer C.N. that he had once again requested a security freeze— a blatant misrepresentation of the facts:

30



LexisNexis®

LexisNexis® Consumer Center

Consumer Number: ████████

Case Number: ████████

January 06, 2025

████████

Dear ████████

RE: Security Freeze Confirmation

Thank you for your request to place a security freeze on your file with LexisNexis Risk Solutions, ("LexisNexis") as provided by law in your state of residence. This letter is to confirm that a security freeze has been placed on your file.

Security freezes will be placed based on your state of residency and the customers use case. Based on this information, LexisNexis may not release your report(s) or score(s) derived for those use cases. You should be aware that applying a security freeze to your file may delay, interfere with, or prohibit the timely approval of applications you make for items such as credit, benefits, or insurance underwriting. WARNING TO PERSONS SEEKING A CREDIT FREEZE AS PERMITTED BY THE CREDIT REPORT PROTECTION ACT: YOU MAY BE DENIED CREDIT AS A RESULT OF A FREEZE PLACED ON YOUR CREDIT FILE. A security freeze does not apply to certain users of consumer reports, including those with whom you already have an existing account. These users request your file for the purpose of reviewing that account.

This security freeze is being placed on your file pursuant to the security freeze laws in your state of residence, NJ, specifically, N.J. Stat. Ann. § 56:11-30, 56:11-46, 13:45F-2.1 through 13:45F-2.7, 13:45F-5.1 as of the date of this letter.If your state of residence changes, please notify LexisNexis at the number below and request an update to the applicability of your security freeze.This security freeze will remain in place indefinitely until you decide to temporarily or permanently remove the security freeze.Below you will find a unique Personal Identification Number(PIN) that you will need in the event that you choose to temporarily or permanently remove the security freeze.

████████

Should you wish to remove your security freeze, you must contact us and provide proper identification and your PIN number.

Please note that LexisNexis does not charge for security freezes.

If you have any further questions, you may contact the LexisNexis Consumer Center via email at consumer.documents@LexisNexisRisk.com or by phone at 800-456-1244. The LexisNexis Consumer Center's hours of operation are Monday – Friday from 8:00 A.M. to 7:00 P.M. Eastern Time. In an effort to protect your privacy and get you prompt service, please have your Consumer Number (located at the top of this letter) available when you call. ████████ number.

LexisNexis Consumer Center
Attn: Security Freeze
P.O. Box 105108
Atlanta, GA 30348-5108

Total Pages 1 of 6                    Page 1

31

153.    The ongoing security freeze poses an urgent and critical financial barrier for Officer C.N., as he is actively seeking to purchase land in another state to begin construction of his retirement home. The real estate market is highly competitive, and properties at his desired price point could become available at any moment. Due to Defendants' continued refusal to remove the unauthorized freeze, Officer C.N. faces the substantial risk of missing out on valuable opportunities simply because he cannot access his own credit report in a timely manner. Without immediate relief, he remains unable to proceed with his long-term financial and personal plans, further compounding the harm inflicted by Defendants' unlawful actions.

## VII.    Plaintiff, Officer J.O.

154.    In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer J.O. exercised his statutory privacy and security rights under Daniel's Law. Around early 2024, Officer J.O. sent a Nondisclosure Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available his home address and unpublished telephone number.

155.    At no point did Officer J.O. request a security freeze on his consumer report, nor did he report an instance of identity theft pursuant to N.J.S.A. 56:11-44, et seq. Nothing in the Nondisclosure Request sent by Officer J.O. to Defendants—or any other entity—contained a request for a security freeze or any report of identity theft.

156.    Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer J.O., acting with intent, design, and malice.

157.    A few weeks later, Defendants responded via email, acknowledging receipt of Officer J.O.'s Nondisclosure Request and confirming that it had been processed. In that same

email, Defendants unilaterally imposed a security freeze on Officer J.O.'s consumer report without authorization.

158.    Subsequently, Officer J.O. received a physical LexisNexis Security Freeze Notification Letter in the mail from Defendants, formally notifying him that a security freeze had been placed on his file. The letter further stated that an identity theft had been reported under N.J.S.A. 56:11-44, et seq.—a complete fabrication, as Officer J.O. had never made such a report.

159.    Officer J.O. needed to get car insurance on a new vehicle he bought. On January 13, 2025, Officer J.O. called USAA. During the process of obtaining an insurance quote, the insurance agent told Officer J.O. that she could not confirm his records through the DMV. The insurance agent told Officer J.O. to contact Defendants and ask if they had placed a freeze on his credit.

160.    Later that day, Officer J.O. called Defendants and asked why there was a freeze on his credit. The representative asked if he happened to be a cop and if he "did Daniel's Law." Officer J.O. answered yes to both questions. The representative said that was why it was frozen.

161.    To verify his identity, the representative asked for Officer J.O.'s PIN. Officer J.O. said he did not know his PIN. Next, the representative asked many questions to confirm Officer J.O.'s identity, all of which he answered. Regardless, the representative said they could not confirm his identity in their system. The representative then told Officer J.O. to submit a picture of his social security card and proof of address so they could generate a new PIN and unfreeze his record. Officer J.O. asked how long it would take to remove the freeze. The representative said it could take anywhere from 24–48 hours to process his paperwork, and then 15 minutes to remove the freeze.

162.    Officer J.O. uploaded his documents on that same day, January 13, 2025. He called Defendants again the next day. Again, Officer J.O. was asked to provide personal information to confirm his identity, which he did, and again, the representative said they could not confirm his identity and asked him to submit identifying documents, which he had already submitted.

163.    Officer J.O. called Defendants again the day after that, trying to check on the status of the security freeze. After having essentially the same conversation as he had had the previous day, with no information about the status of removing his security freeze, Officer J.O. asked to speak to a supervisor. The supervisor told Officer J.O. that the system was not showing any profile under his name. When he asked how long it would take to fix that, they told him that there was no time frame as to when the issue would get resolved.

164.    Officer J.O. called USAA later that day, hoping perhaps the freeze had been removed. The agent informed him that it had not, as they still could not access his information.

165.    On January 16, 2025, Officer J.O. called Defendants yet again. There was still no profile under his name. Later that day, USAA confirmed the freeze was still in place.

166.    Officer J.O. found a form on Defendants' website titled, "Temporarily Lift or Permanently Remove a Security Freeze on Your Credit Report."[10] He filled out and submitted this form as another attempt to get the freeze removed.

167.    Because Defendants continued to refuse to remove the freeze, Officer J.O. spent nearly two weeks with a new car sitting in his driveway which he could not drive because he could not get insurance for it. During this time, Officer J.O. had to ask people to drive him places, pay for rideshare services, or borrow the car that his wife uses to get to work.

---

[10]    https://forms.consumer.risk.lexisnexis.com/#/unfreeze-self.

34

168.    After nearly 2 weeks, Officer J.O. had to ask his sister to get the car insured in her name so that he could drive his own car.

## VIII.    Plaintiff, Officer M.S.

169.    In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer M.S. exercised his statutory privacy and security rights under Daniel's Law. Around January 3, 2024, Officer M.S. sent a Nondisclosure Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available Officer M.S.'s home address and unpublished telephone number.

170.    At no point did Officer M.S. request a security freeze on his consumer report. Nothing in the Nondisclosure Request sent by Officer M.S. to Defendants—or any other entity— contained a request for a security freeze or any report of identity theft.

171.    Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer M.S., acting with intent, design, and malice.

172.    A few weeks later, Defendants responded via email, acknowledging receipt of Officer M.S.'s Nondisclosure Request and confirming that it had been processed. In that same email, Defendants unilaterally imposed a security freeze on Officer M.S.'s consumer report without authorization.

173.    Subsequently, Officer M.S. received a physical LexisNexis Security Freeze Notification Letter in the mail from Defendants, formally notifying him that a security freeze had been placed on his file. The letter further stated that an identity theft had been reported under N.J.S.A. 56:11-44, et seq.—a complete fabrication, as Officer M.S. had never made such a report.

174.    After his automobile insurance was cancelled in July 2024, Officer M.S. sought to purchase new insurance from AAA. The AAA agent informed Officer M.S. of a security freeze on

his credit file that prevented AAA from providing him insurance. Officer M.S. needed this insurance for his personal car that he used to get to work, pick up his kids, and other everyday necessities. As he was about to become entirely uninsured, it was imperative that Officer M.S. procure new insurance as soon as possible.

175.    Officer M.S. promptly contacted Defendants. Officer M.S. informed Defendants that a security freeze on his credit file was preventing him from purchasing dearly needed car insurance from AAA and requested a temporary lift of the security freeze. Defendants temporarily lifted the security freeze, and Officer M.S. was able to procure the insurance before the freeze was reinstated.

176.    In December 2024, Officer M.S. went to a Verizon store to open a new account and obtain new cell phones for his children through financing. Despite presenting his driver's license and law enforcement ID, Verizon was unable to verify Officer M.S.'s identity. After calling Verizon support, Officer M.S. was advised by a Verizon representative to try completing the transaction at a different store. Officer M.S. then travelled to two different Verizon stores and, again, neither store was able to verify Officer M.S.'s identity.

177.    Verizon did not suggest the issues could have resulted from a security freeze. Officer M.S. was confused and distraught by Verizon's inability to verify his identity. At the time, he had no idea what was causing the issue.

178.    Officer M.S. had promised to buy his two children cell phones for Christmas. Having already spent hours arguing with Verizon and driving to different stores, Officer M.S. felt he had no choice but to buy two new phones at full retail price rather than financing the purchase at a lower cost.

179.    Later that month, Officer M.S. contacted Xfinity to add a wireless account to his pre-existing cable account. However, the Xfinity representative informed Officer M.S. that they could not open a wireless account for him because they were unable to access his credit file. The Xfinity representative asked if it was possible that Officer M.S. had some sort of lock or freeze on his credit and advised that he contact Defendants.

180.    Officer M.S. promptly contacted Defendants and informed them that a security freeze on his credit file was preventing him from making purchases with Xfinity. This began Officer M.S.'s protracted and time-consuming efforts to try to remove the unrequested security freeze.

181.    Over the course of multiple days, Officer M.S. spent many hours making approximately 50 phone calls, waiting on hold, reciting his personal identifying information over and over, uploading and reuploading identification documents, and talking to numerous LexisNexis representatives.

182.    When Officer M.S. initially contacted Defendants, a LexisNexis representative told him that they were unable to verify his identity. The LexisNexis representative told Officer M.S. that they needed to consult with a special division to fix the issue but promised to contact Officer M.S. when it was resolved.

183.    Defendants never contacted Officer M.S. after making these assurances. Instead, Officer M.S. was forced to make multiple phone calls to Defendants to check the status of his request and continue trying to remove the security freeze.

184.    Each time Officer M.S. tried to contact Defendants to check on the status of the security freeze, he was met with one of two responses. Sometimes, a LexisNexis representative would once again say they were referring the problem to a different division and ask Officer M.S.

37

to call back later for an update—something he did numerous times without ever receiving the promised updates. Other times, a LexisNexis representative would promise to lift the security freeze on Officer M.S.'s account, promising timeframes ranging from 15 minutes to 30 days for the removal. However, the security freeze was never lifted.

185.    On each of these many calls with Defendants, Officer M.S. was always asked to verify his identity. In addition to numerous verbal questions requiring him to disclose sensitive identifying information, LexisNexis representatives also asked Officer M.S. to upload his driver's license and social security card before he was able to request a lift of the security freeze.

186.    Eventually, a LexisNexis representative told Officer M.S. that he needed to request a PIN to remove the security freeze.

187.    Officer M.S. was now exhausted by Defendants' persistent evasiveness and unwillingness to comply with his countless requests. Officer M.S. felt he would rather deal with the safety risks to himself and his family posed by foregoing his rights under Daniel's Law than continue losing time, money, and sanity endlessly fighting Defendants just to access his own credit.

188.    Officer M.S. asked Defendants for a PIN so he could permanently remove the security freeze. Officer M.S. received a physical letter in the mail some time later containing the PIN. Officer M.S. followed Defendants' directions to enter the PIN via an online portal and requested a removal of the security freeze.

189.    Unfortunately, the security freeze remained in effect. Officer M.S. was infuriated that Defendants still refused to comply with his requests.

190.    Yet again, Officer M.S. contacted Defendants to attempt to remove the security freeze. And again, a LexisNexis representative promised to remove the security freeze within 15

38

minutes. Like Officer M.S.'s many other phone calls to Defendants, this promise was never fulfilled. Feeling angry, hopeless, and powerless, Officer M.S. ceased contacting Defendants.

191.    Officer M.S. was never able to remove the security freeze. Because of Defendants' conduct, Officer M.S. feels immense anxiety about his financial well-being. As such, Officer M.S. felt the need to purchase a credit repair service from Credit Saint LLC.

192.    Officer M.S. fears that he and his family will continue to face adverse financial implications as a result of Defendants' security freeze. Significantly, Officer M.S. is currently between housing situations and fears that he will be prevented from procuring a lease or mortgage because of Defendants' security freeze.

193.    After his many futile interactions with Defendants, Officer M.S. feels helpless to remedy these concerns. Officer M.S. is shocked that Defendants have enough power over his life to prevent him from buying basic necessities like insurance, wireless internet, and even Christmas presents for his children. Officer M.S. is especially disturbed that he finds himself at the whims of the Defendants merely because he asserted his rights under Daniel's Law for the sake of his own and his family's safety.

## CLAIMS AGAINST DEFENDANTS

### COUNT ONE

### VIOLATION OF 15 U.S.C. § 1681c-1 OF THE FAIR CREDIT REPORTING ACT

194.    The allegations of the Complaint set forth above in paragraphs ¶¶ 1–193 are incorporated herein by reference as if set forth at length.

195.    According to the direction provided in the ruling in the Memorandum and Order dated January 27, 2025, Plaintiffs bring this claim under the FCRA. John Doe-1 v. LexisNexis Risk Solutions, Inc., No. 24-4566, ECF Nos. 66–67 (D.N.J. Jan. 27, 2025).

196.    Defendants are consumer reporting agencies. As such, they are required to abide by the mandates of the FCRA and New Jersey Identity Theft Prevention Act. Defendants admit this in their communications to Plaintiffs. Defendants also say so on their websites and in their privacy policies.

197.    Defendants have policies published online and in the LexisNexis Security Freeze Notification Letters they sent to Plaintiffs providing what a consumer needs to do and say to get a security freeze lifted or removed.

198.    Upon receiving Plaintiffs' Nondisclosure Requests under Daniel's Law, Defendants (improperly) placed security freezes on each Plaintiff's consumer report. Sometime later, Defendants notified Plaintiffs of these security freezes via email and mailed letters. Each letter (incorrectly) asserted that the security freeze was placed on that Plaintiff's credit file pursuant to New Jersey state law: N.J.S.A. 56:11-44, et seq.

199.    Defendants have tacitly admitted that the only statutory basis for imposing a security freeze on a consumer's report is pursuant to the FCRA, Section 1681c-1. The same statute governs the removal of security freezes. No other provision of the FCRA could authorize Defendants' conduct, as no other sections apply here.

200.    Plaintiffs contacted Defendants through multiple channels—phone calls, emails, and online request forms—seeking the removal of these unauthorized security freezes. Plaintiffs complied with the legal authentication requirements when submitting these requests. However, Defendants unlawfully delayed and denied these requests, refusing to remove the security freezes within the one-hour timeframe required under the FCRA.

201.    Defendants willfully violated Section 1681c-1(i) of the FCRA in the following ways, among others:

a. Failing to provide Plaintiffs with legally required notifications, including:

    i. Failing to inform Plaintiffs within 5 business days after placing the security freezes of the process by which they could actually authenticate their identities and remove the security freezes (section 1681c-1(i)(2)(B)(ii)(I));

b. Unlawfully denying or delaying Plaintiffs' requests to remove the security freezes, including:

    i. Failing to remove the security freezes within one hour of receiving direct requests for removal and proper identification by toll-free telephone or secure electronic means (section 1681c-1(i)(3)(C)(i), 1681c-1(i)(3)(E));

c. Unlawfully obstructing Plaintiffs' access to their consumer reports for uses that are exempt from security freezes, including:

    i. Blocking the use of consumer reports for insurance underwriting, background screening, and identity verification purposes other than the granting of credit, or for investigating or preventing actual or potential fraud, despite the security freezes (section 1681c-1(i)(4)(H)–(J)).

<u>Willful Violations</u>

202.    Section 1681n of the FRCA states that any person who willfully fails to comply with any requirement imposed under the FCRA with respect to any consumer is liable to that consumer for: (1) any actual damages sustained by the consumer as a result of the failure or damages not less than $100 and not more than $1000; (2) such amount of punitive damages as the court may allow; and (3) the costs of any successful action to enforce liability under Section 1681n, as well as reasonable attorney's fees as determined by the court.

41

Negligent Violations

203.    In the alternative, by their above-described wrongful actions, inaction and omissions, want of ordinary care, and the resulting failure to comply with the requirements of the FCRA, Defendants negligently violated the FCRA and are liable to Plaintiffs for actual damages sustained by Plaintiffs, as well as the costs of this action and reasonable attorney's fees.

204.    As a result of Defendants' negligent conduct (in addition or as an alternative to what was willful), Plaintiffs have suffered actual damages.

205.    Section 1681o of the FCRA provides that any person who negligently fails to comply with any requirement of the FCRA is liable to any consumer for any actual damages as well as the costs of an action under the FCRA and reasonable attorney's fees.

206.    As a result of Defendants' willful and/or negligent violations, Plaintiffs have sufferd economic harm, loss of financial opportunities, and other compensable damages.

207.    Defendants' acts or omissions in causing these violations were the product of actual malice or accompanied by a wanton and willful disregard of Plaintiffs, who foreseeably could have been and were harmed by these acts or omissions. Accordingly, Plaintiffs also seek punitive damages.

## COUNT TWO

### VIOLATION OF N.J.S.A. 56:11-46 OF THE NEW JERSEY IDENTITY THEFT PREVENTION ACT

208.    The allegations of the Complaint set forth above in paragraphs ¶¶ 1–207 are included herein as if set forth at length.

209.    Upon receiving Plaintiffs' requests that Defendants comply with Daniel's Law, Defendants placed security freezes on Plaintiffs' consumer credit reports, in addition to

misreporting identity thefts. In so doing, Defendants cited <u>N.J.S.A.</u> 56:11-44, <u>et seq.</u>, otherwise known as the New Jersey Identity Theft Prevention Act.

210.    At no point did Plaintiffs authorize Defendants to place security freezes on their consumer credit reports. And at no point did Plaintiffs report any instances of identity theft.

211.    Plaintiffs complied with all required procedures in order to remove or lift their security freezes under <u>N.J.S.A.</u> 56:11-46.

212.    Defendants have failed to comply with Plaintiffs' requests to remove or lift their security freezes within three business days, as required by <u>N.J.S.A.</u> 56:11-46(j).

213.    In some cases, Defendants appear to have removed or lifted these security freezes without the consumer providing their PIN, as required by <u>N.J.S.A.</u> 56:11-46(j)(2).

214.    For any violations of <u>N.J.S.A.</u> 56:11-46, Defendants are civilly liable to Plaintiffs pursuant to <u>N.J.S.A.</u> 56:11-50.

215.    As a result of Defendants' willful failure to comply with the Identity Theft Prevention Act, Plaintiffs have suffered damages.

216.    Defendants' deliberate and willful scheme to use unauthorized security freezes as a cudgel against covered persons who asserted their rights under Daniel's Law is precisely the sort of egregious conduct that warrants the award of punitive damages under <u>N.J.S.A.</u> 56:11-44, <u>et seq.</u>

Willful Violations

217.    <u>N.J.S.A.</u> 56:11-38 states that any person who willfully fails to comply with any requirement imposed under Section 56:11-46 with respect to any consumer is liable to that consumer for: (1) any actual damages sustained by the consumer as a result of the failure or damages not less than $100 and not more than $1000; (2) such amount of punitive damages as the court may allow; and (3) the costs of any successful action to enforce liability under this section, as well as reasonable attorney's fees as determined by the court.

43

Negligent Violations

218.    In the alternative, by their above-described wrongful actions, inaction and omissions, want of ordinary care, and the resulting failure to comply with the requirements of N.J.S.A. 56:11-46, Defendants negligently violated the statute and are liable to Plaintiffs for actual damages sustained by Plaintiffs, as well as the costs of this action and reasonable attorney's fees.

219.    As a result of Defendants' negligent conduct (in addition or as an alternative to what was willful), Plaintiffs have suffered actual damages.

220.    N.J.S.A. 56:11-39 provides that any person who negligently fails to comply with any requirement of the act is liable to any consumer for any actual damages as well as the costs of an action under this section and reasonable attorney's fees.

221.    As a result of Defendants' willful and/or negligent violations, Plaintiffs have suffered economic harm, loss of financial opportunities, and other compensable damages.

222.    Defendants' acts or omissions in causing these violations were the product of actual malice or accompanied by a wanton and willful disregard of Plaintiffs, who foreseeably could have been and were harmed by these acts or omissions. Accordingly, Plaintiffs also seek punitive damages.

## COUNT THREE

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

223.    The allegations of the Complaint set forth above in paragraphs ¶¶ 1–222 are included herein as if set forth at length.

224.    Upon receiving Plaintiffs' requests that Defendants comply with Daniel's Law, Defendants placed security freezes on Plaintiffs' consumer reports and misreported identity thefts.

225.    In the correspondence to Plaintiffs informing them of the security freezes and alleged identity thefts, Defendants readily acknowledged that, "[y]ou should be aware that. . . a security freeze to your file may delay, interfere with, or prohibit the timely approval of applications you make for items such as credit, benefits, or insurance underwriting. YOU MAY BE DENIED CREDIT AS A RESULT OF A FREEZE PLACED ON YOUR CREDIT FILE."

226.    At no point did Plaintiffs authorize Defendants to place security freezes on their consumer reports.

227.    When Defendants placed the security freezes on Plaintiffs' reports and reported identity thefts, Defendants had reason to know that Plaintiffs would have prospective economic advantages in the future, such that a security freeze or misreported identity theft could seriously impair each of these relationships and cause each of the Plaintiffs significant detriment.

228.    Defendants were made aware of these specific prospective economic advantages, as each time a Plaintiff, or an agent or representative acting on a Plaintiff's behalf, attempted to run a consumer report to obtain the product or service they needed, Defendants would be notified that the entity making the request was doing so. For instance, Defendants would receive a notification that Geico was trying to run a credit check on a Plaintiff such that Defendants notified Geico that the consumer report was frozen and thereby inaccessible. See 15 U.S.C. § 1681c-1(i)(2)(C).

229.    Plaintiffs made Defendants further aware of their specific expectations of economic advantage by informing Defendants of these expectations during their efforts to remove the freezes.

230.    Plaintiffs called Defendants, desperately requesting the freezes be removed so they could acquire life insurance or homeowners' insurance or purchase a vehicle before it was sold to

45

another consumer, and so on. Plaintiffs even identified the companies with which they planned to contract for these products or services, hoping this information could help the companies obtain access to their credit more quickly.

231.    Plaintiffs' expectations of prospective economic advantage were reasonable. They consisted of everyday contracts for insurance underwriting, loan refinancing, purchases of vehicles, and other similar processes for which consumer reports are commonly utilized.

232.    Having had all of this information, Defendants intentionally and with malice delayed or outright refused to remove the security freezes on Plaintiffs' accounts.

233.    As a result of Defendants' willful interferences, Plaintiffs have suffered damages and loss of the prospective gains as described above.

234.    Defendants' acts or omissions in causing these violations were the product of actual malice or accompanied by a wanton and willful disregard of Plaintiffs, who foreseeably could have been and were harmed by these acts or omissions. Accordingly, Plaintiffs also seek punitive damages.

235.    Plaintiffs further seek injunctive relief compelling Defendants to immediately and permanently remove the security freezes imposed on their consumer reports and to implement corrective measures ensuring that future requests for security freeze removal are promptly and properly processed.

## COUNT FOUR

### PROMISSORY ESTOPPEL/QUASI-CONTRACT (NEW JERSEY)

236.    The allegations of the Complaint set forth above in paragraphs ¶¶ 1–235 are included herein as if set forth at length.

46

237.    Defendants, through their written policies, communications, and representations, made clear and unambiguous promises to Plaintiffs regarding the process for removing or lifting security freezes from their consumer reports.

238.    Plaintiffs reasonably and foreseeably relied upon these promises by submitting the requested documentation, following the verification procedures set forth by Defendants, and expecting timely relief from the unauthorized security freezes placed on their consumer reports.

239.    Defendants failed to fulfill their promises and obligations, instead delaying, obstructing, and outright refusing to remove the security freezes, despite Plaintiffs' full compliance with Defendants' stated procedures.

240.    As a direct and proximate result of Plaintiffs' reasonable reliance on Defendants' promises, Plaintiffs suffered substantial financial harm, emotional distress, and the loss of significant financial opportunities, including but not limited to the denial of loans, inability to complete financial transactions, and higher costs of credit and insurance.

241.    Plaintiffs further seek injunctive relief compelling Defendants to immediately and permanently remove the security freezes imposed on their consumer reports and to implement corrective measures ensuring that future requests for security freeze removal are promptly and properly processed.

## PRAYER

**WHEREFORE**, Plaintiffs request that Judgment be entered against Defendants as follows:

A.  Awarding actual damages, which may consist of any combination of compensatory damages, consequential damages, restitution, and/or return of unjust enrichment;

B.  Awarding statutory damages, at minimum, of $100 to $1000 per violation;

47

C.  Awarding an additional amount in punitive damages, to be determined by the Court, for intentional and malicious conduct as allowed under New Jersey and federal law;

D.  Awarding reasonable attorneys' fees, interest (pre and post judgment), and litigation costs incurred, as provided by 15 U.S.C. §§ 1681n, 1681o; N.J.S.A. 56:11-46, 56:11-39; or any other statute or rule;

E.  Declaratory relief;

F.  Entering equitable or other permanent injunctive relief requiring Defendants to comply with New Jersey and federal laws; and

G.  Awarding such other and further relief against Defendants as the Court deems equitable and just.

Respectfully Submitted,

**PEM LAW LLP**

Dated: September 30, 2025

By: */s/ Rajiv D. Parikh*

Rajiv D. Parikh, Esq.
Kathleen Barnett Einhorn, Esq.
Jessica A. Merejo, Esq.
1 Boland Drive, Suite 101
West Orange, New Jersey 07052
Telephone: (973) 567-7832
Email: rparikh@pemlawfirm.com
        keinhorn@pemlawfirm.com
        jmerejo@pemlawfirm.com

**BOIES SCHILLER FLEXNER LLP**
Adam Shaw, Esq. (*pro hac vice* application to be filed)
30 South Pearl Street, 12th Floor
Albany, New York 12207
Telephone: (518) 434-0600
Email: ashaw@bsfllp.com

*Attorneys for Plaintiffs*

48

## DESIGNATION OF TRIAL COUNSEL

The Court is advised that pursuant to New Jersey Court Rules 4:5-1(c) and 4:25-4, Rajiv

D. Parikh, Esq. is hereby designated as trial counsel for Plaintiffs in this matter.

PEM LAW LLP

Dated: September 30, 2025                    By: */s/ Rajiv D. Parikh*
                                             RAJIV D. PARIKH

## CERTIFICATION PURSUANT TO R. 4:5-1

I certify that, to the best of my knowledge, the matter in controversy is not the subject of

another action pending in the Superior Court of New Jersey. I certify that there are no other actions

or arbitration proceedings contemplated. At the present time, I do not know the names of any other

parties who should be joined in this action.

PEM LAW LLP

Dated: September 30, 2025                    By: */s/ Rajiv D. Parikh*
                                             RAJIV D. PARIKH

## CERTIFICATION PURSUANT TO RULE 1:38-7(b)

Pursuant to Rule 1:38-7(b), it is hereby stated that all confidential personal identifiers

have been redacted from documents now submitted to the Court and will be redacted from all

documents submitted in the future.

PEM LAW LLP

Dated: September 30, 2025                    By: */s/Rajiv D. Parikh*
                                             RAJIV D. PARIKH

49

# New Jersey Courts
Independence · Integrity · Fairness · Quality Service

Essex Vicinage

**Hon. Stephen L. Petrillo**
Judge Superior Court

Essex County Historic Courthouse
470 Martin Luther King Jr. Blvd., Room 203
Newark, New Jersey 07102

njcourts.gov • Tel: 973-776-9460 Fax: 973-424-2483

September 29, 2025

*__Via ecourts__*
**PEM LAW LLP**
Rajiv D. Parikh, Esq.
Kathleen Barnett Einhorn, Esq.
Jessica A. Merejo, Esq.
1 Boland Drive, Suite 101
West Orange, New Jersey 07052

FILED
SEP 29 2025
Hon. Stephen L. Petrillo, J.S.C.

Re:  **V. J. Vs Lexisnexis Risk Solu Tions, Inc.**
**DOCKET NO. ESX-L-7269-25**

Dear Counsel:

The referenced case has been filed as case type **508.** That designation presumptively assigns the case to the Complex Litigation Business Program ("CBLP"). The complaint has been preliminarily reviewed, and the matter appears, at this time, to meet the criteria for inclusion in the CBLP. The following documents are attached:

1. **Case Management Guidelines**. The guidelines provide an overview of the CBLP including an explanation of the criteria for presumptive assignment and exclusion as well as the method of opting in to the CBLP. The Guidelines further describe the management of cases within the CBLP.

2. **Joint Proposed Discovery Plan.** Parties in CBLP matters are required to confer and develop a proposed discovery plan pursuant to R. 4: 103-2(b). The model Joint Proposed Discovery Plan provides information and background necessary for the court to exercise early and effective case management and to render litigation, particularly discovery, more predictable and efficient. It includes deadlines for written discovery, interrogatories and depositions, pretrial motions and the filing of expert and rebuttal reports. The Proposed Joint Discovery Plan also addresses bifurcation, mediation, binding arbitration and the scheduling of an interim status/settlement conference.


Interpreter


**ADA**
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



3. **Scheduling Order.** A scheduling order providing various discovery and trial deadlines, as well as limits on discovery, must be entered following the initial case management conference pursuant to <u>R</u>. 4: 103-3. This provides a template for that order.

4. **Electronic Discovery Stipulation and Order.** The Electronic Discovery Stipulation and Order governs discovery of Electronically Stored Information ("ESI") and covers preservation of ESI, custodians, search terms, production, and documents protected from discovery. Pursuant to <u>R</u>. 4: 103- 2(c), parties are required to advise the court whether they anticipate any issues regarding disclosure, discovery, or preservation of electronically stored information, including the form or forms in which it should be produced.

5. **Clawback Stipulation and Order.** This model stipulation and order is used where the parties agree on a procedure to claw-back inadvertently disclosed privileged or work product materials through the exchange of certain electronically stored or electronically maintained information.

The CBLP case management guidelines, model forms, and model orders are posted on the Judiciary's Complex Business Litigation Program webpage (https://njcourts.gov/courts/civil/cblp.html). The model CBLP forms and model orders can be used without modification or can serve as the starting point for documents crafted to meet the needs of a particular business-related case and situation.

Please review these guidelines and familiarize yourself with the CBLP applicable court rules found at chapter XI of the Rules Governing Civil Practice in the Superior Court, Part IV. **These rules are distinct in certain key respects as regards motion practice and discovery, and must be followed.**

After all parties have appeared, or after default has been entered as to absent parties, an initial case management conference shall be held. Discovery shall proceed as set forth by the CBLP court rules. It shall be the responsibility of the plaintiff's counsel to alert the court to the case's readiness for the initial conference and all counsel shall prepare for same as provided by <u>R</u>. 103-2.

All counsel are reminded to please ensure compliance with <u>R</u>. 4:102-1(b) on all filings.

Please be guided accordingly.

Very truly yours,




Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



SLP/cac

   

# Complex Business Litigation Program (CBLP)
# Case Management Guidelines

## Overview

The Complex Business Litigation Program ("CBLP" or "the Program") is focused on business, commercial and construction cases with significant amounts in dispute or business or commercial cases involving complex factual or legal issues; a large number of separately represented parties; potential numerous pre-trial motions raising difficult or novel legal issues; case management of a large number of lay and expert witnesses or a substantial amount of documentary evidence (including electronically stored information); substantial time required to complete the trial; significant interpretation of a business, commercial or construction statute; or involves other contentions of a complex business, commercial or construction nature.

## Eligibility

A case is assigned to the vicinage CBLP judge in the following situations:

### Threshold Damages

The CBLP involves disputes with and between business entities where the claims, counterclaims, or third-party claims allege business, commercial or construction claims and an amount in controversy of at least $200,000.00, unless the court determines a lesser amount is acceptable.

### Self Designation

Attorneys or parties completing the Civil Case Information Statement will self-designate actions as Complex Commercial (Case Type 508) or Complex Construction (Case Type 513). These case types will presumptively be assigned to the vicinage's CBLP judge for case management.

Complex Commercial (508) actions involve claims by, against, and among parties that arise out of business or commercial transactions and involve parties' exposure to potentially significant damage awards; or where the business or commercial claim involves complex factual or legal issues; a large number of separately represented parties; potential numerous pre-trial motions raising difficult or novel legal issues; case management of a large number of lay and expert witnesses or a substantial amount of documentary evidence (including electronically stored information); substantial time required to complete the trial; significant interpretation of a business or commercial statute; or involves other contentions of a complex business - commercial nature.

Complex Construction (513) actions involve claims by, against, and among owners, contractors, subcontractors, fabricators and installers, architects, engineers, design and construction consultants, and other similar parties associated with a construction project that involves parties' exposure to potentially significant damage awards because of claimed design and construction defects, delay claims, or where the construction claim involves complex factual or legal issues; a large number of separately represented parties; potential numerous pre-trial motions raising difficult or novel legal issues; case management of a large number of lay and expert witnesses or a substantial amount of documentary evidence (including electronically stored information); substantial time required to complete the trial. Complex construction does not include construction and professional payment and billing claims, change order claims, wrongful termination, quantum merit, construction lien or mechanics lien claims, unless associated with a complex construction claim as herein described.

Actions to establish a constructive trust or impose an equitable lien to satisfy damages are also cognizable in the CBLP, as are cases primarily seeking legal relief in which ancillary injunctive relief is sought. The CBLP encompasses both jury and non-jury matters.

CBLP judges handle cases arising from the following non-exclusive list of circumstances:

- non-consumer Uniform Commercial Code transactions;
- the purchase and sale of assets of businesses or assets of a business, including contract disputes and commercial landlord/tenant claims;
- non-consumer sales of goods or services by or to a business;
- non-consumer bank or brokerage accounts including loan, deposit, cash management, and investment accounts;
- purchase, sale, or lease of commercial personal property, or security interests therein;
- arising out of state securities laws;
- intellectual property disputes;
- business licensing agreement disputes;
- unfair competition disputes;
- sale, purchase of a business or purchase or sale of stock, assets or liabilities of a business;
- mergers and acquisitions disputes;
- franchisee/franchisor relationship and liabilities;
- business torts, including interference with prospective economic advantage, interference with contractual relations, tortious interference with business relationships, breach of implied covenant of good faith and fair dealing, fraud, fraud in the inducement, misrepresentation, and breach of fiduciary duty;
- liability or indemnity of managers (officers, directors, managers, trustees or members or partners functioning as managers) of corporations, partnerships, limited partnerships, limited liability companies or partnerships, professional associations, business trusts, joint ventures or other business enterprises;
- Racketeer Influenced and Corrupt Organizations Act (RICO) claims;
- complex commercial construction disputes;
- other complex disputes of a business or commercial nature.

The CBLP retains the law and equity separation that was recognized in the 1947 Constitution. It does not encroach on the cases traditionally heard in General Equity. The CBLP does not include matters involving:

- internal affairs or governance disputes over management and/or control of business entities;
- dissolution or liquidation rights or obligation between or among owners (shareholders, partner, members);
- statutory and custodial receivership or actions seeking the appointment of special fiscal agents;
- restructuring of a business entity;
- shareholder derivative suits;
- actions to protect the interests of a business, such as non-compete agreements, trade secrets or restrictive covenant agreements.

Also excluded from CBLP are actions primarily involving consumers, labor organizations, personal, physical or mental injury; mechanics' lien actions, and condemnation proceedings. Following is a non-inclusive list of actions that generally are not handled by CBLP judges and are handled by judges regularly assigned to the Law Division, Civil Part:

- class action consumer claims;

- products liability actions;

- personal injury and wrongful death actions;

- commercial landlord verses consumer tenant actions;

- noncommercial real estate matters actions;

- actions by consumers against a business and businesses against consumers;

- enforcement of arbitration awards;

- condemnation actions;

- landlord-tenant matters involving summary dispossession;

- employment Law Against Discrimination actions;

- civil rights actions;

- professional malpractice actions;

- medical device litigation and pharmaceutical litigation;

- Multicounty Litigation (mass tort);

- environmental litigation including environmental insurance coverage actions;

- Conscientious Employee Protection Act actions;

- agreements relating to an individual or collective contract of employment;

- wrongful discharge actions;

- slander of title or product disparagement actions;

- fraudulent transfers under the Uniform Fraudulent Transfers Act;

- consumer residential construction actions.

## Opt-In Motion

Parties may formally move before the CBLP judge for inclusion in the Program where a case is not presumptively assigned to the CBLP but involves complex business related issues and/or the amount in controversy is less than $200,000. Business or commercial disputes that involve complex factual or legal issues; a large number of parties; discovery issues such as managing large numbers of documents, multiple experts; is likely to have implications for business beyond the decision in the particular case; is likely to result in a significant interpretation of a business or commercial statute; or involves other contentions that the CBLP judge finds compelling may be assigned to the Complex Business Litigation Program. Such motions shall be granted for good cause shown.

## Complex Business Litigation Assignment Recommendation

If, upon review, the Assignment Judge or the CBLP judge determines a case is appropriate for the CBLP, the judge may, *sua sponte*, assign it to the CBLP.

## Exclusion from CBLP

### Initial Case Review

The CBLP judge will review actions presumptively assigned to the CBLP to determine if the case is appropriate for the CBLP. If, after review, the CBLP judge determines that the complex nature of the action or the threshold damages claim amount is not established, the CBLP judge shall remove the case from the Program. The Assignment Judge may also conduct initial CBLP eligibility reviews. Cases removed from the CBLP by the Assignment Judge or the CBLP judge will be reassigned to the appropriate track for case management.

### Motion for Removal from the Program

Any party may move for removal from the CBLP on the grounds that the action does not meet the eligibility criteria.

# Guidelines

## Assignment of Judges

CBLP cases are assigned to a single judge that handles all aspects of the case, including discovery disputes, summary judgment and other motions, and trial.

## Court Rules

Cases assigned to the CBLP are governed by Part IV, Chapter XI ("Complex Commercial & Complex Construction Matters") of the New Jersey Rules of Court. Absent an express contradictory rule contained in Chapter XI, Parts I and IV of the Court Rules shall otherwise apply to any case in the CBLP.

## Pre-Case Management Conference Activity

Initial conference preparation is required pursuant to *Rules* 4:103-1 and 4:103-2, comparable to Federal Rule of Civil Procedure 26, to require attorneys to both meet with their clients as well as each other before a meeting with a judge.

The initial meetings between counsel and their clients will provide an understanding of the potential data and information at issue and the time required to accomplish full discovery. In conferring with counsel, attorneys should prepare a Joint Discovery Plan for all discovery as well as an Electronic Discovery Plan, both of which are to be provided to the Court in advance of the Initial Conference. Counsel should also advise the Court of any unresolved discovery issues.

Electronic discovery (eDiscovery): the attorneys should meet and confer to discuss form, scope preservation/destruction, and expense of production; method for asserting or preserving claims of privilege or of protection; confidentiality; and any other electronic discovery issues. The Electronic Discovery Plan should set forth the parties' agreements as to all eDiscovery.

## Initial Conferences

The case will be scheduled for an Initial Conference with the CLBP Judge[1]. At that Conference, counsel will meet with the Judge/other court representative to discuss assignment and scheduling of the case. If it is determined that it should not be in the CBLP, the case may be removed at that time. If the case remains in the CBLP, a comprehensive Scheduling Order, setting forth all discovery deadlines, will be entered at that time.

---

[1] Should the need arise, the utilization of other judicial staff such as law clerks and/or a designated statewide case manager should be considered for overseeing/conducting certain conferences for CBLP cases.

## Model Stipulations/Orders

The CBLP Internet website has the following model case management, discovery and protective orders:

> Joint Proposed Discovery Plan;

> Discovery Confidentiality Order (Appendix XXX to the Rules of Court);

> Clawback Stipulation and Order;

> Electronic Discovery Stipulation and Order; and

> Scheduling Order.

## Contacting Chambers

At the time of the Initial Conference, the CBLP Judge should advise the parties the appropriate method(s) (phone, letter, email) and bases for contacting chambers. The CBLP Judge should also advise whether joint submissions will be required.

## Case Management/Status Conferences

As needed/requested by the parties (within reason). There, the parties will report their discovery progress and address any issues. Prior to such a conference a joint letter should be sent to the Court advising of the status of the case and the issues to be discussed at the Conference.

## Discovery and Motions

The Supreme Court has approved Court Rules to govern cases in the Program. Some aspects of discovery and motions in CBLP cases will be handled differently than other civil matters.

### Discovery

See *Rules* 4:104-1 through 4:104-9, which provide the timing, limits and confidentiality of discovery in CBLP matters. The Rules also address discovery disputes (*R.* 4:105-4). The parties should first "meet and confer" to try to resolve the issues. If an agreement cannot be reached, counsel should submit a letter to the court explaining the basis for the motion and requesting a telephone or in-court conference before the motion is made. The Rule provides a process to resolve the dispute if not resolved by the court conference.

### Motions

See *Rules* 4:105-1 through 4:105-9. These Rules seek to streamline and facilitate the motion practice while also addressing the complexity and need for ease and flexibility of litigants to seek and to obtain extensions. Discovery disputes should be handled as noted above and the Dispositive Motion schedule should be set forth in Joint Proposed Discovery Plan.

## Settlement and CDR

Any settlement conferences will be held at the CBLP judge's discretion. The CBLP judge will also advise whether a settlement conference memorandum is necessary as well as any content and formatting requirements.

CBLP cases are not part of the court's mandatory civil mediation and arbitration programs. However, the CBLP judge in each vicinage, as part of case management, should encourage the parties to engage in mediation or some type of dispute resolution to facilitate settlement.

## Pre-trial and Trial

All CBLP actions shall be pretried and the requirements of *Rule* 4:25 shall apply to the final pretrial conference, which should lead to the formulation of a trial plan, including a plan to facilitate the admission of evidence. With regard to trial exhibits, parties should prepare and submit Joint Exhibits to eliminate redundancy (it does not mean the parties are stipulating to its admissibility).

Model Stipulation and Order

Superior Court of New Jersey
Law Division, Civil Part
_____ County
Docket Number: L-_____

_____
                              Plaintiff(s),

            v.

_____
                              Defendant(s).

**Clawback Stipulation
and Order**

WHEREAS, the Parties[1] believe that it will promote the efficient, just, and economical resolution of this Litigation to supplement the existing Discovery Confidentiality Order by entering into this stipulation and Order (the "Clawback Order") regarding the exchange of certain electronically stored information ("ESI"), any electronically stored or maintained information, documents, or things, or portion of any documents or things ("Discovery Materials"); and

WHEREAS, based upon a good faith belief that the procedures set forth in the Electronic Discovery Stipulation and Order (the "eDiscovery Order") are likely to generate a large volume of Discovery Materials;

WHEREAS, based on the anticipated number of relevant and/or responsive Discovery Materials that will be identified in this Litigation, the Parties have previously agreed upon certain delimiters, procedures and processes set forth in the eDiscovery Order which include, *inter alia,* agreeing to utilize agreed upon search terms, date ranges and custodians to more accurately identify potentially relevant Discovery Materials; and

WHEREAS, despite these methods used to cull-down the number of documents identified as potentially relevant, the Parties recognize that the volume of Discovery Materials that will be exchanged in this Litigation is of a magnitude that the inadvertent disclosure of Discovery Materials that are subject to a claim of attorney-client, work product and/or other applicable privilege or immunity, and/or protected pursuant to applicable state and/or federal privacy laws (collectively, "Privileged Discovery Materials"), as well as the disclosure of other materials irrelevant to this Litigation ("Irrelevant Materials") is possible; and

WHEREAS, the Parties believe that permitting the production of Discovery Materials pursuant to this Clawback Order will materially reduce the cost and duration of discovery, the attendant burdens on the Parties, and the need for judicial intervention; and

WHEREAS, although New Jersey has not adopted a rule of evidence similar to Federal Rule of Evidence 502,[2] the Parties understand and stipulate that disclosure of Privileged Discovery Materials pursuant

---

[1] Unless otherwise defined, capitalized terms herein have the meanings assigned in the "Discovery Confidentiality Order").
[2] Entitled "Attorney-Client Privilege and Work Product; Limitations on Waiver."

to this Clawback Order will not prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of attorney-client, work product or other applicable privilege or immunity, under New Jersey law.

IT IS HEREBY STIPULATED, AGREED AND ORDERED:

1. Discovery Materials exchanged by the Parties in this Litigation is subject to and under the terms of this Clawback Order provided that the Party producing the Discovery Materials has made a good faith effort to prevent the inadvertent production of any Privileged Discovery Materials or Irrelevant Materials.

2. A Producing Party shall not be obligated to conduct a document-by-document review of the Discovery Material prior to its production in order to meet the good faith standard mentioned above; provided however, that a Producing Party utilized, at a minimum, the following best practices to avoid the inadvertent production of documents ("Best Practices"):

    a. Keyword search terms (e.g., the names of counsel and law firms for the Producing Party);
    b. Domain names; and
    c. Analytical software tools and/or other reasonable means to locate and exclude potentially Privileged Discovery Materials prior to the production of the Discovery Materials;

3. Any document that is not identified by using the above Best Practices is considered presumptively responsive/non-privileged and may be produced without performing a document-by-document review.

4. Any documents that are identified as being potentially privileged by using the above Best Practices shall be reviewed by the Producing Party and, if such material is responsive and non-objectionable, shall either be (i) produced (if such material is not deemed Privileged Discovery Material), or (ii) identified as privileged and placed onto the Producing Party's privilege log (if such material is deemed as Privileged Discovery Material), in the normal course of discovery, consistent with the Rules of this Court. If a Producing Party complies with Paragraphs 2 and 3 herein, such Producing Party shall be deemed to have implemented adequate precautions to prevent inadvertent disclosure of any Privileged Discovery Materials.

5. Disclosure of Privileged Discovery Materials in this Litigation, pursuant to this Clawback Order, shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any attorney-client, work product or other applicable privilege or immunity. Any Privileged Discovery Materials or Irrelevant Materials shall be deemed to have been inadvertently produced.

    a. A Party who receives any Discovery Materials that, upon review by such Party, appears on their face to be Privileged Discovery Materials shall: (i) refrain from any further examination or disclosure of such document pending confirmation by the Producing Party that such document is not Privileged Discovery Material; and (ii) provide reasonably prompt written notice to counsel

for the Producing Party that such document appears to be Privileged Discovery Material. Upon
receiving a written notice contemplated by the preceding sentence, the Producing Party shall
provide reasonably prompt written notice to the requesting Party indicating whether the
document in question constitutes Inadvertent Production Material.

b. A Producing Party shall be obligated to make a reasonably prompt claim of inadvertent
production upon the earlier of: (i) receiving notice under the preceding paragraph concerning
such document, or (ii) otherwise becoming aware of the inadvertent production of such
document. If a Producing Party complies with this paragraph, such Party shall be deemed to have
acted timely and adequately to rectify any inadvertent disclosure of Privileged Discovery
Materials.

c. The procedures set forth in Paragraph 9 of the Discovery Confidentiality Order shall apply to any
Discovery Material which is claimed to be Inadvertent Production Material.

d. The Producing Party shall timely log any Discovery Material that is claimed to be Inadvertent
Production Material, consistent with the Rules of Court.

6. Each Party shall have the right to demand the immediate return of any Irrelevant Material produced by
such Party. After the documents are returned, the Parties agree to meet and confer in good faith to
resolve any disputes that arise regarding the alleged Irrelevant Materials.  The Party that is challenging
the designation of potentially Irrelevant Material and is subject to destroy and/or return the documents at
issue must also destroy and/or obtain from any Party or third party that was provided with the potentially
Irrelevant Material until the issues are resolved through the meet and confer or by motion to the Court.

7. Nothing in this Clawback Order shall:

a. Require any Party to produce or disclose any Privileged Discovery Materials;

b. Require any Party to produce documents or data as Clawback Discovery Material;

c. Waive any Party's right to conduct limited pre-production review of Discovery Material prior to
production of such materials;

d. Modify the Discovery Confidentiality Order, unless expressly stated herein;

e. Except as expressly stated herein, modify any prior agreements among the Parties concerning the
conduct of discovery in this Litigation, including but not limited to agreements regarding the
collection of Discovery Material from certain custodians or the use of search terms to identify
potentially responsive documents; or

f. Prevent any Party from arguing that a waiver of an attorney-client, work product, or other
applicable privilege or immunity has occurred from circumstances other than disclosure of
Discovery Material pursuant to this Clawback Order.

8.  The Parties agree that any violation of this Clawback Order shall result in irreparable harm for which there is no adequate remedy at law. The Parties further agree that any Party shall be entitled to injunctive relief to enforce the terms hereof. In addition, the Parties expressly acknowledge that the Court may, in its discretion, award such other and further relief as the Court may deem appropriate.

9.  This Clawback Order applies only to Discovery Material produced by the Parties, and does not apply to Discovery Material produced by non-parties. In the event additional parties join or are joined in the Litigation, they shall not have access to Discovery Material until the newly-joined party, by its counsel, has executed and, at the request of any Party, filed with the Court its agreement to be fully bound by this Clawback Order.

10. The Parties agree to be bound by the terms of this Clawback Order pending the entry of this Clawback Order by the Court, and any violation of its terms shall be subject to the same sanctions and penalties as if this Clawback Order has been entered by the Court. Notwithstanding the foregoing, the Parties shall not be obligated to provide any Discovery Material prior to entry of this Clawback Order by the Court, unless the production of such Discovery Material is expressly required by another Order of the Court.

11. Subject to any applicable Rule of Court, the provisions of this Clawback Order shall, absent written permission of the Producing Party or further Order of the Court, continue to be binding throughout and after the conclusion of the Litigation, including without limitation any appeals therefrom.

12. Nothing in this Clawback Stipulation and Order shall preclude any Party from seeking judicial relief, upon notice to the Parties, with regard to any provision hereof.

13. This Clawback Stipulation and Order may be executed by PDF or conformed signature and may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which together shall constitute but one agreement.

Dated: _____

Dated: _____          _____
                                         Counsel for Plaintiff

                                         _____
                                         Counsel for Defendant

**IT IS SO ORDERED.**

Dated: _____          _____
                                                                    J.S.C.

Model Stipulation and Order

Superior Court of New Jersey
Law Division, Civil Part
_____ County
Docket Number: L-_____

_____
Plaintiff(s),

v.

**Electronic Discovery
Stipulation and Order**

_____
Defendant(s).

1. **Purpose**
   This Order (the "eDiscovery Order") will govern discovery of Electronically Stored Information ("ESI")
   and any electronically stored or maintained information in this case as a supplement to the Rules of Court,
   the Complex Business Litigation Program's Guidelines, and any other applicable Orders and Rules.

2. **Cooperation**
   The Parties are aware of the importance the Court places on cooperation and commit to cooperate in good
   faith throughout the matter consistent with this Court's Guidelines for the discovery and production of ESI
   and any electronically stored or maintained documents.

3. **Liaison**
   The Parties have designated liaisons who are and will be knowledgeable about and responsible for
   discussing their respective ESI and/or electronic documents ("eDiscovery Liaison"). Each eDiscovery
   Liaison will be, or have access to those who are, knowledgeable about the technical aspects of e-discovery,
   including the location, nature, accessibility, format, collection, search methodologies, and production of ESI
   and/or electronic documents in this matter. The Parties will rely on the eDiscovery Liaison, as needed, to
   confer about ESI and/or electronic documents and to help resolve disputes without court intervention. The
   following individuals are the designated as the eDiscovery Liaison for this litigation:

   Plaintiff(s) [with contact information]:

   Defendant(s) [with contact information]:

4. **Preservation**
   By signing this eDiscovery Order, the Parties certify that they have taken reasonable steps to preserve all
   ESI and electronically stored documents. Additionally, the Parties have discussed their preservation
   obligations and needs as litigation progresses and agree that preservation of potentially relevant ESI and
   electronically stored documents will be reasonable and proportionate. To reduce the costs and burdens of
   preservation, and to ensure proper ESI and/or electronically stored information is preserved, the Parties
   agree that:

   a) They have exchanged a list of custodians, the types of ESI and/or electronically stored information they
      believe should be preserved, or general job titles or descriptions of custodians, for whom they believe
      ESI and/or electronically stored information should be preserved, e.g., "HR head," "scientist,"
      "marketing manager," etc…;

   b) In addition to the previously preserved ESI and/or electronically stored information, the Parties agree
      that any ESI created or received between _____ and _____ will be preserved for the custodians
      and/or for those individuals who meet the general job titles or descriptions of custodians provided by the
      opposing party;

c) They have agreed/will agree on the number of custodians per party for whom ESI and/or electronically stored information will be preserved;

d) Data sources that are not reasonably accessible because of undue burden or cost and ESI from these sources will be preserved but not searched, reviewed, or produced: [e.g., backup media of [named] system, systems no longer in use that cannot be accessed];

e) Among the sources of data the Parties agree are not reasonably accessible, the Parties agree not to preserve the following: [e.g., backup media created before _____, digital voicemail, instant messaging, automatically saved versions of documents];

f) Any data sources, ESI and/or electronically stored information that has or potentially could have been destroyed is listed below and has been divulged to the opposing party;

　　　Plaintiff(s) Preservation Issues (if any):

　　　Defendant(s) Preservation Issues (if any):

g) In addition to the agreements above, the Parties agree data from these sources (a) could contain relevant information but (b) under the proportionality factors, should not be preserved: _____

## 5. Custodians

The Parties agree that in providing *R.* 4:103-1 Initial Disclosures, or earlier if appropriate, they have met and conferred about methods to search ESI in order to identify data sources that are likely to contain relevant documents. The Parties have agreed to _____ custodians and/or data sources each for the purposes of this litigation. Those custodians and/or data sources are listed below. The Parties shall add or remove custodians as reasonably necessary.

　　　Plaintiff(s) Custodians and/or Data Sources:

　　　Defendant(s) Custodians and/or Data Sources:

## 6. Search Terms

The Parties have agreed upon the following search terms:

　　　Plaintiff(s) Search Terms:

　　　Defendant(s) Search Terms:

In the event that any of the search terms return _____ documents or more, the Parties agree that the search term is per se overly broad and will work to create a more tailored search term.

## 7. Production

The Parties agree to run the appropriate de-duplication program prior to any production to reduce the number of duplicate documents. The Parties further agree to the Production Format set forth in Exhibit "A", which is attached hereto and incorporated as part of the eDiscovery Order, for all ESI and/or electronically stored information exchanged in this litigation.

The Parties agree to electronically Bates label documents as follows:

　　　Plaintiff(s) Bates Designation:

　　　Defendant(s) Bates Designation:

8. **Phasing (Rolling) Production**
   When a party propounds discovery requests pursuant to proposed *R.* 4:104-5, the Parties agree to phase the production of ESI (*i.e.* produce the documents on a rolling basis), and the initial production will be from the above-agreed upon custodians and data sources.

   Following the initial production, the Parties will continue to prioritize the order of subsequent productions.

9. **Documents Protected From Discovery**
   Although New Jersey has not adopted a rule of evidence similar to Federal Rule of Evidence 502 (Attorney-Client Privilege and Work Product; Limitations on Waiver), the Parties understand and stipulate that disclosure of Privileged Discovery Materials pursuant to this Stipulation and Order as well as any Clawback or other Order will not prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of attorney-client, work product or other applicable privilege or immunity, under New Jersey law.

   For example, the mere production of privileged or work-product-protected documents in this case as part of a mass production is not itself a waiver in this case, or in any other Federal or State proceeding.

   Communications involving trial counsel that post-date the filing of the Complaint need not be placed on a privilege log. Communications may be identified on a privilege log by category, rather than individually, if appropriate.

10. **Modification**
    This Stipulated Order may be modified by a Stipulated Order of the Parties or by the Court for good cause shown.

    **IT IS SO STIPULATED,** through Counsel of Record

Dated: _____          _____
                                Counsel for Plaintiff

Dated: _____          _____
                                Counsel for Defendant

    **IT IS SO ORDERED** that the foregoing Agreement is approved.

Dated: _____          _____
                                                              J.S.C.

Model Form

Superior Court of New Jersey
Law Division, Civil Part
_____ County
Docket Number: L-_____

_____
Plaintiff(s),

v.

**Joint Proposed
Discovery Plan**

_____
Defendant(s).

1.  Set forth the name of each attorney appearing, the firm name, address and telephone number and email address of each, designating the party represented.

2.  Set forth a brief description of the case, including the causes of action and defenses asserted.

3.  Have settlement discussions taken place?  ☐ Yes  ☐ No

4.  The Parties  ☐ have  ☐ have not  met pursuant to *R.* 4:103-2.

5.  The Parties  ☐ have  ☐ have not  exchanged the information required by *R.* 4:103-1(a)(1).  If not, state the reason therefor.

6.  Explain any problems in connection with completing the disclosures required by *R.* 4:103-1(a)(1).

7.  The Parties  ☐ have  ☐ have not  conducted discovery other than the above disclosures.  If so, describe.

8.  Proposed joint discovery plan:

    a)  Discovery is needed on the following subjects: _____

    b)  Discovery  ☐ should  ☐ should not  be conducted in phases or be limited to particular issues. Explain:

    c)  Proposed schedule:

        1)  *R.* 4:103-1 Disclosures _____.

        2)  Service of initial written discovery _____.

        3)  Maximum of _____ Interrogatories and _____ document requests by each party to each other party.  NOTE: Parties are to provide rolling privilege logs within ten (10) days after each production.

        4)  Maximum of _____ depositions to be taken by each party.

        5)  Motions to amend pleadings or to add Parties to be filed by _____.

        6)  Motions to resolve any privilege log disputes to be filed by _____.

        7)  Factual discovery to be completed by _____.

Promulgated by Directive #01-19 (01/31/2019), CN 12372

page 1 of 2

8) Plaintiff's expert report(s) due on _____.

9) Defendant's expert report(s) due on _____.

10) Any rebuttal reports due on _____.

11) Expert depositions to be completed by _____.

12) Discovery end date: _____.

13) Dispositive motions to be served within _____ days of discovery end date.

d) Set forth any special discovery mechanism or procedure requested.

e) A pretrial conference may take place on _____.

f) Trial Date: _____      ☐ Jury Trial  ☐ Non-Jury Trial

9. Do you anticipate any special discovery needs (i.e., videotape/telephone depositions, problems with out-of-state witnesses or documents, etc.)? If "Yes", please explain.      ☐ Yes  ☐ No

10. Do you anticipate any issues about disclosure or discovery of electronically stored information, including the form or forms in which it should be produced?      ☐ Yes  ☐ No

If "Yes", how will electronic discovery or data be disclosed or produced?

Describe any agreements reached by the Parties regarding same, including costs of discovery, production, related software, licensing agreements, etc.

11. Do you anticipate entry of a Discovery Confidentiality Order? See *R.* 4:104-6 and Appendix XXX.      ☐ Yes  ☐ No

12. Do you anticipate any discovery problem(s) not listed above? If "Yes", describe:      ☐ Yes  ☐ No

13. Is this case appropriate for bifurcation?      ☐ Yes  ☐ No

14. Is the case appropriate for mediation?      ☐ Yes  ☐ No

15. Do the parties consent to binding arbitration?      ☐ Yes  ☐ No

16. An interim status/settlement conference (with client representatives having settlement authority in attendance), shall be held on _____.

17. Identify any other issues to address at the Scheduling Conference.

_____      _____
Attorney(s) for Plaintiff(s)            Date

_____      _____      _____
Attorney(s) for Defendant(s)        Name of client                  Date

Model Order

Superior Court of New Jersey
Law Division, Civil Part
_____ County
Docket Number: L-_____

_____
                            Plaintiff(s),

                v.

_____
                            Defendant(s).

**Scheduling Order**

This matter having come before the Court for an Initial Conference, and for good cause shown,

It is, on this ____ day of _____, 20__, **ORDERED** as follows:

(1)     *R.* 4:103-1 Disclosures of the parties must be served on all parties no later than fourteen (14) days from the date of the Initial Conference.

(2)     Service of initial written discovery to be completed by _____.

(3)     Maximum of ____ Interrogatories and document requests by each party to each other party (if other than the limits set forth in *R.* 4:104-4).

(4)     Maximum of ____ depositions to be taken by each party (if other than the limits set forth in *R.* 4:104-3).

(5)     Motions to amend pleadings or to add parties to be filed by _____.

(6)     Motions to resolve any privilege log disputes to be filed by _____.

(7)     Factual discovery to be completed by _____.

(8)     Plaintiff's expert report(s) due on _____.

(9)     Defendant's expert report(s) due on _____.

(10)    Any rebuttal reports due on _____.

(11)    Expert depositions to be completed by _____.

(12)    Discovery end date: _____.

(13)    Dispositive motions to be served within ____ days of discovery end date.

(14)    Tentative Status Conference Date (if necessary): _____.

(15)    Tentative Pre-Trial Conference Date: _____.

(16)    Tentative Trial Date: _____.

Dated: _____        _____
                                                                                            J.S.C.

NOTE: The parties may agree to set and/or modify interim deadlines without court approval, provided that any such change will not have any impact on the discovery end date.

NOTE:  The setting of the Tentative Trial Date, above, does not implicate the "exceptional circumstances" standard of *R.* 4:24-1(c), and discovery extensions may be considered for good cause shown.

Promulgated by Directive #01-19 (01/31/2019), CN 12373

**ESSEX COUNTY - CIVIL DIVISION**
**SUPERIOR COURT OF NJ**
**465 MARTIN LUTHER KING JR BLVD**
**NEWARK          NJ 07102**

                           **TRACK ASSIGNMENT NOTICE**

**COURT TELEPHONE NO. (973) 776-9300**
**COURT HOURS  8:30 AM - 4:30 PM**

                    **DATE:    SEPTEMBER 24, 2025**
                    **RE:      V. J.  VS LEXISNEXIS RISK SOLU TIONS, IN**
                    **DOCKET: ESX L -007269 25**

     **THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 4.**

     **DISCOVERY IS PRESUMPTIVELY 450 DAYS BUT MAY BE ENLARGED OR SHORTENED BY THE**
**JUDGE AND RUNS FROM THE FIRST ANSWER OR 90 DAYS FROM SERVICE ON THE FIRST**
**DEFENDANT, WHICHEVER COMES FIRST.**
**FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.**

     **THE MANAGING JUDGE ASSIGNED IS:  HON STEPHEN L. PETRILLO**

     **IF YOU HAVE ANY QUESTIONS, CONTACT TEAM     004**
**AT:  (973) 776-9300 EXT 57345.**

     **IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A**
 **CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.**
     **PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE**
**WITH  R.4:5A-2.**
                    **ATTENTION:**

                         **ATT: JESSICA A. MEREJO**
                         **PEM LAW LLP**
                         **1 BOLAND DR**
                         **SUITE 101**
                         **WEST ORANGE       NJ 07052**


**ECOURTS**