**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

P.J., G.P., C.N., *individually and on behalf of all others similarly situated*,

Plaintiffs,

v.

LEXISNEXIS RISK SOLUTIONS, INC., RICHARD ROES 1-10, *fictitious names of unknown individuals* and ABC COMPANIES 1-10, *fictitious names of unknown entities*,

Defendants.

Civil Action No.: 1:25-cv-18288

Honorable Harvey Bartle, III, U.S.D.J.

**SECOND AMENDED COMPLAINT**

**PEM LAW LLP**
Rajiv D. Parikh, Esq.
Kathleen Barnett Einhorn, Esq.
Jessica A. Merejo, Esq.
1 Boland Drive, Suite 101
West Orange, New Jersey 07052
Telephone: (973) 577-5500
Email: rparikh@pemlawfirm.com
keinhorn@pemlawfirm.com
jmerejo@pemlawfirm.com

**BOIES SCHILLER FLEXNER LLP**
Adam R. Shaw, Esq. (*pro hac vice* forthcoming)
30 South Pearl Street, 12th Floor
Albany, New York 12207
Telephone: (518) 434-0600
Email: ashaw@bsfllp.com
*Attorneys for Plaintiffs*

## INTRODUCTION

1. This case is very simple. Irrespective of whether a proper security freeze has been imposed on a consumer's credit file, consumer reporting agencies have an unequivocal obligation under both Federal and State law to lift such a freeze promptly upon the consumer's request.

2. Here, Defendant LexisNexis Risk Solutions, Inc. and its affiliates (collectively "Defendants") failed to lift security freezes they unilaterally imposed on the named Plaintiffs and other members of the proposed class despite each Plaintiff's repeated attempts and efforts to have Defendants remove them.

3. Defendants' failure to remove these security freezes, irrespective of whether they were properly placed or not, violates the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*; the New Jersey Identity Theft Prevention Act, N.J.S.A. 56:11-44, *et seq.*; and common law.

4. As set forth in more detail below, Plaintiffs, whose names have been anonymized due to their privacy and safety concerns, are all law enforcement officers who reside in New Jersey.

5. Defendants are consumer reporting agencies engaged in data-brokering and credit-reporting services. Defendants are each directly involved in the violations and unlawful conduct described in this Complaint.

6. Plaintiffs name additional fictitious defendants insofar as they are affiliates of LexisNexis's consumer reporting business. Plaintiffs expressly exclude any of LexisNexis's non-FCRA covered entities that also sell or disclose data from this Complaint.

7. Daniel's Law[1] was passed unanimously by the New Jersey Legislature to provide judges, prosecutors, and law enforcement officers and their families with the right to prevent the disclosure of their home addresses and unpublished telephone numbers. This right was intended

[1] P.L. 2020, c. 125, codified in N.J.S.A. 47:1A-1 *et seq.*, N.J.S.A. 47:1B-1, *et seq.*, and N.J.S.A. 56:8-166.1, *et seq*.

to allow these public servants to better protect themselves and their family members against a wide range of harassment and threats, including threats of physical violence and death. Recognizing the severity of the risks involved in public service, the Legislature also provided these individuals with meaningful ways for them to enforce their rights against uncooperative profit- seeking data brokers such as LexisNexis Risk Solutions, Inc. ("LexisNexis").

8. As set forth in more detail below, Plaintiffs are some of the over 18,000 Covered Persons who each exercised their legal right under New Jersey's Daniel's Law and personally transmitted a nondisclosure request via electronic mail to Defendants or entities related to Defendants, only seeking to prevent the disclosure or redisclosure of their home addresses and/or unpublished telephone number to **unauthorized** third parties (a "Nondisclosure Request").

9. Rather than complying with these lawful requests, Defendants chose to engage in an unlawful campaign of retaliation and intimidation against Plaintiffs and others. Instead of fulfilling their legal obligations, Defendants set into motion a campaign to, among other things, freeze Plaintiffs' credit reports, effectively blocking their access to financial, insurance, and other essential services. This deliberate retaliation punished Plaintiffs and others for invoking their privacy and safety rights under Daniel's Law.

10. In written correspondence to Plaintiffs, Defendants themselves admitted that the freezes they imposed could result in denied credit, insurance underwriting failures, and barriers to accessing financial and healthcare services.

11. In response to this correspondence, Plaintiffs repeatedly contacted Defendants requesting removal of the freezes, only to be met with delays, denials, and misleading responses that exacerbated their hardship.

12. The consequences of Defendants' misconduct have been devastating. Many Plaintiffs have faced severe actual financial hardship, lost opportunities, and experienced

significant emotional distress due to their inability to access their own credit. Some Plaintiffs were unable to purchase vehicles, refinance loans, or obtain necessary insurance coverage. Others were humiliated and frustrated when denied routine financial transactions due to the unauthorized freezes. All Plaintiffs and putative class members spent a significant amount of time seeking to have the improper freezes lifted without success. Defendants' deliberate refusal to remove these freezes—even after Plaintiffs verified their identities multiple times—left them stranded without financial access, forcing them to make desperate pleas for resolution.

13. Plaintiffs now bring this action because they have exhausted all other avenues for relief. To be clear, this suit is not about whether Defendants acted in accordance with the law in placing unauthorized security freezes on Plaintiffs' consumer reports. Rather, this suit is singularly focused on the fact that despite numerous requests, Defendants have and continue to defy the law by failing to timely remove these unauthorized security freezes.

14. The law is clear: security freezes must be promptly lifted or removed upon request. Yet, Defendants have brazenly disregarded this requirement, inflicting harm upon these public servants and their families. As detailed below, LexisNexis has engaged in a prolonged effort to thwart Plaintiffs' efforts to lift these security freezes. The purposeful retribution, intimidation, and financial harm orchestrated by Defendants against the Plaintiff law enforcement officers—who already risk their lives in service to the public—cannot and should not be tolerated. Plaintiffs, on behalf of themselves and others similarly situated, respectfully seek relief from this Court.

## THE PARTIES

### I. Plaintiff, Officer P.J.

15. Plaintiff P.J., whose name and address have been anonymized for security reasons, is a resident of Flemington, New Jersey. Officer P.J. serves as a Detective in Somerset County.

16. In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer P.J. exercised his statutory privacy and security rights under Daniel's Law.

Around early 2024, Officer P.J. sent a Nondisclosure Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available his home address and unpublished telephone number.

17. At no point did Officer P.J. request a security freeze on his consumer report, nor did he report an instance of identity theft pursuant to N.J.S.A. 56:11-44, et seq.[2] Nothing in the Nondisclosure Request sent by Officer P.J. to Defendants—or any other entity—contained a request for a security freeze or any report of identity theft.

18. Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer P.J., acting with intent, design, and malice.

19. A few weeks later, Defendants responded via email, acknowledging receipt of Officer P.J.'s Nondisclosure Request and confirming that it had been processed. In that same email, Defendants unilaterally imposed a security freeze on Officer P.J.'s consumer report without authorization.

20. Subsequently, Officer P.J. received a physical LexisNexis Security Freeze Notification Letter in the mail from Defendants, formally notifying him that a security freeze had been placed on his file (a "LexisNexis Security Freeze Notification Letter"):

[2] N.J.S.A. 56:11-44, *et seq.* is entitled the "Identity Theft Prevention Act."

LexisNexis®

LexisNexis® Consumer Center
Consumer Number: [redacted]
Case Number: [redacted]

[redacted]

[redacted]

[redacted]

Dear [redacted]

RE: Security Freeze Confirmation

Thank you for your request to place a security freeze on your file with LexisNexis Risk Solutions, ("LexisNexis") as provided by law in your state of residence. This letter is to confirm that a security freeze has been placed on your file.

Security freezes will be placed based on your state of residency and the customers use case. Based on this information, LexisNexis may not release your report(s) or score(s) derived for those use cases. You should be aware that applying a security freeze to your file may delay, interfere with, or prohibit the timely approval of applications you make for items such as credit, benefits, or insurance underwriting. WARNING TO PERSONS SEEKING A CREDIT FREEZE AS PERMITTED BY THE CREDIT REPORT PROTECTION ACT: YOU MAY BE DENIED CREDIT AS A RESULT OF A FREEZE PLACED ON YOUR CREDIT FILE. A security freeze does not apply to certain users of consumer reports, including those with whom you already have an existing account. These users request your file for the purpose of reviewing that account.

This security freeze is being placed on your file pursuant to the security freeze laws in your state of residence, NJ, specifically, N.J. Stat. Ann. § 56:11-30, 56:11-46, 13:45F-2.1 through 13:45F-2.7, 13:45F-5.1 as of the date of this letter.If your state of residence changes, please notify LexisNexis at the number below and request an update to the applicability of your security freeze.This security freeze will remain in place indefinitely until you decide to temporarily or permanently remove the security freeze.Below you will find a unique Personal Identification Number(PIN) that you will need in the event that you choose to temporarily or permanently remove the security freeze.

[redacted]

Should you wish to remove your security freeze, you must contact us and provide proper identification and your PIN number.

Please note that LexisNexis does not charge for security freezes.

If you have any further questions, you may contact the LexisNexis Consumer Center via email at consumer.documents@LexisNexisRisk.com or by phone at 800-456-1244. The LexisNexis Consumer Center's hours of operation are Monday – Friday from 8:00 A.M. to 7:00 P.M. Eastern Time. In an effort to protect your privacy and deliver prompt service, please have your Consumer Number (located at the top of this letter) accessible when you call our support number.

[redacted]

LexisNexis Consumer Center
Attn: Security Freeze
P.O. Box 105108
Atlanta, GA 30348-5108

[redacted]

Total Pages 1 of 6 Page 1 [redacted]

21. The LexisNexis Security Freeze Notification Letter further stated that an identity theft had been reported under N.J.S.A. 56:11-44, et seq.—a complete fabrication, as Officer P.J. had never made such a report.

22. In July of 2024, Officer P.J. called Defendants using the phone number provided in the LexisNexis Security Freeze Notification Letter to request the security freeze on his credit report be lifted. At that time, he needed financing to purchase a new mattress. In accordance with the process outlined by Defendants, Officer P.J. provided his PIN, verified his personal information, and uploaded a copy of his social security card and New Jersey driver's license to the LexisNexis Dropbox. Defendants did not lift the freeze right away. After approximately two days, Defendants lifted the security freeze, allowing Officer P.J. to obtain financing and complete the purchase of the mattress. However, shortly thereafter, Defendants reinstated the security freeze.

23. In December 2024, Officer P.J. sought to purchase a Toyota Tacoma. Anticipating that a credit check would be required, he called Defendants on December 10, 2024, and again requested that the security freeze be lifted to facilitate the vehicle purchase. After verifying his identity, the LexisNexis representative instructed him to upload his identifying documents again. The representative advised that processing the request could take up to 24 hours. Officer P.J. also provided the representative his PIN.

24. Following these instructions, Officer P.J. again uploaded copies of his driver's license and Social Security card. Upon submission, Officer P.J. received an automated confirmation message via the LexisNexis web portal, indicating that the documents had been received.

25. That same day, Officer P.J. visited the Morristown Toyota dealership, intending to place a deposit on a specific 2022 Tacoma TRD Sport for $33,873.21 ("Desired Tacoma"). The Desired Tacoma was in pristine condition and met all of Officer P.J.'s specifications.

26. However, Officer P.J. was unable to proceed with the purchase due to the ongoing security freeze. Recognizing the risk that another buyer might purchase the vehicle, he inquired with a dealership sales representative about placing a deposit to hold the vehicle until the security freeze was lifted. Unfortunately, the dealership required a credit check before allowing a deposit, effectively preventing Officer P.J. from securing the Desired Tacoma.

27. On the morning of December 11, 2024, Officer P.J. again called Defendants, seeking an update on the removal of the security freeze. The LexisNexis representative informed him that this identity verification process would take an additional 24 hours, followed by another 24-hour period before the security freeze could be lifted.

28. Due to the urgency of the situation, Officer P.J. requested expedited processing. The LexisNexis representative denied this request, stating that the documents he previously submitted could not be located. Eventually the representative located the documents but then claimed that Officer P.J.'s profile could not be found in the system.

29. Frustrated by Defendants' continued delays, Officer P.J. requested that the matter be escalated to a supervisor. He was transferred to a supervisor who verified his identity for the third time, but the LexisNexis supervisor likewise stated that his profile could not be located.

30. The following morning, at approximately 10 a.m., the dealership contacted Officer P.J. and informed him that the Desired Tacoma had been sold to another buyer.

31. Later that morning, the LexisNexis supervisor called Officer P.J. but had no update regarding the status of his request. Frustrated and realizing the financial loss caused by Defendants' deliberate conduct, Officer P.J. explained to the supervisor that due to their inability to lift the freeze in a timely manner, he had lost the opportunity to purchase his preferred vehicle. Later that afternoon, in a subsequent call with the same supervisor, the supervisor reiterated that she could not provide an estimate for when the security freeze could be lifted or escalate the issue to another department.

32. After approximately 5 p.m., another LexisNexis representative called Officer P.J. and informed him that the security freeze had been lifted. However, the representative noted that there were still unresolved issues with his profile.

33. Now left without his desired vehicle, Officer P.J. had no choice but to purchase a different vehicle. The alternative vehicle he was able to find was inferior in condition and cost more than the

Desired Tacoma. Additionally, it lacked several features that were included in the Desired Tacoma, forcing Officer P.J. to incur additional expenses to obtain those features separately.

34. Shortly after purchasing the replacement vehicle, Officer P.J. began experiencing electrical system issues with the vehicle. Moreover, because Defendants had only temporarily lifted the security freeze, Officer P.J. continues to face difficulties accessing his credit.

35. Then, on April 8, 2025, Officer P.J. called Defendants again to request another lift of his security freeze to co-sign on a business bank account with his wife. Once again, the LexisNexis representative could not find Officer P.J.'s profile in their system. The representative provided Officer P.J. with a case number and directed him to upload his driver's license and social security card to verify his identity yet again.

36. Officer P.J. uploaded the supporting documents to the LexisNexis portal the next morning. Defendants never confirmed receipt or followed up.

37. In attempt to speed up the process, on April 11, 2025 Officer P.J. returned to the portal and submitted his documentation again. The portal immediately confirmed receipt and informed Officer P.J. that his submission was under review.

38. Since then, Officer P.J. has not received any communication from Defendants regarding the status of his request to lift the freeze.

39. As a result of this delay, Officer P.J. had to postpone the bank appointment with his wife indefinitely. While Defendants refuse to lift the freeze, Officer P.J. cannot co-sign on the business account, inhibiting his family's ability to generate income.

**II. Plaintiff, Officer G.P.**

40. Plaintiff G.P., whose name and address have been anonymized for security reasons, is a resident of Lacey Township, New Jersey. Officer G.P. serves as a Detective in Monmouth County. He has served as a law enforcement officer for over 20 years and has received multiple commendations

from his department in recognition of his dedication and service.

41. In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer G.P. exercised his statutory privacy and security rights under Daniel's Law. Around late 2023, Officer G.P. sent a Nondisclosure Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available his home address and unpublished telephone numbers.

42. At no point did Officer G.P. request a security freeze on his consumer report, nor did he report an instance of identity theft pursuant to N.J.S.A. 56:11-44, et seq. Nothing in the Nondisclosure Request sent by Officer G.P. to Defendants—or any other entity—contained a request for a security freeze or any report of identity theft.

43. Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer G.P., acting with intent, design, and malice.

44. A few weeks later, Defendants responded via email, acknowledging receipt of Officer G.P.'s Nondisclosure Request and confirming that it had been processed. In that same email, Defendants unilaterally imposed a security freeze on Officer G.P.'s consumer report without authorization.

45. On December 30, 2024, Officer G.P. received a letter from his homeowners' insurance provider, Narragansett Bay Insurance Company, informing him that his homeowners' insurance policy would not be renewed.

46. Concerned with this unexpected policy cancellation, Officer G.P. contacted Geico Insurance ("Geico") to secure a new homeowners' insurance policy. During the application process, Geico agent Jeffrey Sinicki ("Sinicki") informed Officer G.P. that he was unable to complete the application due to an issue with the insurance underwriting. Sinicki then forwarded Officer G.P. an email from Geico's underwriting department which stated: "[t]he loss report was not received due to a Hold placed on the loss report. Please have the customer contact LexisNexis at 1-800-456-1244 and include

the C.L.U.E. reference number below to have the Hold lifted."

47. Upon receiving this information, Officer G.P. immediately called Defendants. He provided his full name, address, date of birth, Social Security number, and New Jersey driver's license number. He then explained that he was attempting to obtain homeowners' insurance but had been informed that a security freeze on his file was preventing the completion of the application.

48. The LexisNexis representative informed Officer G.P. that she was unable to locate his file. She then asked whether he was a covered person under Daniel's Law as a law enforcement officer or government employee. Officer G.P. confirmed that he was a law enforcement officer covered under Daniel's Law. In response, the LexisNexis representative stated that she needed to check the system again.

49. After reviewing the system, the representative informed Officer G.P. that she could not remove the security freeze and that his request would be forwarded to another department. When Officer G.P. asked for additional information regarding the status of the request, the LexisNexis representative refused to provide further details and stated she had no estimated timeframe for the removal of the security freeze.

50. The following day, on December 31, 2024, Officer G.P. sent an email to Defendants, demanding that the security freeze be removed within one hour of receipt. In the email, Officer G.P. provided the same information as in his initial Nondisclosure Request: his name, address, and phone number.

51. On January 2, 2025, Officer G.P. followed up with Geico agent Sinicki to determine whether Defendants had removed the freeze from his file. Sinicki replied that the security freeze was still in place and that he remained unable to process the application.

52. Following Sinicki's email, Officer G.P. located his physical LexisNexis Security Freeze Notification Letter which he had received in the mail from Defendants. The letter formally notified him

that a security freeze had been placed on his file. The letter further stated that an identity theft had been reported under N.J.S.A. 56:11-44, et seq.—a complete fabrication, as Officer G.P. had never made such a report.

53. That same day, Officer G.P. once again called Defendants seeking the removal of the unauthorized security freeze placed on his consumer report. As in prior calls, he was required to provide his personal information, including his full name, address, date of birth, Social Security number, and New Jersey driver's license number. Given the sensitive nature of this information, Officer G.P. felt increasingly uneasy about repeatedly disclosing it. Nevertheless, he complied and provided the case number and PIN, clearly identifying himself and authenticating his request.

54. After returning to the call, the representative said that under New Jersey state law, there was a freeze placed on the account. Officer G.P. stopped the representative and advised her that she and her company misinterpreted Daniel's Law.

55. Despite his full compliance with all authentication requirements, the LexisNexis representative informed him there was nothing she could do. She stated that the request would have to be forwarded to another department for further handling. When Officer G.P. inquired about the expected timeline for resolution, the representative admitted she could not provide an estimate.

56. Frustrated by the continued delays, Officer G.P. requested to speak to a LexisNexis supervisor. However, his conversation with the supervisor was nearly identical to the previous exchange with the representative. Once again, Defendants refused to take immediate action, despite Officer G.P.'s urgent need to secure homeowners' insurance. He explained that Defendants' refusal to remove the unauthorized security freeze placed him at risk of a lapse in coverage and the loss of a favorable insurance rate from Geico. Despite the serious financial consequences, the LexisNexis supervisor failed to provide any assistance or timeline for resolution.

57. After several additional days of uncertainty and financial risk, on the morning of January

9, 2025, Sinicki was finally able to run Officer G.P.'s application for homeowners' insurance.

**III. Plaintiff, Officer C.N.**

58. Plaintiff C.N., whose name and address have been anonymized for security reasons, is a resident of Brick, New Jersey. Officer C.N. serves as a law enforcement officer in Ocean County, where he works as a SWAT sniper.

59. In an effort to protect himself and his family from threats arising from his law enforcement duties, Officer C.N. exercised his statutory privacy and security rights under Daniel's Law. Around late 2023, Officer C.N. sent a Nondisclosure Request to Defendants, requesting they cease disclosing, re-disclosing, or otherwise making available his home address and unpublished telephone number.

60. At no point did Officer C.N. request a security freeze on his consumer report, nor did he report an instance of identity theft pursuant to N.J.S.A. 56:11-44, et seq. Nothing in the Nondisclosure Request sent by Officer C.N. to Defendants—or any other entity—contained a request for a security freeze or any report of identity theft.

61. Rather than complying with Daniel's Law, Defendants engaged in a deliberate and retaliatory course of conduct against Officer C.N., acting with intent, design, and malice.

62. A few weeks later, Defendants responded via email, acknowledging receipt of Officer C.N.'s Nondisclosure Request and confirming that it had been processed. In that same email, Defendants unilaterally imposed a security freeze on Officer C.N.'s consumer report without authorization.

63. Subsequently, Officer C.N. received a physical LexisNexis Security Freeze Notification Letter in the mail from Defendants, formally notifying him that a security freeze had been placed on his file. The letter further stated that an identity theft had been reported under N.J.S.A. 56:11-44, et seq.—a complete fabrication, as Officer C.N. had never made such a report.

64. Over the past several months, Officer C.N. has encountered numerous financial obstacles

due to Defendants' unauthorized security freeze on his consumer report.

65. In February 2024, Officer C.N. contacted USAA to inquire about interest rates for refinancing his truck. However, USAA was unable to retrieve the necessary financial data to provide refinancing options. When Officer C.N. inquired about the issue, USAA could not identify the reason for the problem. Unbeknownst to him at the time, Defendants' unauthorized security freeze had blocked access to his credit report, preventing him from obtaining refinancing.

66. Officer C.N. shares a JetBlue credit card account with his wife, which serves as the primary credit card for their household expenses. Recently, JetBlue began sending repeated requests for him to update his account information, indicating that their system could not verify his existence. Despite multiple attempts to update his account information, the issue remained unresolved. If Officer C.N. is ultimately removed as a cardholder due to his inability to authenticate his identity through a credit check, his family will suffer substantial financial hardship.

67. In May 2024, Officer C.N. attempted to use his BestBuy credit card to make a purchase. At the point of sale, the store representative informed him that there was an issue with his account and advised him to contact the bank. Upon calling the bank, the bank agent confirmed that there were no issues with his account and that he should have been approved to complete the purchase. Confused and embarrassed, Officer C.N. had no choice but to use a different card, forfeiting the deferred interest benefits and rewards points that he would have otherwise accumulated on the purchase.

68. Officer C.N. also attempted to use his Synchrony credit card to make a purchase. As before, the store representative informed him that there was a problem with his account and advised him to contact the bank. Although the bank was ultimately able to approve the transaction—since the purchase was under $500.00—this incident was yet another consequence of the security freeze improperly placed by Defendants.

69. In addition to these challenges, Officer C.N. has experienced unexplained increases in

his car insurance premiums with Farmers Insurance. After noticing multiple increases in his premium, he contacted Farmers Insurance to inquire about the cause. The Farmers Insurance agent was unable to provide an explanation, prompting Officer C.N. to request a credit check. The agent informed him that they were unable to access his credit file, preventing them from properly assessing his rates. Since then, his premiums have increased a third time, adding further financial strain on him and his family.

70. Officer C.N. also attempted to open a new credit card with Raymour & Flanigan to take advantage of a new cardholder deal to purchase a bed for his child at a discounted rate. After reviewing his personal information, the representative informed him that he was pre-approved for the store card. However, when he attempted to finalize the application, it was denied because his credit report could not be processed. As a result, he was forced to use a different card to complete the purchase, causing him to lose out on the deferred interest benefit he would have received as a new cardholder.

71. Due to the security freeze, Officer C.N. has also been denied multiple purchases through Affirm, a financial firm he regularly uses to make large purchases without interest. On January 2, 2025, he attempted to purchase a fireplace for $1,600 through Affirm. Despite multiple attempts, Affirm denied his purchase three times. The denial letters attributed the denial to issues verifying Officer C.N.'s identity, stating: "Our partner bank can't approve the loan you requested because we couldn't verify your identity based on the information we received."

72. Later that day, Officer C.N. called Defendants to demand the removal of the unauthorized security freeze. The LexisNexis representative requested that he verify his identity by providing his full name, address, date of birth, Social Security number, and PIN. Officer C.N. fully complied with these authentication procedures. Despite this, the LexisNexis representative informed him that his profile could not be created because his identifying information was frozen, rendering his account inaccessible.

73. Following this stressful call, Officer C.N. submitted his identification documents to Defendants, fully expecting the issue to be resolved.

74. However, instead of removing the security freeze, Defendants responded with yet another letter falsely informing Officer C.N. that he had once again requested a security freeze—a blatant misrepresentation of the facts:

LexisNexis®

LexisNexis® Consumer Center
Consumer Number: [redacted]
Case Number: [redacted]

January 06, 2025

[redacted]

Dear [redacted]

RE: Security Freeze Confirmation

Thank you for your request to place a security freeze on your file with LexisNexis Risk Solutions, ("LexisNexis") as provided by law in your state of residence. This letter is to confirm that a security freeze has been placed on your file.

Security freezes will be placed based on your state of residency and the customers use case. Based on this information, LexisNexis may not release your report(s) or score(s) derived for those use cases. You should be aware that applying a security freeze to your file may delay, interfere with, or prohibit the timely approval of applications you make for items such as credit, benefits, or insurance underwriting. WARNING TO PERSONS SEEKING A CREDIT FREEZE AS PERMITTED BY THE CREDIT REPORT PROTECTION ACT: YOU MAY BE DENIED CREDIT AS A RESULT OF A FREEZE PLACED ON YOUR CREDIT FILE. A security freeze does not apply to certain users of consumer reports, including those with whom you already have an existing account. These users request your file for the purpose of reviewing that account.

This security freeze is being placed on your file pursuant to the security freeze laws in your state of residence, NJ, specifically, N.J. Stat. Ann. § 56:11-30, 56:11-46, 13:45F-2.1 through 13:45F-2.7, 13:45F-5.1 as of the date of this letter.If your state of residence changes, please notify LexisNexis at the number below and request an update to the applicability of your security freeze.This security freeze will remain in place indefinitely until you decide to temporarily or permanently remove the security freeze.Below you will find a unique Personal Identification Number(PIN) that you will need in the event that you choose to temporarily or permanently remove the security freeze.

[redacted]

Should you wish to remove your security freeze, you must contact us and provide proper identification and your PIN number.

Please note that LexisNexis does not charge for security freezes.

If you have any further questions, you may contact the LexisNexis Consumer Center via email at consumer.documents@LexisNexisRisk.com or by phone at 800-456-1244. The LexisNexis Consumer Center's hours of operation are Monday – Friday from 8:00 A.M. to 7:00 P.M. Eastern Time. In an effort to protect your privacy and deliver prompt service, please have your Consumer Number (located at the top of this letter) accessible when you call our support number.

LexisNexis Consumer Center
Attn: Security Freeze
P.O. Box 105108
Atlanta, GA 30348-5108

Total Pages 1 of 6 Page 1 CC18-08-19b

75. The ongoing security freeze poses an urgent and critical financial barrier for Officer

C.N., as he is actively seeking to purchase land in another state to begin construction of his retirement home. The real estate market is highly competitive, and properties at his desired price point could become available at any moment. Due to Defendants' continued refusal to remove the unauthorized freeze, Officer C.N. faces the substantial risk of missing out on valuable opportunities simply because he cannot access his own credit report in a timely manner. Without immediate relief, he remains unable to proceed with his long-term financial and personal plans, further compounding the harm inflicted by Defendants' unlawful actions.

**Plaintiffs Meet the Requirements of Rule 23 for Certification as a Class**

76. Plaintiffs P.J., G.P., and C.N. seek to represent the following class of "covered persons" under New Jersey's Daniel's Law:

a. Persons who submitted requests to Defendants to lift or remove security freezes Defendants placed on their credit reports, whose security freezes were not lifted within the time required by the FCRA or New Jersey Identity Theft Protection Act ("NJ ITPA").

77. The proposed class consists of at least 2,500 members; accordingly, the class is so numerous that joinder of all members is impracticable.

78. Questions of law or fact are common to the class. Common questions include:

a. What constitutes a request to lift or remove a security freeze under the FCRA or NJ ITPA;

b. Whether Defendants lifted or removed the security freezes within the time required by the FCRA or NJ ITPA;

c. Whether Defendants' conduct was motivated by a desire to retaliate against Plaintiffs exercising their rights under Daniel's Law;

d. Whether Defendants acted willfully with respect to their violations of the FCRA or

NJ ITPA; and

e. Whether Defendants acted negligently with respect to their violations of the FCRA or NJ ITPA.

79. The claims or defenses of the representative parties are typical of the claims or defenses of the class in that:

a. All the representative parties are "covered persons" under Daniel's Law;

b. All were subjected to Defendants' unauthorized security freezes and misreporting of identity theft in retaliation for their efforts to bring Defendants into compliance with Daniel's Law;

c. All the representative parties submitted requests to lift or remove a security freeze from their credit report; and

d. Defendants failed to lift or remove the security freezes within the required timeframe.

80. The representative parties will fairly and adequately protect the interests of the class because their interests are aligned in that the harm caused by Defendants' actions. Additionally, the representative parties have retained counsel with substantial experience litigating such class actions.

81. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because without a class action, most class members would find the cost of litigating their claims to be prohibitively high, and they would accordingly be left with no effective remedy at law or equity and would continue to incur damages. A class action is also superior because it will conserve the resources of both the courts and the litigants while promoting consistency in the adjudication of the class's claims.

**Defendants, ROES, and ABC Companies**

82. Defendant LexisNexis Risk Solutions, Inc. ("LNRS") is an entity that provides data-

brokering and credit-reporting services and is an entity involved in the violations described in this Second Amended Complaint.

83. LNRS transacts business within the State of New Jersey and is registered to do business in the State of New Jersey. LNRS is registered with the New Jersey Department of the Treasury and the New Jersey Division of Revenue and Enterprise Services to do business in the State of New Jersey. LNRS has been incorporated in New Jersey since February 14, 1975. LNRS has an office in New Jersey at 300 Connell Drive, Berkeley Heights, New Jersey 07922.

84. LNRS is a corporation with its principal place of business located at 1000 Alderman Drive, Alpharetta, Georgia. LNRS engages in data-brokering and credit-reporting services and is directly involved in the violations and unlawful conduct described in this Complaint. LNRS is a credit reporting agency that issues consumer reports regulated by the FCRA. LNRS discloses or re-discloses on the Internet or otherwise makes available the home addresses and/or unpublished home telephone numbers of Covered Persons.

85. LNRS provides services that are specific to New Jersey. In 2017, the New Jersey Department of Gaming Enforcement accepted LNRS' application to service the New Jersey gaming sector.[3] Public information on LNRS' website shows it offers identity and age verification services to online gaming operators in New Jersey. LNRS also contracts with law enforcement agencies in New Jersey to buy access to automobile crash reports and then sells this crash report data to third parties through its product, BuyCrash.[4] LNRS has another contract with the New Jersey state government to provide "DATA ACCESS SERVICES: WEB-BASED INVESTIGATIVE AND LOCATOR DATA" from March 9, 2016 through September 8, 2025.[5] In addition, LNRS works extensively with the New

---

[3] https://www.nj.gov/oag/ge/docs/Rulings/2017/may16_31/c4_lexis.pdf.
[4] https://www.rlsmedia.com/article/settlement-reached-lexisnexis-over-its-failure-make-automobile-crash-report-payments; https://policereports.lexisnexis.com/ui/coverage.
[5]https://www.njstart.gov/bso/external/purchaseorder/poSummary.sdo?docId=40692&releaseNbr=0&external=true&parentUrl=close.

Jersey Department of Labor and Workforce Development.

86. LNRS provides credit reporting services nationwide, including in New Jersey.

87. LNRS also acknowledges that it is subject to regulation in New Jersey in its privacy policies. The policies state they apply to LNRS and the "LexisNexis Risk Solutions companies." In one policy, LNRS details users' "Rights Under New Jersey Privacy Laws," including those under Daniel's Law, and explains what LNRS and the LexisNexis Risk Solutions companies must do to comply with New Jersey law. In its U.S. Consumer Privacy Notice, LNRS asserts compliance with the New Jersey Data Privacy Act.[6]

88. Defendants Richard ROES 1–10 and ABC Companies 1–10 (collectively with the defendant identified above referred to as the "Defendants") are fictitious names used for currently unknown individuals and/or corporate entities involved in the violations set forth in this Complaint. These ROES and ABC Companies are organizations and entities acting as consumer reporting agencies under the FCRA. Plaintiffs have been unable to identify these entities in part due to Defendants' apparent efforts to obscure the specific corporate actors involved in and jointly responsible for Defendants' unlawful actions.

89. Plaintiffs are informed, and on that basis allege, that Defendants are mobilizing and coordinating their members to continue harming and exacting retribution on the judges, prosecutors, law enforcement officers, and child protective investigators in the Division of Child Protection and Permanency—as well as their immediate family members—seeking protections under Daniel's Law. Like LNRS, the ROES and ABC Companies may also know that Plaintiffs never requested a security freeze or reported an identity theft, but nevertheless are perpetuating a fraud and intimidation campaign to further industry financial interests, instead of the very important safety of the public servants of this State and their families.

---

[6] https://risk.lexisnexis.com/state-privacy-act-notice.

90. To date, Defendants continue their attempts to undermine Daniel's Law and chill the exercise of its critical privacy rights, by insisting on the security freeze and misreporting an identity theft for anyone who sent them a Daniel's Law request.

91. Defendants intend to keep some of the unauthorized security freezes in place to coerce Plaintiffs into abandoning their claims for redress under Daniel's Law. And to date, Plaintiffs are not aware of Defendants correcting their disparaging statements regarding how Plaintiffs allegedly suffered identity thefts—if that damage can ever be repaired.

## JURISDICTION AND VENUE

92. This Court has jurisdiction under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, et seq., as ordered by the Court, and 28 U.S.C. § 1331, because the claim arises under federal law.

93. This Court also has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), 28 U.S.C. § 1441(a)–(b), and 28 U.S.C. § 1453, because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendants. Plaintiffs are residents of New Jersey and therefore diverse from Defendant LexisNexis Risk Solutions, Inc., which has its principal place of business in Georgia.

94. Venue is proper pursuant to 28 U.S.C. § 1391, in that Essex County is the county in which one or more of the parties reside and/or conduct business. In addition, many of the events giving rise to this action occurred in this County.

## CLAIMS AGAINST DEFENDANTS

## COUNT ONE

### VIOLATION OF 15 U.S.C. § 1681c-1 OF THE FAIR CREDIT REPORTING ACT

95. The allegations of the Complaint set forth above in paragraphs ¶¶ 1–94 are incorporated herein by reference as if set forth at length.

96. According to the direction provided in the ruling in the Memorandum and Order dated January 27, 2025, Plaintiffs bring this claim under the FCRA. *John Doe-1 v. LexisNexis Risk Solutions, Inc.*, No. 24-4566, ECF Nos. 66–67 (D.N.J. Jan. 27, 2025).

97. Defendants are consumer reporting agencies. As such, they are required to abide by the mandates of the FCRA and New Jersey Identity Theft Prevention Act. Defendants admit this in their communications to Plaintiffs. Defendants also say so on their websites and in their privacy policies.

98. Defendants have policies published online and in the LexisNexis Security Freeze Notification Letters they sent to Plaintiffs providing what a consumer needs to do and say to get a security freeze lifted or removed.

99. Upon receiving Plaintiffs' Nondisclosure Requests under Daniel's Law, Defendants (improperly) placed security freezes on each Plaintiff's consumer report. Sometime later, Defendants notified Plaintiffs of these security freezes via email and mailed letters. Each letter (incorrectly) asserted that the security freeze was placed on that Plaintiff's credit file pursuant to New Jersey state law: N.J.S.A. 56:11-44, et seq.

100. Defendants have tacitly admitted that the only statutory basis for imposing a security freeze on a consumer's report is pursuant to the FCRA, Section 1681c-1. The same statute governs the removal of security freezes. No other provision of the FCRA could authorize Defendants' conduct, as no other sections apply here.

101. Plaintiffs contacted Defendants through multiple channels—phone calls, emails, and online request forms—seeking the removal of these unauthorized security freezes. Plaintiffs complied with the legal authentication requirements when submitting these requests. However, Defendants unlawfully delayed and denied these requests, refusing to remove the security freezes within the one-hour timeframe required under the FCRA.

102. Defendants willfully violated Section 1681c-1(i) of the FCRA in the following ways,

among others:

a. Unlawfully denying or delaying compliance with Plaintiffs' requests to remove the security freezes, including:

i. Failing to remove the security freezes within one hour of receiving direct requests for removal and proper identification by toll-free telephone or secure electronic means (section 1681c-1(i)(3)(C)(i), 1681c-1(i)(3)(E));

Willful Violations

103. Section 1681n of the FRCA states that any person who willfully fails to comply with any requirement imposed under the FCRA with respect to any consumer is liable to that consumer for: (1) any actual damages sustained by the consumer as a result of the failure or damages not less than $100 and not more than $1000; (2) such amount of punitive damages as the court may allow; and (3) the costs of any successful action to enforce liability under Section 1681n, as well as reasonable attorney's fees as determined by the court.

Negligent Violations

104. In the alternative, by their above-described wrongful actions, inaction and omissions, want of ordinary care, and the resulting failure to comply with the requirements of the FCRA, Defendants negligently violated the FCRA and are liable to Plaintiffs for actual damages sustained by Plaintiffs, as well as the costs of this action and reasonable attorney's fees.

105. As a result of Defendants' negligent conduct (in addition or as an alternative to what was willful), Plaintiffs have suffered actual damages.

106. Section 1681o of the FCRA provides that any person who negligently fails to comply with any requirement of the FCRA is liable to any consumer for any actual damages as well as the costs of an action under the FCRA and reasonable attorney's fees.

107. As a result of Defendants' willful and/or negligent violations, Plaintiffs have suffered

economic harm, loss of financial opportunities, and other compensable damages.

108. Defendants' acts or omissions in causing these violations were the product of actual malice or accompanied by a wanton and willful disregard of Plaintiffs, who foreseeably could have been and were harmed by these acts or omissions. Accordingly, Plaintiffs also seek punitive damages.

## COUNT TWO

## VIOLATION OF N.J.S.A. 56:11-46 OF THE NEW JERSEY IDENTITY THEFT PREVENTION ACT

109. The allegations of the Complaint set forth above in paragraphs ¶¶ 1–108 are included herein as if set forth at length.

110. Upon receiving Plaintiffs' requests that Defendants comply with Daniel's Law, Defendants placed security freezes on Plaintiffs' consumer credit reports, in addition to misreporting identity thefts. In so doing, Defendants cited N.J.S.A. § 56:11-44, et seq., otherwise misreporting identity thefts. In so doing, Defendants cited N.J.S.A. 56:11-44, et seq., otherwise known as the New Jersey Identity Theft Prevention Act.

111. At no point did Plaintiffs authorize Defendants to place security freezes on their consumer credit reports. And at no point did Plaintiffs report any instances of identity theft.

112. Plaintiffs complied with all required procedures in order to remove or lift their security freezes under N.J.S.A. 56:11-46.

113. Defendants have failed to comply with Plaintiffs' requests to remove or lift their security freezes within three business days, as required by N.J.S.A. 56:11-46(j).

114. In some cases, Defendants appear to have removed or lifted these security freezes without the consumer providing their PIN, as required by N.J.S.A. 56:11-46(j)(2).

115. For any violations of N.J.S.A. 56:11-46, Defendants are civilly liable to Plaintiffs pursuant to N.J.S.A. 56:11-50.

116. As a result of Defendants' willful failure to comply with the Identity Theft

Prevention Act, Plaintiffs have suffered damages.

117. Defendants' deliberate and willful scheme to use unauthorized security freezes as a cudgel against covered persons who asserted their rights under Daniel's Law is precisely the sort of egregious conduct that warrants the award of punitive damages under N.J.S.A. 56:11-44, et seq.

Willful Violations

118. N.J.S.A. 56:11-38 states that any person who willfully fails to comply with any requirement imposed under Section 56:11-46 with respect to any consumer is liable to that consumer for: (1) any actual damages sustained by the consumer as a result of the failure or damages not less than $100 and not more than $1000; (2) such amount of punitive damages as the court may allow; and (3) the costs of any successful action to enforce liability under this section, as well as reasonable attorney's fees as determined by the court.

Negligent Violations

119. In the alternative, by their above-described wrongful actions, inaction and omissions, want of ordinary care, and the resulting failure to comply with the requirements of N.J.S.A. 56:11-46, Defendants negligently violated the statute and are liable to Plaintiffs for actual damages sustained by Plaintiffs, as well as the costs of this action and reasonable attorney's fees.

120. As a result of Defendants' negligent conduct (in addition or as an alternative to what was willful), Plaintiffs have suffered actual damages.

121. N.J.S.A. 56:11-39 provides that any person who negligently fails to comply with any requirement of the act is liable to any consumer for any actual damages as well as the costs of an action under this section and reasonable attorney's fees.

122. As a result of Defendants' willful and/or negligent violations, Plaintiffs have suffered economic harm, loss of financial opportunities, and other compensable damages.

123. Defendants' acts or omissions in causing these violations were the product of actual malice

or accompanied by a wanton and willful disregard of Plaintiffs, who foreseeably could have been and were harmed by these acts or omissions. Accordingly, Plaintiffs also seek punitive damages.

**COUNT THREE**

**PROMISSORY ESTOPPEL/QUASI-CONTRACT (NEW JERSEY)**

124. The allegations of the Complaint set forth above in paragraphs ¶¶ 1–123 are included herein as if set forth at length.

125. Defendants, through their written policies, communications, and representations, made clear and unambiguous promises to Plaintiffs regarding the process for removing or lifting security freezes from their consumer reports.

126. Plaintiffs reasonably and foreseeably relied upon these promises by submitting the requested documentation, following the verification procedures set forth by Defendants, and expecting timely relief from the unauthorized security freezes placed on their consumer reports.

127. Defendants failed to fulfill their promises and obligations, instead delaying, obstructing, and outright refusing to remove the security freezes, despite Plaintiffs' full compliance with Defendants' stated procedures.

128. As a direct and proximate result of Plaintiffs' reasonable reliance on Defendants' promises, Plaintiffs suffered substantial financial harm, emotional distress, and the loss of significant financial opportunities, including but not limited to the denial of loans, inability to complete financial transactions, and higher costs of credit and insurance.

129. Plaintiffs further seek injunctive relief compelling Defendants to immediately and permanently remove the security freezes imposed on their consumer reports and to implement corrective measures ensuring that future requests for security freeze removal are promptly and properly processed.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that the Court certify a Class pursuant to Fed. R. Civ.

P. 23(b)(2) and (b)(3) or, in the alternative, 23(c)(4).

**FURTHER**, Plaintiffs request that Judgment for the certified Class be entered against Defendants as follows:

A. Awarding actual damages, which may consist of any combination of compensatory damages, consequential damages, restitution, and/or return of unjust enrichment;

B. Awarding statutory damages, at minimum, of $100 to $1000 per violation;

C. Awarding an additional amount in punitive damages, to be determined by the Court, for intentional and malicious conduct as allowed under New Jersey and federal law;

D. Awarding reasonable attorneys' fees, interest (pre and post judgment) and litigation costs incurred, as provided by 15 U.S.C. §§ 1681n, 1681o; N.J.S.A. 56:11-46, 56:11-39; or any other statute or rule;

E. Declaratory relief;

F. Entering equitable or other permanent injunctive relief requiring Defendants to comply with New Jersey and federal laws; and

G. Awarding such other and further relief against Defendants as the Court deems equitable and just.

Respectfully Submitted,

**PEM LAW LLP**

Dated: September 8, 2026

By: <u>*/s/ Rajiv D. Parikh*</u>

Rajiv D. Parikh, Esq.
Kathleen Barnett Einhorn, Esq.
Jessica A. Merejo, Esq.
1 Boland Drive, Suite 101
West Orange, New Jersey 07052
Telephone: (973) 577-5500
Email: rparikh@pemlawfirm.com
kcinhorn@pemlawfirm.com
jmerejo@pemlawfirm.com

**BOIES SCHILLER FLEXNER LLP**
Adam R. Shaw, Esq. (*pro hac vice* application to be filed)
30 South Pearl Street, 12th Floor
Albany, New York 12207
Telephone: (518) 434-0600
Email: ashaw@bsfllp.com

*Attorneys for Plaintiffs*